Case No. 25-10515

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; and

LEE ZELDIN, in his official capacity as Administrator
of the United States Environmental Protection Agency,

*Respondents.*

## PETITIONER'S RESPONSE TO
## JURISDICTIONAL QUESTIONS

Ragan Whitlock
Ryan Maher
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

*Counsel for Petitioner*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Petitioner Center for Biological Diversity certifies that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Further, the following is a complete list of interested persons pursuant to Eleventh Circuit Rule 26.1-2(a) that have an interest in the outcome of this appeal, to the best of Petitioner's knowledge:

Center for Biological Diversity (Petitioner)

Luna, Mario Alfonso (Counsel for Respondents)

Maher, Ryan (Counsel for Petitioner)

Mosaic Fertilizer, LLC (Subsidiary receiving approval)

The Mosaic Company, MOS (Parent company of subsidiary receiving approval)

United States Environmental Protection Agency (Respondent)

Whitlock, Ragan (Counsel for Petitioner)

Zeldin, Lee; Administrator, Environmental Protection Agency (Respondent)

DATED: March 13, 2025

Respectfully submitted,

*/s/ Ragan Whitlock*
Ragan Whitlock

*Counsel for Petitioners*

# INTRODUCTION

Petitioner Center for Biological Diversity respectfully submits the following response to this Court's February 27, 2025 Jurisdictional Questions. Dkt. No. 2.

On February 19, 2025, the Center petitioned this Court for review of EPA's final action entitled *Notice of Approval for Other Use of Phosphogypsum*. 89 Fed. Reg. 104,535 (Dec. 23, 2024) ("Notice of Approval"). Phosphogypsum is a waste created during wet-process phosphoric acid production, and it contains appreciable quantities of uranium and its decay products, such as radium-226.[1] Additionally, phosphogypsum leachate contains many toxic constituents including arsenic, lead, nickel, cadmium, chromium, silver, antimony, copper, mercury, and thallium.[2] EPA established the maximum individual risk of fatal cancer from radon emitted by phosphogypsum stacks is 9.1 in 100,000, 54 Fed. Reg. 51,654, 51,675 (Dec. 15, 1989), and phosphogypsum may not be removed from a stack unless the proposed use is "at leas[t] as protective of public health" as placement in stacks. 40 C.F.R. § 61.206(c).

The Center filed its petition for review pursuant to Section 307(b)(1) of the Clean Air Act, the Act's judicial review provision. 42 U.S.C. § 7607(b)(1). On

---

[1] U.S. EPA, TENORM: Fertilizer and Fertilizer Production Wastes, https://www.epa.gov/radiation/tenorm-fertilizer-and-fertilizer-production-wastes.
[2] U.S. EPA, Report to Congress on Special Wastes from Mineral Processing (1990) at 12-8.

February 27, 2025, this Court directed the Center to address (1) whether the Center had to file its petition for review in the United States Court of Appeals for the District of Columbia, and (2) the Center's standing to challenge the agency action identified in the petition, the Notice of Approval. Dkt. No. 2 (the Center will refer to these as "Jurisdictional Question 1" and "Jurisdictional Question 2," respectively).

For the reasons discussed below, the Center properly filed its petition for review with this Court, rather than the D.C. Circuit. Further, the Center has standing to bring this challenge. If the Court agrees with Petitioner that it has properly asserted its standing theory, the Center reserves the right to further detail its standing allegations through sworn member and organizational declarations when appropriate.[3]

## RESPONSE TO JURISDICTIONAL QUESTIONS

I. **The Clean Air Act's judicial review provision requires the Center to petition this Court for review, rather than the D.C. Circuit.**

This Court's first jurisdictional question requests that the Center "[p]lease address whether the Center for Biological Diversity had to file its petition for

---

[3] These declarations are customarily submitted "at the first appropriate point in the review proceedings," which, unless directed otherwise by the court, "will be the petitioners opening brief." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002); *see also Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018) (submitting standing declarations along with Petitioner's opening brief).

review in the United States Court of Appeals for the District of Columbia." *See* Jurisdictional Question 1. Petitioners agree with Respondents' legal analysis in response to this question. Because the final agency action at issue in this direct appeal is (1) "locally or regionally applicable" and (2) is not "based on a determination of nationwide scope or effect" according to EPA, it "may be filed only in the United States Court of Appeals for the appropriate circuit."[4] 42 U.S.C. § 7607(b)(1).

Section 307(b)(1) sets out three situations and specifies the circuit court in which petitions for review must be filed for each. 42 U.S.C. § 7607(b)(1); *see Hunt Refin. Co. v. EPA*, 90 F.4th 1107, 1109–10 (11th Cir. 2024).

First, the D.C. Circuit is the required venue for petitions of review of "nationally applicable" final actions. Section 307(b)(1) provides that petitions for review of certain enumerated nationally applicable actions and rules (which do not include the final agency action at issue) "or any other nationally applicable regulations promulgated, or . . . final action taken . . . may be filed only in

---

[4] Should this Court determine that the Center's challenge should be heard in the D.C. Circuit instead, the Center respectfully requests that this Court transfer the Center's petition to the D.C. Circuit, rather than dismiss it. *See, e.g.*, *RMS of Georgia*, 64 F.4th at 1375 (determining that the petition for review must be heard in the D.C. Circuit under Section 307(b)(1) and transferring the case to the D.C. Circuit, instead of dismissing the case); *cf. Hunt Refining*, 90 F.4th at 1113 (dismissing petition for review instead of transferring it to the D.C. Circuit, but only because the petitioner had filed protective petitions for review in the D.C. Circuit).

the United States Court of Appeals for the District of Columbia.' 42 U.S.C. § 7607(b)(1).

Second, the United States Court of Appeals "for the appropriate circuit" is the required venue for petitions of review of "locally or regionally applicable" final actions. Section 307(b)(1) provides that petitions for review of certain enumerated locally or regionally applicable actions (which do not include the final agency action at issue) "or any other final action . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." *Id*. This is the situation that applies to the Center's petition for review.

Third, Section 307(b)(1) provides that petitions for review of "locally or regionally applicable" final actions, which would otherwise belong in the "appropriate circuit," "may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect **and** if in taking such action [EPA] finds and publishes that such action is based on such a determination." *Id.* (emphasis added).

### A.    EPA's final action is not "nationally applicable" within the meaning of Section 307(b)(1).

The first situation does not apply because the Center is not petitioning for review of a "nationally applicable" regulation or final action. To determine whether a final action is "nationally applicable," this Court, like other circuits,

begins by "analyzing the nature of the EPA's action, not the specifics of the petitioner's grievance." *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1372–73 (11th Cir. 2023) (citations omitted). Courts consider the "geographic focus" of the action to determine its applicability. *Id.* at 1373–74; *see also, e.g.*, *Sierra Club v. EPA*, 47 F.4th 738, 744 (D.C. Cir. 2022).

EPA's Notice of Approval, on its face, specifically approves of "the request for a 'Small-scale Road Pilot Project on Private Land in Florida' submitted by Mosaic Fertilizer, LLC . . ." for its New Wales facility in Polk County, Florida. *Id.* at 104,535. Accordingly, the final action at issue is distinguishable from the final actions at issue in both *Hunt Refining* and *RMS of Georgia*, which this Court determined were "nationally applicable" final actions that must be challenged in the D.C. Circuit.

In *Hunt Refining*, the final actions at issue were EPA's denial of petitioner's applications for an exemption from the Clean Air Act's Renewable Fuel Standard. 90 F.4th at 1108–09. Petitioner sought the exemption on the basis that compliance with the standard would cause petitioner's refinery in Tuscaloosa, Alabama, disproportionate economic hardship. *Id.* The final actions were nationally applicable because EPA denied petitioner's applications *in addition to* 104 other applications from other refineries *across the country*. *Id.* at 1110 (describing how the first of the final rules at issue in the case pertained to 30 refineries in 18 states

and either different federal judicial circuits, while the second final rule pertained to over 30 refineries in 15 states, also in eight federal circuits). This Court contrasted that circumstance against a case in which EPA's action was not nationally applicable because EPA "denied a 'petition to objection to a single permit for a single plant located in a single state' and had 'immediate effect only for that plant.'" *Id*. at 1110-11 (quoting *Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019)). EPA also subjected the applications at issue in *Hunt Refining* to a common "analytical framework" that did not vary based on their location.

In *RMS of Georgia*, this Court transferred the petition for review to the D.C. Circuit for similar reasons. The EPA final action at issue was the agency's allocation of permits to consume hydrofluorocarbons under the American Innovation and Manufacturing Act. 64 F.4th at 1369. EPA's allocation notice "assign[ed] allowances to firms nationwide" and "nothing in [the notice] limits the scope of EPA's action based on geography." *Id*. at 1373. Further, the permits petitioner was assigned could be transferred anywhere in the country, because the permits were allocated on a firm-specific, rather than a site-specific, basis. *Id*.

Like in *Sierra Club*, the Notice of Approval at issue, on its face, relates to a Mosaic's pilot road project in Florida. 926 F.3d at 849; *see* 89 Fed. Reg. at 104,535. Multiple projects are not being analyzed in this approval. The Notice of Approval is not nationally applicable.

**B. EPA's final action is "locally or regionally applicable" within the meaning of Section 307(b)(1).**

Rather, the Notice of Approval is locally or regionally applicable because "this Court need look only to the face of the rulemaking, rather than to its practical effects," to see that the action pertains specifically to Mosaic's New Wales facility in Polk County, Florida. *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 456 (D.C. Cir. 2013); *Sierra Club*, 926 F.3d at 849; *see* 89 Fed. Reg. at 104,535. EPA's final action resulted in "terms and conditions which limit the project to the scope of the application." 89 Fed. Reg. at 104,536; *see Sierra Club*, 47 F.4th at 744 ("In short, the challenged rules approve . . . requirements for – and only for – the Houston and Dallas areas. Those are the hallmarks of a locally or regionally applicable action, not a nationally applicable one.") (citations omitted). The other types of final actions listed as "locally or regionally applicable," like approvals of state implementation plans, can be much broader in scope than the Notice of Approval, geographically speaking, but petitions for review challenging them still may be filed only in the "appropriate circuit."[5] 42 U.S.C. § 7607(b)(1).

---

[5] The "appropriate circuit" means "the circuit within which the agency's action applies." *See Texas v. EPA*, 983 F.3d 826, 833 (5th Cir. 2020). The EPA action at issue applies to Mosaic's New Wales facility in Florida, and thus applies within the Eleventh Circuit.

**C.     EPA's final action is not based on a determination of nationwide scope or effect according to EPA.**

Given that EPA's Notice of Approval is locally or regionally applicable, rather than nationally applicable, the Center's petition for review belongs in front of this Court unless "such action is based on a determination of nationwide scope or effect **and** if in taking such action [EPA] finds and publishes that such action is based on such a determination." 42 U.S.C. § 7607(b)(1) (emphasis added). These are independent requirements that must both be met for petitions to review of locally or regionally applicable actions to be filed in the D.C. Circuit. *Sierra Club*, 47 F.4th at 745 ("The statute makes clear that the requirement that EPA make and publish a finding is distinct from the requirement that the action be based on a determination of nationwide scope or effect."). EPA did not find or publish that its Notice of Approval was based on a determination of nationwide scope or effect. A review of the Notice of Approval yields no reference to such a determination.[6] Nor

---

[6] When EPA makes such a determination, it publishes it explicitly in the Federal Register notice tied to its final agency action. *See*, *e.g.*, EPA, *Excess Emissions During Periods of Startup, Shutdown, and Malfunction; Partial Withdrawals of Findings of Failure To Submit State Implementation Plan (SIP)*, 89 Fed. Reg. 93,187, 93,192 (Nov. 26, 2024) ("this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is hereby publishing that finding in the Federal Register."); EPA, *Partial Denial of Petitions for Reconsideration: Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 89 Fed. Reg. 23,526, 23,527 (Apr. 4, 2024) ("to the extent a court finds this action or a relevant portion thereof to be locally or

does the rulemaking docket contain reference to this determination. *See* Docket No. EPA–HQ–OAR–2024–0446.

For the reasons stated above, the Section 307(b)(1) of the Clean Air Act required the Center to petition this Court for review of EPA's Notice of Approval, rather than the D.C. Circuit.

## II. The Center has standing to bring this case on behalf of its members.

This Court's second jurisdictional question requests that the Center "[p]lease address whether the Center for Biological Diversity has standing to challenge the agency action identified in the petition." Jurisdictional Question 2. The Center has standing to bring this case as a nonprofit organization on behalf of its members.

The Center is relying on a theory of associational standing in this case. To establish associational standing, the Center must, and can, show that at least one of its members has standing to sue in their own right, the Center seeks to protect interests which are germane to its organizational purposes, and the participation of individual members is not needed. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see also Sierra Club v. Johnson,* 436 F.3d 1269, 1279 (11th Cir. 2006) (finding Sierra Club had standing to bring a challenge against EPA on behalf of a member who was concerned by pollution).

---

regionally applicable, the Administrator hereby makes and publishes a finding that the action is based on several determinations of "nationwide scope or effect" within the meaning of CAA section 307(b)(1).

Under the first prong of the associational standing analysis, the Center must, and can, establish a member to have standing to sue in their own right by showing that: (1) Center members have suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision of the court. *Sierra Club v. Johnson,* 436 F.3d at 1276; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

As the Center will detail more fully through sworn declarations from its members at a late time in this litigation or at an alternative time requested by the Court, the Center has members who live in close proximity to the project site and are injured by increased hazardous air pollutant exposure from this Notice of Approval, specifically radiation exposure from radium-226, a radioactive compound that is replete in phosphogypsum. *See Texas v. NRC*, F.4th 827, 836 (5th Cir. 2023) (finding a membership organization whose members own land in proximity to a site housing radioactive materials, draw water from wells beneath the facility, and travel close by had standing to challenge a private license issuance); *see also Kelley v. Selin*, 42 F.3d 1501, 1509 (6th Cir. 1995) (petitioners who own land in proximity to a nuclear plant established standing through allegations of harms to their aesthetic interests, property values, and physical health). For example, the Center has a member that lives less than six miles from

the project site. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1265-66 (D.C. Cir. 2004) (anticipated contamination of water supplies and adverse effects from a member who lived eighteen miles from a repository of radioactive material was "more than sufficient" to establish standing).

The Center's members injuries are concrete and particularized and actual or imminent, not "generalized grievances" against the government. *Lujan*, 504 U.S. at 573-74. The injuries stem from threats of additional radiation exposure and further aquifer contamination from this project. EPA's reversal of decades-long findings that phosphogypsum in road construction carries a maximum individual cancer risk that is "significantly greater than the presumptive safe level" further threatens their health, recreational, and aesthetic interests. 57 Fed. Reg. 23,305, 23,311 (June 3, 1992).

The EPA prohibited the use of phosphogypsum in road construction—the type of use it is now approving—in 1992, citing an "unacceptable level of risk to public health." *Id*. at 23,311-12. For the first time since the 1992 finding, EPA is allowing removal of phosphogypsum from a stack for placement in roads. In so doing, EPA has tripled the acceptable cancer risk to the public in direct contravention of regulations that require any "other use" be at least as protective as placement in stacks. 57 Fed. Reg. at 23,316; 40 C.F.R. § 61.206.

EPA established in 1989 and reiterated in 1992 that the maximum individual risk of fatal cancer from radon from phosphogypsum stacks is 9.1 in 100,000. 57 Fed. Reg. at 23,306; 54 Fed. Reg. at 51,675. EPA is now relying, for the first time, on guidance—not regulation—to analyze requests under a risk factor of 3 in 10,000, a risk factor that is three times less protective.[7] The Center's members fear imminent harm of radiation exposure as a result of this Notice of Approval and EPA's reversal of what constitutes an "acceptable" risk to the public.

The project site also has an extensive history of environmental issues that have endangered the public, including massive sinkholes in 1994, 2004, 2013, and 2016, with the most recent reported sinkhole causing 215 million gallons of acidic process water and an unknown quantity of radioactive phosphogypsum to collapse into the Floridan aquifer.[8] In 2022, seismic activity demonstrating the potential to "adversely affect the integrity of the stack" drove on-site construction to a halt.[9] In late 2023, as EPA was considering this application, the facility confirmed that "Area of Interest 4" was the result of several liner tears that could potentially leak

[7] U.S. EPA, Review of the Small-Scale Road Pilot Project on Private Land in Florida Submitted by Mosaic Fertilizer, LLC, at 2 (Oct. 1, 2024); U.S. EPA, Applying to EPA for Approval of Other Uses of Phosphogypsum, at 5 (Dec. 2005).
[8] ABC News, Florida Fertilizer Plant Sinkhole Reportedly Leaks 215 Million Gallons of Radioactive Water Into Aquifer (Sept. 16, 2016), https://abcnews.go.com/US/florida-fertilizer-plant-sinkhole-reportedly-leaks-215-million/story?id=42138240.
[9] Ex. A, Letter from Vishwas Sathe, Fla. Dept. Envtl. Mgmt to Santino A. Provenzano, Mosaic Fertilizer, LLC (Oct. 21, 2021).

an unknown amount of process wastewater into the aquifer.[10] In short, this facility

has significant structural integrity concerns, which will only be exacerbated by the

increased construction activities needed for this project. *See Friends of the Earth,*

*Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (discussing

reasonable fear as a basis for standing); *Nuclear Energy Inst., Inc.,* 373 F.3d at

1266 (even though "radionuclides escaping the [facility] may not reach [member's]

community for thousands of years" his "injury is 'actual or imminent.'")

Moreover, this "pilot-project" is explicitly billed as the "intermediate step

between laboratory testing and full-scale implementation of the alternative use."[11]

In fact, the applicant did not create a risk assessment for this specific project but

attempted to "incorporate by reference" a previous assessment submitted along

with a 2019 request for nationwide use of phosphogypsum in road construction.[12]

Given that this is the first approval of phosphogypsum in road construction since

EPA prohibited it, and the project will serve as the next "step" to nationwide use,

Center members that use the Floridan aquifer for drinking water and reside near

---

[10] Tampa Bay Times, Liner tear confirmed at Mosaic's New Wales 'gypstack,' Florida regulators say (March 19, 2024), https://www.tampabay.com/news/environment/2024/03/19/liner-tear-confirmed-mosaics-new-wales-gypstack-florida-regulators-say/.

[11] U.S. EPA, Applying to the EPA for Approval of Other Uses of Phosphogypsum, at 9 (Dec. 2005); Mosaic Fertilizer, LLC, Request for Approval of Additional Uses of Phosphogypsum Pursuant to 40 C.F.R. § 61.206, at 3 (March 31, 2022).

[12] *Id*. at 2.

other phosphogypsum stacks also are threatened by this approval. This is an independent basis for the Center members' standing. Just as the Supreme Court found in *Massachusetts v. EPA* that EPA's regulation of domestic automobile emissions was a "step" toward potentially reducing greenhouse gas emissions, providing redressability of Petitioner's injuries, EPA's de-regulation of the phosphate industry by permitting this "intermediate step" provides for Petitioner's injury-in-fact. 549 U.S. 497, 504 (2007) ("That a first step might be tentative does not by itself negate federal-court jurisdiction. And reducing domestic automobile emissions is hardly tentative.").

Unlike petitioners in *Wolff v. Cash 4 Titles*, the Center's members are directly aggrieved by EPA's action. 351 F.3d 1348, 1352 (11th Cir. 2003) (finding appellants did not have standing to challenge an award of attorneys' fees award to which they were not a party). The Center's members' interests are threatened by the pollution that will result from EPA's final action. *Sierra Club v Johnson*, 436 F.3d at 1279 (finding the member's "injury in fact exists as a result of concerns about pollution" emitted by the King Finishing plant).

Because EPA's approval harms the Center's members' interests, causation and redressability "rationally follow[]." *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 316 (D.C. Cir. 2015). The injuries are more than "fairly

traceable" to EPA's final agency action, and they are likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).

The Center plainly meets the second and third requirements for associational standing. The Center's effort to protect human health and the environment from radiation exposure and aquifer contamination is germane to its organizational mission of protection and enjoyment of the environment. Relevant here, the Center works to protect biodiversity and human health from toxic substances. Further, there is no reason the claim or the relief requested requires participation of the Center's individual members.

## CONCLUSION

For the foregoing reasons, the petition for review belongs before this Court and the Center has standing. This Court has jurisdiction over this appeal.

DATED: March 13, 2025

Respectfully submitted,

*/s/ Ragan Whitlock*
Ragan Whitlock
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

*/s/ Ryan Maher*
Ryan Maher
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street, NW, Suite 1300

Washington, D.C. 20005
Tel: (781) 325-6303
Email: rmaher@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 3,636 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Ragan Whitlock*
Ragan Whitlock

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2025, I caused the foregoing to be electronically filed with the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Ragan Whitlock*
Ragan Whitlock

# Exhibit A

**Letter from Vishwas Sathe, Fla. Dept. Envtl. Mgmt to Santino A. Provenzano, Mosaic Fertilizer, LLC (Oct. 21, 2021)**



**FLORIDA DEPARTMENT OF**
**Environmental Protection**

Division of Water Resource Management
Phosphate Management Program
13051 North Telecom Parkway, Suite 101
Temple Terrace, FL 33637

**Ron DeSantis**
Governor

**Jeanette Nuñez**
Lt. Governor

**Shawn Hamilton**
Secretary

Oct. 21, 2021

Santino A. Provenzano, Director, Environmental
Mosaic Fertilizer, LLC
13830 Circa Crossing Drive
Lithia, FL 33547
Santino.Provenzano@mosaicco.com

Re:     Subsurface Activity Early Detection System
        Non-routine Report Notification
        New Wales Facility – South Phosphogypsum Stack
        Wastewater / NPDES Facility ID No. FL0036421

Dear Mr. Provenzano:

On Oct. 18, 2021, and revised on Oct. 19, 2021, Mosaic provided information to the department regarding the ongoing seismic monitoring of subsurface conditions at the South Phosphogypsum Stack (South Gypstack) at the New Wales facility. This seismic monitoring system was required as part of the permit requirements for this facility to provide early detection of any potential geologic changes in subsurface conditions at the site. The information indicated multiple acoustic detections from Oct. 8, 2021-Oct. 18, 2021 at the facility.

Based on the review of department regulatory staff, as well as the State Geologist, the department concludes that the information provided, "indicates the presence of a subsurface condition that has the potential to adversely affect the integrity of the phosphogypsum stack." Therefore, in accordance with condition VI.15 of Mosaic's wastewater permit (Permit No. FL0036421 as revised on Oct. 15, 2021), this information must be reported to the department no later than 24 hours following confirmation of its existence as a non-routine report. As such, Mosaic is required to provide a follow-up written report within seven days of this notification (by Oct. 25, 2021), that includes all of the information specified in condition VI.15 of the permit, including any actions needed to maintain the integrity of the phosphogypsum stack.

Further, in accordance with permit condition VI.11, Mosaic shall notify the department within 14 days of discovery of any such new subsurface features, "that may need further exploration to determine if stabilization is needed," and shall submit a plan for department review and approval

to address any additional exploration needed. Given the proximity of the detected acoustic emissions and the overlying boundary of the adjoining expansion area with the south slope of South Gypstack, Mosaic is advised that authorization to commence phosphogypsum stacking operations in the Phase III East area cannot be provided without knowledge of whether there are any new subsurface features that may require further exploration to determine whether stabilization is needed.

As part of its initial investigations, the department understands that Mosaic plans to conduct expedited exploratory drilling to determine whether additional steps may be needed for the continued safe operation of the South Gypstack. While Mosaic is conducting its investigations, Mosaic shall include the following requirements as part of its monitoring and investigation actions until such time as it is determined by the department these actions are no longer required for this non-routine report notification:

1. Submittal of daily reports of the number of confirmed acoustic detection events from the Subsurface Activity Early Detection System, including information describing the nature of any such subsequent detections providing the date, time, spatial location, location uncertainty, moment magnitude, and the energy of the detected acoustic event.
2. Submittal of a daily status report of the ongoing investigations, including the status of the exploratory drilling to provide additional information on the acoustic detections, and any subsequent actions to further investigate potential subsurface conditions and determine whether additional steps are needed to maintain the integrity of the phosphogypsum stack.
3. Identification, suspension, or alteration of any onsite activities (such as the currently ongoing grouting operations in near proximity of the recent readings) that may be needed to facilitate investigation of any future acoustic detections.

The department is continuing to review the information provided by Mosaic and this letter shall not be construed as the department waiving any of its authority to ensure protection of Florida's water resources under any applicable statute, rule or permit conditions. Specifically, the department is considering whether these acoustic detections constitute changes in the environment or surrounding conditions, or new information that was not available at the time of permit issuance, which may warrant revision of Mosaic's permit pursuant to Rule 62-625.325, Fla. Admin. Code.

The department emphasizes that the follow-up exploratory drilling, along with any additional steps needed to further investigate this subsurface condition, must be completed as expeditiously as possible to ensure that the environment, our water resources and Florida residents are properly protected. The department also reiterates that based on the existing permit for the facility, no phosphogypsum stacking operations can commence within the Phase III East area until the department has determined no new stabilization is needed.

Please contact Vishwas Sathe, at (813) 470-5909, or John Coates, at (850) 245-8709, if there are any questions on this response to your notification, or if you wish to arrange a meeting to further discuss this matter.

Sincerely,

Vishwas Sathe
Phosphate Management Program
Division of Water Resource Management
Florida Department of Environmental Protection

VS/jc

cc:     Dara Ford, Mosaic (Dara.Ford@mosaicco.com)
        John A. Coates, P.E., FDEP (John.Coates@floridadep.gov)
        Tim Bahr, P.G., FDEP (Tim.Bahr@FloridaDEP.gov)
        Guy "Harley" Means, P.G., FDEP (Guy.Means@dep.state.fl.us)
        John Truitt, FDEP (John.Truitt@dep.state.fl.us)