Case No. 25-10515

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and

LEE ZELDIN, in his official capacity as Administrator
of the United States Environmental Protection Agency,

*Respondents*.

MOSAIC FERTILIZER, LLC*,*

*Intervenor-Respondent.*

---

# PETITIONER'S OPENING BRIEF

---

Ragan Whitlock
Ryan Maher
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 21555
St. Petersburg, FL 33731
Tel: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

*Counsel for Petitioner*

Case No. 25-10515, *Center for Biological Diversity v. EPA, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Petitioner Center for Biological Diversity certifies that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Further, the following is a complete list of interested persons pursuant to Eleventh Circuit Rule 26.1-2(a) that have an interest in the outcome of this appeal:

Arnold & Porter Kaye Scholer LLP (Attorneys for Intervenor-Respondent)

Center for Biological Diversity (Petitioner)

Ferenc, Samuel I. (Attorney for Intervenor-Respondent)

Maher, Ryan (Attorney for Petitioner)

Mosaic Fertilizer, LLC (Intervenor-Respondent)

Preheim, Elissa J. (Attorney for Intervenor-Respondent)

The Mosaic Company, MOS (Parent company of Intervenor-Respondent)

Theodore, Elisabeth S. (Attorney for Intervenor-Respondent)

United States Environmental Protection Agency (Respondent)

Whitlock, Ragan (Attorney for Petitioner)

Zeldin, Lee; Administrator, Environmental Protection Agency (Respondent)

*/s/ Ragan Whitlock*
Ragan Whitlock

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to F.R.A.P. 34(a)(1) and 11th Cir. R. 28-1(c), Petitioner Center for Biological Diversity respectfully requests oral argument. The issues raised in this case—deriving from the United States Environmental Protection Agency's approval of a request to use radioactive phosphogypsum in road construction—presents multiple issues of first impression, and it is relatively rare that Clean Air Act cases are litigated in this Court. Oral argument would assist the Court's review of the facts and legal issues presented.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ........................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .................................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES........................................................................ iv

ACRONYMS AND ABBREVIATIONS ................................................................. ix

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE CASE...........................................................................3

    I.    Statutory and Regulatory Framework ............................................3

        A.    The Clean Air Act and NESHAP........................................4

        B.    EPA's listing of radionuclides .........................................6

        C.    1990 Amendments to the Act............................................6

        D.    NESHAP for Phosphogypsum Stacks .................................8

           1.    Original NESHAP for Phosphogypsum Stacks.....................9

           2.    Revised NESHAP for Phosphogypsum Stacks ....................10

           3.    The "other purposes" provision .................................13

    II.    Mosaic's Road Project.....................................................14

    III.    Administrative Proceedings .............................................15

    IV.    Statement of the Standard and Scope of Review .........................16

SUMMARY OF THE ARGUMENT .........................................................18

STANDING..........................................................................................21

ARGUMENT .......................................................................................23

I.    EPA's approval of the Road Project must be rejected because the agency cannot interpret "other purposes" to include road construction projects without a new rulemaking. ...................................................................................23

    A.    EPA cannot interpret the "other purposes" provision to include road construction without a rulemaking..................................................................24

        1.    EPA definitively rejected road construction as an "other purpose.".......24

        2.    EPA cannot reverse its exclusion of road construction projects without a new rulemaking. ...................................................................................26

        3.    EPA's Response to the Center's Comments does not justify its interpretation.....................................................................................32

    B.    EPA's interpretation contravenes the judicial review requirements of the Clean Air Act.........................................................................................34

    C.    The Court has jurisdiction over this as-applied challenge to EPA's reliance on the "other purposes" provision. .....................................................37

II.    EPA's Assessment Arbitrarily Applied a Reduced Safety Threshold in Contravention of the Plain Language and History of Section 61.206...................38

III.    EPA's Approval Unlawfully Departs from the Required Analysis of "Other Purpose" Applications. ...............................................................................44

    A.    EPA fails to estimate maximum individual risk by neglecting pathways that consistently yielded the highest cancer risks and limiting others...............45

    B.    EPA unlawfully accepted stale, unverifiable radium-226 testing data in contravention of its own guidance. .............................................................51

IV.    Remedy.............................................................................................54

CONCLUSION.........................................................................................56

CERTIFICATE OF COMPLIANCE ....................................................................57

STANDING DECLARATIONS

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Advanced Energy United, Inc. v. FERC*
 82 F.4th 1095 (D.C. Cir. 2023) ...................................................................27

*Alabama v. PCI Gaming Auth.*
 801 F.3d 1278 (11th Cir. 2015) ..................................................................38

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*
 988 F.2d 146 (D.C. Cir. 1993) ....................................................................54

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*
 717 F.3d 851 (11th Cir. 2013) ....................................................................37

*Am. Lung Ass'n v. EPA*
 134 F.3d 388 (D.C. Cir. 1998) ............................................................. 18, 50

*BBX Capital v. Fed. Deposit Ins. Corp.*
 956 F.3d 1304 (11th Cir. 2020) ........................................................ 17, 44, 49

*Benitez v. City of Orlando*
 2025 U.S. Dist. LEXIS 99997 (M.D. Fla. 2025) ..........................................41

*Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*
 781 F.3d 1271 (11th Cir. 2015) ............................................................. 54, 55

*Blanco v. Samuel*
 91 F.4th 1061 (11th Cir. 2024) ...................................................................41

*Burlington Truck Lines v. United States*
 371 U.S. 156 (1962) ...................................................................................37

*Cal. Cmty. Against Toxics v. EPA*
 688 F.3d 989 (9th Cir. 2012) ......................................................................56

*Christopher v. SmithKline Beecham Corp.*
 567 U.S. 142 (2012) ...................................................................................29

*Citizens to Preserve Overton Park, Inc. v. Volpe*
 401 U.S. 402 (1971) ...................................................................................17

*City of Idaho Falls v. FERC*
 629 F.3d 222 (D.C. Cir. 2011) ........................................................ 27, 28, 33

*Ctr. for Biological Diversity, Manasota-88 v. United States Army Corps of Eng'rs*
 941 F.3d 1288 (11th Cir. 2019) ....................................................................2

*Eagle Cnty. v. Surface Transp. Bd.*
 82 F.4th 1152 (D.C. Cir. 2023) ...................................................................54

*Environmental Defense Fund v. EPA*
 852 F.2d 1316 (1988) ...................................................................................8

*Environmental Defense Fund v. EPA*
 852 F.2d 1316 (D.C. Cir. 1988) ....................................................................2

*FCC v. Fox TV Stations, Inc.*
  556 U.S. 502 (2009) .......................................................................... 18, 20
*FDA v. Wages*
  145 S. Ct. 898 (2025)......................................................................... 28, 53
*Fed. Power Comm'n v. Florida Power & Light Co.*
  404 U.S. 453 (1972) .................................................................................18
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
  528 U.S. 167 (2000) .................................................................................21
*Ft. Stewart Schools v. FLRA*
  495 U.S. 641 (1990) ....................................................................... 39, 42, 44
*Global Green, Inc. v. SEC*
  631 Fed. Appx. 868 (11th Cir. 2015).......................................................29
*Golden Living Ctr. – Mt. View v. Sec'y of HHS*
  832 Fed. Appx. 967 (6th Cir. 2020).........................................................29
*Gonzales v. Oregon*
  546 U.S. 243 (2006) .................................................................................27
*Hunt v. Washington State Apple Advertising Comm'n*
  432 U.S. 333 (1977) .................................................................................21
*IAL Aircraft Holding, Inc. v. FAA*
  206 F.3d 1042 (11th Cir. 2000).................................................................27
*Kelley v. Selin*
  42 F.3d 1501 (6th Cir. 1995).....................................................................22
*Kisor v. Wilke*
  588 U.S. 558 (2019) .................................................................................17
*Long Island Care at Home, Ltd. v. Coke*
  551 U.S. 170 (2007) .................................................................................29
*Loper Bright Enters. v. Raimondo*
  144 U.S. 2244 (2024) ...............................................................................17
*Lujan v. Defs. of Wildlife*
  504 U.S. 555 (1992) .................................................................................21
*Michigan v. EPA*
  576 U.S. 743 (2015) ...................................................................................7
*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance*
  463 U.S. 29 (1983) ............................................................................. 17, 45
*Nat'l Ass'n of Home Builders v. EPA*
  682 F.3d 1032 (D.C. Cir. 2012) ...............................................................31
*NRDC v. EPA*
  489 F.3d 1250 (D.C. Cir. 2007) ...............................................................54
*NRDC v. EPA*
  824 F.2d 1146 (D.C. Cir. 1987) ...............................................................40

*Nuclear Energy Inst., Inc. v. EPA*
373 F.3d 1251 (D.C. Cir. 2004) ..................................................................22

*Perez v. Mortg. Bankers Ass'n*
575 U.S. 92 (2015) ....................................................................................30

*Rafferty v. Denny's, Inc.*
13 F.4th 1166 (11th Cir. 2021) ............................................................ 17, 27

*Sabra v. Pompeo*
453 F. Supp. 3d 291 (D.D.C. 2020) ............................................................8

*SEC v. Levin*
849 F.3d 995 (11th Cir. 2017) ..................................................................41

*Sierra Club v. EPA*
353 F.3d 976 (D.C. Cir. 2004) ....................................................................6

*Sierra Club v. EPA*
895 F.3d 1 (D.C. Cir. 2018) ......................................................................43

*Sierra Club v. Flowers*
526 F.3d 1353 (11th Cir. 2008) ........................................................... 54, 55

*Sierra Club v. Johnson*
436 F.3d 1269 (11th Cir. 2006) ........................................................... 16, 46

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*
985 F.3d 1032 (D.C. Cir. 2021) ................................................................56

*Texas v. NRC*
78 F.4th 827 (5th Cir. 2023) .....................................................................21

*Thomas Jefferson Univ. v. Shalala*
512 U.S. 504 (1994) ..................................................................................27

*Utah v. EPA*
2025 U.S. App. LEXIS 10694 (D.C. Cir. 2025)........................................31

*West Virginia v. EPA*
597 U.S. 697 (2022) ....................................................................................4

*White Stallion Energy Center v. EPA*
748 F.3d 1222 (D.C. Cir. 2014) ..................................................................7

*Williams v. Mosaic Fertilizer, LLC*
2016 U.S. Dist. LEXIS 192236 (M.D. Fla. 2016)........................................2

*Wright v. FEMA*
913 F.2d 1566 (11th Cir. 1990)..................................................................27

*Wy. Outdoor Council v. U.S. Forest Serv.*
165 F.3d 43 (D.C. Cir. 1999) ....................................................................41

**Statutes**

42 U.S.C. § 7401(b)(1)..............................................................................3

42 U.S.C. § 7401(c) ..................................................................................3

42 U.S.C. § 7411(a)(3)..............................................................................5

42 U.S.C. § 7412 ......................................................................................4

42 U.S.C. § 7412(a)(1)..............................................................................5

42 U.S.C. § 7412(a)(2)..............................................................................5

42 U.S.C. § 7412(a)(3)..............................................................................5

42 U.S.C. § 7412(a)(6)..............................................................................7

42 U.S.C. § 7412(b)(1)...........................................................................6, 7

42 U.S.C. § 7412(b)(2)..............................................................................7

42 U.S.C. § 7412(c) ..................................................................................8

42 U.S.C. § 7412(c)(1)..............................................................................5

42 U.S.C. § 7412(c)(5)..............................................................................5

42 U.S.C. § 7412(d) ..................................................................................4

42 U.S.C. § 7412(d)(1).........................................................................5, 31

42 U.S.C. § 7412(d)(1)–(2)........................................................................8

42 U.S.C. § 7602(k) ..................................................................................5

42 U.S.C. § 7607(b)(1)...................................................................1, 24, 34

5 U.S.C. § 553 ........................................................................................31

5 U.S.C. § 702 ..........................................................................................1

5 U.S.C. § 706 ........................................................................................17

5 U.S.C. § 706(2)(A).................................................................................16

Pub. L. No. 101-549, 104 Stat. 2531 (1990)..................................................7

Pub. L. No. 91-604, § 112(b)(1)(B), 84 Stat. 1676 (1970) ............................5, 6

Pub. L. No. 91-604, § 112, 84 Stat. 1676 (1970)............................................4

Pub. L. No. 91-604, §112(b)(1)(A)–(B), 84 Stat. 1676 (1970) ........................10

Pub. L. No. 91-604, §112(b)(1)(A), 84 Stat. 1676 (1970)................................4

Pub. L. No. 95-95, § 401(c), 91 Stat. 685 (1977) ...........................................4

**Other Authorities**

44 Fed. Reg. 76,738 (Dec. 27, 1979) ............................................................6

54 Fed. Reg. 51,654 (Dec. 15, 1989)................................... 6, 8, 9, 10, 39, 40

57 Fed. Reg. 23,305 (June 3, 1992) ............ 2, 8, 9, 10, 11, 12, 22, 39, 40, 41, 42, 43

89 Fed. Reg. 104,535 (Dec. 23, 2024) .......................................................1, 16

89 Fed. Reg. 81,910 (Oct. 9, 2024)..............................................................14

**Rules**

Fed. R. Evid. 201(b)(2) ................................................................................8

**Regulations**

40 C.F.R. § 61.01(a) ....................................................................................6

40 C.F.R. § 61.204 ........................................................... 12, 25, 32, 42

40 C.F.R. § 61.205 ........................................................................ 12, 25

40 C.F.R. § 61.206 ........................................................... 13, 14, 39, 43

40 C.F.R. § 61.206(a) ............................................................... 13, 26

40 C.F.R. § 61.206(b) ...............................................................................13

40 C.F.R. § 61.206(b)(8) ..........................................................................45

40 C.F.R. § 61.206(c) ........................................................... 19, 39, 45, 51

40 C.F.R. §§ 61.204–205 ........................................................................43

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Center | Center for Biological Diversity |
| EPA | U.S. Environmental Protection Agency |
| HAP | Hazardous Air Pollutant |
| Mosaic | Mosaic Fertilizer LLC |
| MIR | Maximum Individual Risk |
| NESHAP | National Emission Standard for Hazardous Air Pollutants |
| Road Project | The Mosaic Company's road project approved by the final agency action at issue |

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1)[1] and 5 U.S.C. § 702 to review the Center's appeal of EPA's final action entitled "Notice of Approval for Other Use of Phosphogypsum," 89 Fed. Reg. 104,535 (Dec. 23, 2024), "Appendix Document ("Doc.") 2 [hereinafter "Notice of Approval"].[2] The Center timely filed its petition for review on February 19, 2025, within 60 days of publication of the action in the *Federal Register*. 42 U.S.C. § 7607(b)(1).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.      Whether EPA improperly interpreted "other purposes" for which phosphogypsum may be used to include a road project, where the agency rejected all road projects as an "other purpose" for phosphogypsum when promulgating the applicable regulation, 40 C.F.R § 61.206.

II.     Whether EPA's assessment arbitrarily applies a reduced safety threshold in contravention of the plain language and history of Section 61.206.

III.    Whether EPA's approval unlawfully departs from the requirements necessary to analyze "other purpose" applications.

---

[1] The statutes, regulations, and Federal Register notices supporting this brief are set forth in a separate Statutory and Regulatory Addendum filed with the Court.
[2] *See also* Center for Biological Diversity, Response to Jurisdictional Questions, Dkt. No. 10, at 4–11 (Mar. 13, 2025) (discussing why this Court has jurisdiction).

**INTRODUCTION**

Phosphogypsum is a radioactive waste left over from processing phosphate ore into phosphate-based fertilizer. 57 Fed. Reg. 23,305, 23,3106–12 (June 3, 1992) [hereinafter "1992 Rule"]. Phosphogypsum is associated with cancer, genetic damage, and serious illness. *Id*. For the past 36 years, Respondents, the Environmental Protection Agency and its Administrator ("EPA"), have required that phosphogypsum be initially stored in large, open-air stacks to protect the public from the heavy metals and radon gas that can disseminate into the air and water. *Ctr. for Biological Diversity, Manasota-88, Inc. v. United States Army Corps of Eng'rs*, 941 F.3d 1288, 1294 (11th Cir. 2019); *Williams v. Mosaic Fertilizer, LLC*, 2016 U.S. Dist. LEXIS 192236, *2 (M.D. Fla. 2016).

Today, over one billion tons of phosphogypsum are stacked in Florida, with each ton of phosphate product generating five times the amount of phosphogypsum. *Ctr. for Biological Diversity*, 941 F.3d at 1294, 1306. Instead of following its own "policy of waste minimization" to reduce the generation of phosphogypsum in the first place, EPA continues to entertain alternative disposal options that increase cancer risk for the public. 1992 Rule at 23,314; *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1322 (D.C. Cir. 1988) ("annual disposal of phosphogypsum from phosphoric acid plants is approximately 47 million metric tons").

EPA now approves a road project using phosphogypsum in its base, despite rejecting—absolutely and without qualification—all road projects as a possible purpose for phosphogypsum when promulgating the relevant regulations. EPA also fundamentally alters it approach to assessing cancer risks from uses of phosphogypsum in a way that fails to meet the requirement of its regulations and will, without vacatur, affect all approvals moving forward, ultimately weakening protections meant to prevent radiation-based cancers.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Framework

Congress enacted the Clean Air Act in 1970 to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again." H.R. Rep. No. 91–1146, 91st Cong., 2d Sess. 1, 1, (1970) *as reprinted in* 1970 U.S.C.C.A.N. 5356, 5356; *see also* 42 U.S.C. § 7401(b)(1) (declaring that one of the fundamental purposes of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare"). A "primary goal" of the Clean Air Act is "pollution prevention." 42 U.S.C. § 7401(c).

In furtherance of this goal, the Clean Air Act requires EPA to promulgate regulations to reduce emissions of an especially pernicious category of pollutants

3

called Hazardous Air Pollutants ("HAPs"), which cause cancer, genetic harm, and brain damage, among other dangerous health effects. 42 U.S.C. § 7412(b)(2), (d). These regulations are referred to as National Emission Standards for Hazardous Air Pollutants ("NESHAP").

### A.    The Clean Air Act and NESHAP

The passage of the Clean Air Act in 1970 resulted in a major shift in the federal government's role in controlling air pollution and authorized three major regulatory programs that today represent cornerstones of the Clean Air Act. *West Virginia v. EPA*, 597 U.S. 697, 707 (2022). Among these was the NESHAP program for reducing HAP emissions, codified at Section 112 of the Act. 42 U.S.C. § 7412, Pub. L. No. 91-604, § 112, 84 Stat. 1676, 1685 (1970).

The original NESHAP program defined HAPs as "air pollutants … which in the judgment of the [EPA] Administrator cause[], or contribute[] to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 401(c), 91 Stat. 685, 791 (1977).

The NESHAP program required EPA to publish a list containing "each hazardous air pollutant for which [it] intends to establish an emission standard." § 112(b)(1)(A), 84 Stat. at 1685. An "emission standard" is a "requirement . . . which limits the quantity, rate or concentration of emissions of air pollutants on a

continuous basis, including . . . any design, equipment, work practice or operational standard." 42 U.S.C. § 7602(k). These emission standards, *i.e.*, NESHAP, control pollution from "stationary sources,"[3] like phosphogypsum stacks, rather than mobile sources, like cars and trucks. 42 U.S.C. § 7412(a)(1), (2); (c)(1), (5).

After listing a HAP, the original NESHAP program required EPA to promulgate an emission standard for controlling emissions of the HAP from its sources within a specific timeframe. § 112(b)(1)(B), 84 Stat. at 1685.

The NESHAP program required, and still requires, EPA to promulgate emission standards for pollution sources in the form of <u>regulations</u> via administrative rulemaking. § 112(b)(1)(A)–(B), 84 Stat. at 1685; 42 U.S.C. § 7412(d)(1).

To meet these requirements, EPA must evaluate the risk posed by sources that emit HAPs. As the D.C. Circuit has described, "EPA followed a *risk-based* analysis to set emission standards under the statute, meaning that EPA considered levels of HAPs at which health effects are observed, factored in an 'ample margin of safety to protect the public health,' and set emission restrictions

---

[3] A "stationary source" is "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. §§ 7411(a)(3), 7412(a)(3).

5

accordingly." *Sierra Club v. EPA*, 353 F.3d 976, 979 (D.C. Cir. 2004) (emphasis in original) (citing § 112(b)(1)(B), 84 Stat. at 1685).

### B.    EPA's listing of radionuclides

Under the original NESHAP program, EPA listed "radionuclides" as a HAP in 1979. 44 Fed. Reg. 76,738 (Dec. 27, 1979); *see also* 40 C.F.R. § 61.01(a). Radionuclides are harmful radioactive elements, and include the radon emitted from phosphogypsum stacks. 54 Fed. Reg. 51,654, 51,658–59 (Dec. 15, 1989) [hereinafter, "1989 Rule"]; *see* 42 U.S.C. § 7412(b)(1) (listing "Radionuclides (including radon)" as a HAP).

EPA listed this class of pollutants as a HAP after determining that "radionuclides are a known cause of cancer and genetic damage" and that radionuclides cause or contribute to air pollution that may reasonably be anticipated to result in "an increase in mortality or an increase in serious irreversible or incapacitating reversible illness." 1989 Rule at 51,657; 44 Fed. Reg. at 76,738.

### C.    1990 Amendments to the Act

EPA, however, only listed seven other HAPs under the original NESHAP program, between 1970 and 1990. 40 C.F.R. § 61.01(a). The original program "proved to be disappointing." *Sierra Club*, 353 F.3d at 979 ("Very little has been

done since the passage of the 1970 [Clean Air Act] to identify and control hazardous air pollutants" (quoting S. Rep. No. 101-228, at 3 (1989))).

Frustrated by EPA's slow progress in regulating HAPs under the 1970 Clean Air Act, Congress substantially amended the NESHAP program in 1990—the last time the Act was significantly amended—to ensure that EPA would require prompt, permanent, and ongoing regulation of HAPs. Pub. L. No. 101-549, 104 Stat. 2531 (1990); *see White Stallion Energy Center v. EPA*, 748 F.3d 1222, 1230 (D.C. Cir. 2014), *rev'd on other grounds, Michigan v. EPA*, 576 U.S. 743 (2015).

The core of the NESHAP program, however, remains the same. EPA must maintain and revise a list of HAPs. 42 U.S.C. § 7412(b)(2). HAPs are now defined as pollutants that:

> . . . present, or may present, . . . a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise.

*Id*. § 7412(a)(6), (b)(2). Radionuclides, including radon, remain listed HAPs requiring NESHAP. 42 U.S.C. § 7412(b)(1).

Under the revised NESHAP program, EPA must still identify sources of listed HAPs, evaluate their risk to public health and the environment, and

7

promulgate emission standards the sources must abide by to reduce their emissions. 42 U.S.C. § 7412(c), (d)(1)–(2).

### D.    NESHAP for Phosphogypsum Stacks

Phosphogypsum is the radioactive, carcinogenic, and toxic residual waste generated by the production of phosphate-based fertilizers.[4] Phosphogypsum stacks contain high concentrations of the radionuclides uranium and radium. 1989 Rule at 51,674. The presence of radium in the stacks causes them to release radon into the atmosphere, itself a radionuclide, and the HAP of concern in this matter. *Id*. at 51,658, 51,674; 1992 Rule at 23,306. Five tons of phosphogypsum are produced for each ton of phosphate fertilizer. *Environmental Defense Fund,* 852 F.2d at 1322.

Radon is an odorless, colorless, radioactive gas.[5] The radon emitted from phosphogypsum causes cancer and presents a variety of other threats to human health and the environment. *Supra* n.5; 1989 Rule at 51,659. Crucially, EPA assumes radon to be a non-threshold pollutant, meaning any amount of radon can

---

[4] *See* EPA, Background Information Document, Potential Uses of Phosphogypsum and Associated Risks ("Doc. 9") at 2-1—2-2, 2-6, 2-8 (May 1992).

[5] EPA, Radionuclide Basics: Radon, https://www.epa.gov/radiation/radionuclide-basics-radon. The Center requests that the Court take judicial notice of documents from the federal government's websites as a "source[] whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Sabra v. Pompeo*, 453 F. Supp. 3d 291, 302 (D.D.C. 2020) (taking notice of federal government's "official website").

cause cancer, typically manifesting in lung cancer. 1989 Rule at 51,659, 51,663; 1992 Rule at 23,307, 23,314. Also, once radon induces a cancer, the severity of the cancer "is independent of the dose," meaning that any non-zero amount of radon can cause cancer of any severity. 1989 Rule at 51,659.

EPA estimates that about 21,000 lung cancer deaths each year in the United States are radon-related.[6] Exposure to radon is the second leading cause of lung cancer after smoking. *Id*. For most people, radon is the single greatest environmental source of radiation exposure. *Id*.

Additionally, EPA has identified widespread groundwater contamination near phosphogypsum stacks, contaminated off-site wells and drinking water sources, and a lengthy history of harmful, unlawful releases and environmental damages caused by phosphogypsum. EPA Report to Congress on Special Wastes from Mineral Processing, at 12–13 (July 1990).[7]

### 1.    Original NESHAP for Phosphogypsum Stacks

EPA's listing of radionuclides as a HAP in 1979 triggered the 1970 Clean Air Act's requirement to establish a NESHAP for radionuclides at a level which "provides an ample margin of safety to protect the public health" from the HAP. §

---

[6] EPA, Radionuclide Basics: Radon, *see supra n*.5.

[7] *Available at* https://www.epa.gov/sites/default/files/2015-05/documents/ 10001aze.pdf. We request that the Court take judicial notice of this EPA resource. *See supra* n.5; *see also, e.g.*, *Goldstein v. Exxon Mobil Corp.*, 2019 U.S. Dist. LEXIS 174025 (C.D. Cal. 2019) (taking judicial notice of an EPA report).

112(b)(1)(A)–(B), 84 Stat. at 1685. To meet this requirement, EPA in 1989 identified multiple categories of sources of radionuclides that should be subject to specific NESHAP, including phosphogypsum stacks. 1989 Rule at 51,674.

When creating the original NESHAP for phosphogypsum stacks, EPA imposed the requirement that phosphogypsum "be disposed of in stacks or old phosphate mines," without allowing any other emission standard or disposal practice. *Id*. at 51,675.

EPA thereby created the original NESHAP for "Radon Emissions from Phosphogypsum Stacks," codified in its regulations at 40 C.F.R. Pt. 61, Subpt. R ("Subpart R"). 40 C.F.R. § 61.200–61.205 (1989).

### 2.    Revised NESHAP for Phosphogypsum Stacks

After promulgating this original NESHAP for phosphogypsum stacks, EPA received multiple petitions to reconsider its 1989 decision from fertilizer companies and a fertilizer industry trade group. 1992 Rule at 23,305, 23,307. In response, EPA undertook a "limited reconsideration of the portion of the phosphogypsum NESHAP . . . which required disposal of phosphogypsum in stacks or mines." *Id*.

In the 1992 Rule—the final result of that limited reconsideration process— EPA created the NESHAP for phosphogypsum stacks in place today, still codified at Subpart R.

10

The 1992 Rule retained the NESHAP from the 1989 Rule requiring that phosphogypsum be initially disposed of in a phosphogypsum stack or mine. 40 C.F.R. § 61.202; 1992 Rule at 23,315–16.

EPA, however, evaluated the risks of using phosphogypsum removed from stacks for other purposes. Specifically, EPA evaluated seven scenarios involving agricultural applications of phosphogypsum, one scenario involving indoor research and development activities with phosphogypsum, and four scenarios involving the use of phosphogypsum in the construction of roads to estimate the cancer risk posed by these purposes. *Id.* at 23,308–11.

The purpose of evaluating these scenarios was to identify the risk of cancer posed by each of the uses to the general public, segments of the population especially vulnerable to cancer, people living on contaminated land, and workers. *Id*. at 23,306. EPA evaluated the risk based on the greatest "maximum individual lifetime risk of fatal cancer" to individuals in those groups. *Id*. EPA defined maximum individual risk as "the maximum additional cancer risk imposed on a person due to exposure to a pollutant for a 70-year lifetime." *Id*. at 23,311.

As a result of this risk analysis, EPA allowed that "[p]hosphogypsum may be lawfully removed from a stack and distributed in commerce for use in outdoor agricultural research and development and agricultural field use" if certain testing and certification requirements to control radon emissions are met. 40 C.F.R. §

11

61.204. EPA similarly allowed for the removal of phosphogypsum from stacks for "use in indoor research and development activities," provided testing and certification requirements are met. *Id*. § 61.205.

EPA, however, unequivocally rejected the use of phosphogypsum in all road projects as an other purpose for which phosphogypsum could be used. 1992 Rule at 23,311. EPA found that "[i]n contrast" to the agricultural and indoor research uses, "regardless of the radium[] concentration in phosphogypsum, the use of phosphogypsum in road construction **always** resulted in a [maximum individual cancer risk] significantly greater than the presumptively safe level." *Id.* at 23,311 (emphasis added). EPA went on to state: "Therefore, EPA has determined that the use of phosphogypsum in road construction presents an unacceptable level of risk to public health." *Id*. at 23,312. As a result, EPA did not supplement the NESHAP for phosphogypsum stacks to allow removal of phosphogypsum from a stack for use in road construction.

This conclusion, which the Center agrees with, and thus had no reason to appeal, has never been reversed and it remains in 40 C.F.R. § 61, Subpart R, *sub silencio*, in the form of Subpart R not authorizing the use of phosphogypsum in roads.

### 3.   The "other purposes" provision

In addition to rejecting all road construction projects as an "other purpose" for which phosphogypsum may be used, while allowing agricultural and indoor research uses, EPA also created an "other purposes" provision through the 1992 Rule. 40 C.F.R. § 61.206. Pursuant to this provision, "phosphogypsum may not be lawfully removed from a stack and distributed or used for any purpose not expressly specified in § 61.204 [for an agricultural use] or § 61.205 [for an indoor research use] without prior approval." 40 C.F.R. § 61.206(a).

Any person who wants to remove phosphogypsum from a stack and use it for any "other purpose" must apply to EPA for approval. 40 C.F.R. § 61.206(b). Applications must include details about the applicant, the project, the risk posed by the use, and the intended pollution control measures. *Id*. Importantly, EPA can only approve use of phosphogypsum for an "other purpose[]" if the Administrator determines that the proposed use "is at leas[t] as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. § 61.206(c).

The "other purposes" provision is entirely unique among all the NESHAP EPA has promulgated. No source has ever been approved and constructed pursuant to this provision. Neither the provision, nor an "other purpose" approved under it, have ever been subject to judicial review.

13

## II.    Mosaic's Road Project

Under EPA's "other purposes" provision, 40 C.F.R. § 61.206, Intervenor-Respondent Mosaic Fertilizer LLC ("Mosaic") requested EPA's approval for the use of phosphogypsum in a road construction project in March 2022. Pending Approval for Other Use of Phosphogypsum, ("Doc. 1"), 89 Fed. Reg. 81,910, 81,911 (Oct. 9, 2024); *See* Request For Approval of Additional Uses of Phosphogypsum Pursuant to 40 C.F.R. § 61.206 ("Mosaic Application") ("Doc. 3").

Mosaic plans to construct four sections of "test road," with varying mixtures of radioactive phosphogypsum sourced from a nearby stack in the road base, at its New Wales Facility in Polk County, Florida. *See* Review of the Small-Scale Road Pilot Project on Private Land in Florida Submitted by Mosaic Fertilizer, LLC ("EPA Assessment") ("Doc. 4") at 15. The Road Project will be constructed in place of an existing facility road near the phosphogypsum stack at the New Wales Facility and is estimated to use 1,200 tons of phosphogypsum across 3,200 feet of roadway. 89 Fed. Reg. at 81,910; EPA Assessment, Doc. 4 at 4.

EPA and Mosaic have characterized this as a "pilot project." 89 Fed. Reg. at 81,911. The goal, according to Mosaic, is "to demonstrate the range of [phosphogypsum] road construction designs that meet the Florida Standard Specifications for Road and Bridge construction." *Id*. Additionally, the Road

14

Project, as a "pilot project," serves as the "intermediate step between laboratory testing and full-scale implementation of the alternative use." *See* Applying to EPA for Approval of Other Uses of Phosphogypsum: Preparing and Submitting a Complete Petition Under 40 CFR 61.206, A Workbook ("EPA Guidance") (Doc. 10) at 9.

### III.    Administrative Proceedings

Mosaic submitted its application for the Road Project to EPA in March 2022 and submitted a revised application in August 2023. EPA Assessment, Doc. 4 at 2. On October 9, 2024, EPA issued a "pending approval of the request," published notice of its proposed approval in the *Federal Register*, and solicited public comments. Doc. 1 at 81,910.

The Center submitted detailed technical comments on the proposed approval on November 23, 2024. *See* Comment Submitted by the Center for Biological Diversity, ("Doc. 7"). The Center detailed its concerns regarding, *inter alia*, (1) EPA's use of the "other purposes" provision to approve the Road Project where EPA has already unequivocally determined that all road construction projects cannot qualify as an other purpose for phosphogypsum; (2) the agency's arbitrary decision to apply a lower safety threshold when evaluating the cancer risk of the Road Project; and (3) the agency's arbitrary decision to severely limit the scope of its risk analysis to avoid considering crucial risks posed by the Road Project. *Id*.

15

Despite the problems raised by the Center—and by over twenty thousand individuals, dozens of environmental groups, and a member of Congress—EPA responded to the comments on December 11, 2024, without making any changes to its proposed approval of the Road Project. Response to Comments (Dec. 11, 2024), ("Doc. 5") [hereinafter, "2024 Response to Comments"]. EPA informed Mosaic of the project approval via a December 20, 2024 letter. Letter from EPA on Final Approval for Revised Mosaic Request ("Doc. 6").

EPA then published the Notice of Approval in the *Federal Register* on December 23, 2024. Doc. 2 at 104,535. The Center timely petitioned this Court for review of the Notice of Approval on February 19, 2025.

## IV.    Statement of the Standard and Scope of Review

Because the Clean Air Act does not set forth an independent standard of review, the standard of review applicable to EPA's final action derives from the Administrative Procedure Act ("APA"). *Sierra Club v. Johnson*, 436 F.3d 1269, 1273 (11th Cir. 2006). Under this standard, courts must set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Sierra Club*, 436 F.3d at 1273.

The APA "specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they

16

interpret it.*" Loper Bright Enters. v. Raimondo*, 144 U.S. 2244, 2261 (2024) (quoting 5 U.S.C. § 706). Further, before deferring to an agency's interpretation of its own regulation, a regulation must be "genuinely ambiguous," *Kisor v. Wilke*, 588 U.S. 558, 563 (2019) and before that a court must "carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (citing *Kisor*, 588 U.S. at 563).

Additionally, while courts afford "deference . . . when the agency is making decisions within its area of special expertise," they "[n]evertheless . . . may find an agency action 'arbitrary and capricious where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *BBX Capital v. Fed. Deposit Ins. Corp.*, 956 F.3d 1304, 1314–15 (11th Cir. 2020); *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Additionally, if the action fails to meet statutory requirements, the court must vacate the agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971).

The grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. *State Farm*, 463 U.S. at 43. Moreover, an agency cannot disregard the facts and circumstances of its prior policies without further justification. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515–16 (2009). EPA's action must ultimately have a "substantial basis in fact." *Fed. Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463 (1972).

Courts have further held that, under the Clean Air Act, where Congress has "delegated to an administrative agency the critical task of assessing the public health and the power to make decisions of national importance in which individuals' lives and welfare hang in the balance," EPA has the "heaviest of obligations" to explain its reasoning. *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 392 (D.C. Cir. 1998).

## SUMMARY OF THE ARGUMENT

I.    EPA's decision is unlawful and contrary to the "other purposes" provision in Subpart R because EPA unequivocally rejected all road projects as an "other purpose" for which phosphogypsum could be used in the 1992 Rule. EPA cannot now interpret the term "other purposes" to include a road project through the Notice of Approval at issue.

18

Such an interpretation is invalid because it directly contradicts the agency's clear intent to exclude roads as an "other purpose" when promulgating Subpart R. Further, the interpretation is invalid because it violates the "fair notice" doctrine by pulling a bait-and-switch with road projects, preventing members of the public harmed by the interpretation from obtaining proper judicial review.

EPA cannot revise Subpart R to undo its rejection of road projects as an "other purpose" without a new rulemaking to either amend Subpart R or promulgate a new, distinct NESHAP for radon emissions from roads.

EPA's attempt to improperly revise "other purposes" in Subpart R to include road projects thus contravenes judicial review requirements. Any such rulemaking would offer injured parties the option for judicial review in the D.C. Circuit, where review of new or amended NESHAP must take place, instead of unleashing a deluge of litigation across the country over individual road projects. 42 U.S.C. § 7607(b)(1).

II.    Even putting this violation aside, which the Court should not, EPA did not use the appropriate standard for gauging the risk of the Road Project set forth in the "other purposes" provision, which only allows disposal of phosphogypsum for "other purposes" that are "at leas[t] as protective in the short term and long term as placement in a stack or mine." 40 C.F.R. § 61.206(c). What qualifies "as protective" as stack disposal is a standard that has remained unchanged for three

19

decades. 1989 Rule at 51,675. EPA has defined this term in the rule text of 40 C.F.R. § 61.206 to mean a cancer risk of 9 in 100,000. The meaning of this term is unambiguous, admitting no alternative interpretation.

EPA unlawfully conflates certain, specific risk thresholds for the agricultural and research uses allowed in Subpart R as a substitute for this explicit standard. EPA cannot rework this standard and "disregard[] facts and circumstances that underlay or were engendered by the prior policy" by accepting a new risk threshold of 3 in 10,000 simply because it is evaluating a pilot project, as doing so would permanently redefine the risk assessment for all approvals moving forward. *FCC*, 556 U.S. at 516.

III.    Finally, EPA is required by its own regulation to assess the maximum individual risk of the proposed use, and even if that use is a pilot project, EPA must evaluate meaningful cancer risks to the public. EPA fails to assess the maximum individual risks from phosphogypsum in road construction by limiting the pathways considered and accepting deficient sampling data. EPA is ignoring an important aspect of the problem and arbitrarily approving a deficient application.

20

**STANDING**

The Center has associational standing to bring this claim on behalf of its members. An organization asserting standing on behalf of its members must show (a) its members would otherwise have standing to sue in their own right, (b) the interests at stake are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000)*; Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

To have standing in their own right, members must have (1) an injury in fact, that is both (a) concrete and particularized and (b) actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that a favorable decision by the court will result in remedy of the injury. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992).

The Center's members have suffered concrete, particularized and actual injuries related to EPA's Notice of Approval, and relief in this court would redress their injuries. The Center has members who live in close proximity to the project site and are injured by hazardous air pollutant exposure and increased aquifer and groundwater contamination from this project. *See Texas v. NRC*, 78 F.4th 827, 836 (5th Cir. 2023) (finding a membership organization whose members own land in

21

proximity to a site housing radioactive materials, draw water from wells near the facility, and travel close by had standing to challenge a private license issuance); *Kelley v. Selin*, 42 F.3d 1501, 1509 (6th Cir. 1995) (petitioners who own land in proximity to a nuclear plant established standing through allegations of harms to their aesthetic interests, property values, and physical health); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1265–66 (D.C. Cir. 2004) (anticipated contamination of water supplies from a member who lived eighteen miles from a repository of radioactive material that planned to bury waste was "more than sufficient" to establish standing).

EPA's unlawful reversal of decades-old findings that phosphogypsum in road construction carries a maximum individual cancer risk that is "significantly greater than the presumptive safe level" and presents an "unacceptable level of risk to public health" injures the Center's members' health in addition to their recreational and aesthetic interests. 1992 Rule at 23,305, 23,311–12.

Specifically, the Center's members residing and recreating near the facility are threatened by increased radon exposure and toxic and heavy metal contamination to nearby groundwater and their drinking water. *See, e.g.*, Declaration of Michael Lexner (a Center member who lives within 5 miles of the New Wales Facility, draws water from a well near the facility, and whose health and enjoyment of property are injured by the Notice of Approval)*; see also,*

22

Declaration of Elise Pautler Bennett (a Center member and staffer who lives within the range of the facility determined by the EPA in rulemaking to experience the highest rate of fatal cancers from stack emissions). Center members are particularly injured by the failure of EPA to evaluate the risk pathway from this project to nearby residents as the agency did when establishing the risks posed from the stacks themselves.

Neither this claim, nor its relief, requires the participation of individual members in their own right, and the interests at stake, the protection of public health and the environment, are germane to the Center's organizational purpose. *See, e.g.*, Bennett Decl. ¶¶ 3–7 (a Center member and staffer describing the Center's long history of engagement with phosphate related pollution). Therefore, the Center has associational standing.

## ARGUMENT

I. **EPA's approval of the Road Project must be rejected because the agency cannot interpret "other purposes" to include road construction projects without a new rulemaking.**

In the 1992 Rule, EPA unequivocally rejected all road construction projects as an "other purpose" for which phosphogypsum could be used. EPA cannot now interpret the term "other purposes" to include a road project. Nor can EPA attempt to revise its rejection of road projects as an other purpose without a new

rulemaking to either amend Subpart R or promulgate a new, distinct NESHAP for radon emissions from roads. EPA does not dispute that its Notice of Approval is not a rulemaking.

EPA's attempt to improperly revise "other purposes" in Subpart R to include road projects without a new rulemaking contravenes judicial review requirements. Any such rulemaking would offer injured parties the option for judicial review in the D.C. Circuit, where review of new or amended NESHAP must take place, instead of unleashing a deluge of litigation across the country for individual road projects. 42 U.S.C. § 7607(b)(1).

This renders the approval of the Road Project invalid, necessitating its vacatur.

### A. EPA cannot interpret the "other purposes" provision to include road construction without a rulemaking.

In promulgating Subpart R in the 1992 Rule, EPA rejected all road construction projects as an "other purpose" for phosphogypsum, definitively and without qualification. To revise this rejection requires a new rulemaking.

### 1. EPA definitively rejected road construction as an "other purpose."

In the 1989 Rule where EPA created the original NESHAP for radon emissions from phosphogypsum stacks, EPA required that "[a]ll phosphogypsum shall be disposed of in stacks or in phosphate mines," without allowing use of

phosphogypsum for any other purposes. 1989 Rule at 51,701. When reconsidering this original NESHAP in the rulemaking that led to the 1992 Rule, EPA evaluated uses of phosphogypsum beyond disposal in stacks and mines. 1992 Rule at 23,308. Specifically, EPA evaluated "the uses of phosphogypsum in agriculture, road construction, and research and development activities." *Id*.

As discussed above, EPA ultimately approved the use of phosphogypsum for "outdoor agricultural purposes," subject to specific limitations. 1992 Rule at 23,308–10; *see* 40 C.F.R. § 61.204. EPA also approved the use of phosphogypsum for "indoor research and development," subject to specific limitations. 1992 Rule at 23,311; *see* 40 C.F.R. § 61.205. EPA concluded with the limitations it imposed on these two uses of phosphogypsum through Subpart R it could allow these uses while "protect[ing] the public with an ample margin of safety." 1992 Rule at 23,313.

While EPA had the opportunity to also approve the other purpose of road construction projects, the agency rejected all road construction as an other purpose for phosphogypsum when it promulgated the 1992 Rule. Agricultural and research purposes "could result in maximum individual lifetime risks exceeding the presumptively safe level" of risk, but "limitations" imposed on these purposes allowed for their approval while protecting public health. 1992 Rule at 23,311. Not so for road construction.

25

EPA unconditionally rejected all road projects as an other purpose for phosphogypsum after finding that "regardless of the radium-226 concentration in phosphogypsum, the use of phosphogypsum in road construction **always** resulted in a [maximum individual cancer risk] significantly greater than the presumptively safe level." 1992 Rule at 23,311 (emphasis added). EPA therefore concluded "that the use of phosphogypsum in road construction presents an unacceptable level of risk to public health." *Id*. at 23,312.

EPA went on to add the "other purposes" provision to the NESHAP for radon emissions from phosphogypsum stacks, barring the use of phosphogypsum for "any purpose not expressly specified in § 61.204 [applying to agricultural purposes] or § 61.205 [applying to indoor research purposes] without prior EPA approval." 40 C.F.R. § 61.206(a); 1992 Rule at 23,316.

### 2.    EPA cannot reverse its exclusion of road construction projects without a new rulemaking.

EPA cannot now shoehorn approval of the Road Project into place through the "other purposes" provision after rejecting all road projects when promulgating Subpart R. Its interpretation must be rejected.

EPA's interpretation of "other purposes" to now include the Road Project is impermissible, and cannot be afforded deference, because it "improperly divorces the regulation's text from both the rulemaking process from which it emerged and the underlying statutory scheme pursuant to which it was issued, making it 'plainly

26

erroneous' and 'inconsistent with the regulation.'" *IAL Aircraft Holding, Inc. v. FAA*, 206 F.3d 1042, 1046 (11th Cir. 2000); *City of Idaho Falls v. FERC*, 629 F.3d 222, 230 (D.C. Cir. 2011) (citing *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 904–05 (D.C. Cir. 2010). There are two reasons for this.

First, courts "must 'defer to the [agency's] interpretation unless an alternative reading is compelled by the regulation's plain language **or by other indications of the [agency's] intent at the time of the regulation's promulgation**.'" *Advanced Energy United, Inc. v. FERC*, 82 F.4th 1095, 1114 (D.C. Cir. 2023) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (emphasis added); *Wright v. FEMA*, 913 F.2d 1566, 1571 (11th Cir. 1990) (citations omitted); *see also Gonzales v. Oregon*, 546 U.S. 243, 257–58 (2006). A regulation must be "genuinely ambiguous" for agency deference. *Rafferty*, 13 F.4th at 1179 (citing *Kisor*, 588 U.S. at 563). A regulation cannot qualify as "genuinely ambiguous" until after a court "carefully consider[s] the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* (internal quotations and citation omitted).

For example, in *Advanced Energy United, Inc. v. FERC*, the D.C. Circuit found that a term in the "regulation's plain language" allowed for alternative interpretations, but did not defer to the agency's interpretation based on the context provided by the rule promulgating the regulation. 82 F.4th at 1114–15. "Order No.

888" was the *Federal Register* notice through which the agency, FERC, promulgated the regulation being interpreted. *Id*. at 1102 (citing 61 Fed. Reg. 21540–41 (May 10, 1996)). The Court determined: "Petitioners' argument that [the agency]'s construction is inconsistent with Order No. 888 is persuasive." 82 F.4th at 1114–15. While the regulation itself did not define the term at issue— "discounted rate"—Order No. 888 provided decisive context, "indicat[ing] that 'at the time of the regulation's promulgation,' FERC intended the term 'discounted rate' to include" what petitioners contended the term included. *Id*. at 1115 (citing *Shalala*, 512 U.S. at 512). The D.C. Circuit remanded the issue to FERC on this basis. *Id*.

The same rationale applies here. The 1992 Rule evinces that EPA excluded all road projects as an other purpose for phosphogypsum. 1992 Rule at 23,311–12. EPA cannot now "divorce[] the regulation's text from . . . the rulemaking process from which it emerged," which rejected all road projects. *City of Idaho Falls*, 629 F.3d at 230; *see FDA v. Wages*, 145 S. Ct. 898, 918 (2025) (finding a change-in-policy exists when an agency "acts inconsistently with an earlier position," or "performs a reversal of its former views as to the proper course," when an agency "abandoned a decades-old practice applied in enforcement actions.").

Second, under the "fair notice" doctrine, "the Supreme Court has counseled reticence in applying agency interpretations that give rise to 'unfair surprise.'"

28

*Golden Living Ctr. – Mt. View v. Sec'y of HHS*, 832 Fed. Appx. 967, 973–74 (6th Cir. 2020) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012)). In *SmithKline Beecham*, the Supreme Court declined to defer to an agency's interpretation resulting in "precisely the kind of 'unfair surprise' against which our cases have long warned" because to do so "would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." 567 U.S. at 156 (cleaned up); *cf. Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 170, 170–71 (2007) (deferring to new interpretation that "create[d] no unfair surprise" because the agency promulgated the interpretation through notice-and-comment rulemaking).

While the Center is not a regulated party subject to Subpart R, the Center and its members comprise part of the public that the NESHAP are meant to protect. It is entirely unreasonable to suppose that the Center and other injured members of the public had "fair notice" that Subpart R would not, in fact, protect them from radon emissions from roads when the 1992 Rule was issued. *See Global Green, Inc. v. SEC*, 631 Fed. Appx. 868, 870 (11th Cir. 2015) (explaining that the fair notice doctrine is applied in a "very limited set of cases," but that it is applied "where the agency's interpretation was 'so far from a reasonable person's understanding of the regulations'" that the agency's interpretation was not discernable. (citations omitted)).

29

To the contrary, the 1992 Rule definitively rejected all road projects as other purposes. EPA's unfair, surprise interpretation harms the Center and the public by enabling EPA to approve road projects without undergoing a new rulemaking and abiding by proper process to now allow roads as an other purpose. This harms the Center and the public by requiring that litigation over road project approvals take place via multiple cases in circuit courts across the country, instead of in one case before the D.C. Circuit, *see infra* Argument I.B.

By adopting the interpretation of "other purposes" it has, EPA is improperly revising Subpart R to now include roads as an other purpose without a rulemaking. EPA does not contend that the Notice of Approval rises to the level of an amendment to Subpart R or a new regulation, and in fact is clear that the proceeding below "is not a rulemaking." 89 Fed. Reg. at 104,536.[8]

EPA must follow the same process to revise a rule as it used to promulgate it, i.e., a rulemaking for NESHAP. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015); *see also* 1992 Rule at 23,316 (EPA acknowledging that "[t]he procedures to be utilized to modify or revise a NESHAP under the old section 112 are the same as the procedures used to promulgate the NESHAP in the first place."). EPA needs

---

[8] As EPA stated in the Notice of Approval below, "EPA's decision to approve or deny a request for other use under 40 C.F.R. § 61.206 is not a rulemaking." 89 Fed. Reg. at 104,536.

to undertake a rulemaking to change its regulation, rather than doing so through a "Notice of Approval" for an individual project.

As the D.C. Circuit recently explained: "A final rule is generally applicable to the public and cannot be revised without the agency undertaking a new rulemaking, following the procedures required by the Administrative Procedure Act." *Utah v. EPA*, 2025 U.S. App. LEXIS 10694, at *62–63 (D.C. Cir. 2025) (citing 5 U.S.C. § 553; *State Farm*, 463 U.S. at 42. "The [APA] makes no distinction ... between initial agency action and subsequent agency action undoing or revising that action." *FCC*, 556 U.S. at 515.

The Center is not claiming here that EPA cannot reevaluate roads as an other purpose. *See, e.g.*, *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 138, 1043 (D.C. Cir. 2012) (explaining that an agency's "reevaluation of which policy would be better in light of the facts" is within in discretion, but in the context of EPA revising its regulation through a rulemaking). Rather, EPA must abide by the proper process to do so, which it has not here.

Congress provided EPA with the authority to revise existing or promulgate new NESHAP. *E.g.*, 42 U.S.C. §§ 7412(d)(1), (6); 7607(d)(1)(C) (providing rulemaking procedures for the "promulgation or revision of any" NESHAP). EPA has a path forward to implement its interpretation of "other purposes" to include

31

roads—the path forward established by Congress and consistent with fundamental administrative principles.

### 3.    EPA's Response to the Center's Comments does not justify its interpretation.

In its 2024 Response to Comments, EPA attempts to rewrite the history of rulemaking that resulted in Subpart R. EPA acknowledges that while approving agricultural and indoor research uses, it also considered "authorizing the use of PG[9] in road construction, but the EPA decided not to do so because it concluded that 'the use of phosphogypsum in road construction presents an unacceptable level of risk to public health.'" 2024 Response to Comments, Doc. 5 at 7 (citing 1992 Rule at 23,312). EPA, however, claims that it "did not necessarily foreclose any or all use of PG in road construction, but simply declined, at that time, to categorically authorize – as for agricultural or research and development uses – use of PG in road construction." *Id*.

The 1992 Rule proves the opposite. EPA did not simply conclude that it was not appropriate to include a sub-provision in Subpart R allowing for road use, as it did for agricultural and research uses, 40 C.F.R. §§ 61.204, 61.205, while leaving the door open to road projects in some situations. Rather, "EPA [] determined that

---

[9] EPA's 2024 Response to Comments abbreviates phosphogypsum to "PG."

the use of phosphogypsum in road construction presents an unacceptable level of risk to public health" and rejected that purpose. 1992 Rule at 23,312.

These statements were not qualified with respect to roads potentially being an "other purpose" for phosphogypsum, and EPA did not suggest, indicate, or otherwise represent that—despite concluding all roads were too dangerous as an "other purpose"—some might be approved eventually, through the backdoor of the "other purposes" provision. *See generally* 1992 Rule.

EPA's interpretation is entirely unreasonable and impermissible given its definitive rejection of all roads in the 1992 Rule. EPA "divorc[es] the regulation's text from . . . the rulemaking process from which it emerged." *City of Idaho Falls*, 629 F.3d at 230. This interpretation is not entitled to deference and must be rejected. *Rafferty*, 13 F.4th at 1179; *NetworkIP, LCC v. FCC*, 548 F.3d 116, 122 (D.C. Cir. 2008) ("Though agencies are entitled to deference, they may not retroactively change the rules at will. Indeed, that '[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly' has been well-established for 'centuries.'" (quoting *Landgraf v. USI Film Products, Inc.*, 511 U.S 244, 265 (1994))).

## B.    EPA's interpretation contravenes the judicial review requirements of the Clean Air Act.

The invalidity of EPA's interpreting "other purposes" to now allow it to approve road projects through the backdoor of the "other purposes" provision is further demonstrated by its implications for judicial review. EPA is contravening the judicial review requirements of the Clean Air Act, because a new regulation is required to effectuate its interpretation. Such a regulation would be subject to judicial review only in the D.C. Circuit. This would allow the Center and other injured members of the public to challenge the revised interpretation in one case in one court, instead of unleashing an entire series of cases in courts across the country as EPA backdoors individual road project approvals into place.

Petitions for review of EPA's amendment or promulgation of a NESHAP then belong in the D.C. Circuit. The Clean Air Act's judicial review provision explicitly identifies EPA's promulgation of "any emission standard or requirement under section 112" as one example of "nationally applicable regulations" for which petitions for review "may be filed only in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 7607(b)(1).

EPA's use of the "other purpose" provision to approve the Road Project violates this requirement of the Clean Air Act by improperly amending Subpart R in an agency action that is "locally" applicable. "Locally" applicable final agency

34

actions "may be filed only in the United States Court of Appeals for the appropriate circuit." *Id*.

EPA is suggesting that injured parties should have foreseen that the "other purposes" provision would allow for individual road project approvals despite its conclusion that **no** road projects would be safe in the 1992 Rule. 1992 Rule at 23,312. Based on EPA's position, injured parties should have then sought judicial review in the D.C. Circuit to protect against the eventuality of EPA's use of the "other purposes" provision to approve road projects.

To the contrary, given EPA's categorical rejection of road construction projects as an other purpose for phosphogypsum in the 1992 Rule, it is eminently unreasonable to fault the Center and, likely, any other concerned members of the public for not appealing EPA's promulgation of the "other purposes" provision to the D.C. Circuit in 1992. The 1992 Rule did not invite such a challenge due to EPA's explicit statement that it was rejecting all roads. An appeal of Subpart R for allowing a road as a possible "other purpose" would have been nonsensical because all road projects had already been rejected.

Allowing EPA's interpretation will result in a deluge of litigation around each individual approval in different circuit courts around the country, but particularly in the 11th Circuit where phosphogypsum stacks are most common. 1992 Rule at 23,306. EPA and Mosaic represent the Road Project as a pilot project

35

intended to prove that roads constructed with a phosphogypsum base can "meet the Florida Standard Specifications for Road and Bridge construction." 89 Fed. Reg. at 81,911. This pilot project further serves as "the intermediate step between laboratory testing and full-scale implementation of the alternative use." EPA Guidance, Doc. 10 at 9.

This will result in additional requests for use of phosphogypsum from stacks in road construction under the "other purpose" provision. Because each request will qualify as a "locally" applicable final EPA action, like the Road Project approval before the Court, each EPA approval must be independently appealed to the "United States Court of Appeals for the appropriate circuit." 42 U.S.C. § 7607(b)(1). This not only contravenes the judicial review requirements of the Clean Air Act, it will open the floodgates to litigation challenging individual road approvals in circuit courts across the country. This will manifest in judicial inefficiencies, waste of party resources, and the potential for inconsistent decisions on source-specific NESHAP promulgated under the "other purpose" provision. Parties injured by road projects will be required to litigate projects one by one, instead of all at once in the D.C. Circuit, as the Clean Air Act provides.

Congress already rejected this approach to judicial review of NESHAP by requiring NESHAP by putting the power of judicial review of NESHAP in the hands of the D.C. Circuit. EPA's action contravenes the plain requirements and

36

intention of the Clean Air Act and administrative law, which require EPA to revise its interpretation via rulemaking and then provide that litigation over the resulting regulation proceed in the D.C. Circuit.

### C. The Court has jurisdiction over this as-applied challenge to EPA's reliance on the "other purposes" provision.

EPA may argue that the Center is challenging the "other purposes" provision on its face, and that such a challenge is outside of the Court's jurisdiction because the 60-day window to petition for review of the 1992 Rule is long past. 42 U.S.C. § 7607(b)(1). As an initial matter, this would be an impermissible post-hoc rationalization because the agency did not rely on this rationale in reaching its decision. *Burlington Truck Lines v. United States*, 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action").

Regardless, the Center brings an as-applied challenge here. As this Court has explained "[a] facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) (quoting *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000)). The Center is not seeking to invalidate or otherwise challenging the "other purposes" provision itself. Rather, the Center has petitioned for review of EPA's interpretation of the "other purposes" provision to now approve the Road Project, in reliance on an

impermissible re-interpretation of "other purposes" that directly contradicts the rejection of road projects in the 1992 Rule.

This Court has recognized that as-applied challenges "give[] a party ultimately affected by a rule 'an opportunity to question the rule's validity' when the party could not have brought a timely challenge." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1292 (11th Cir. 2015) (citing *NLRB Union*, 834 F.2d at 196) (cleaned up).

It is unreasonable to conclude that the Center should have foreseen that, despite EPA's detailed representations and its clear, unequivocal rejection of all road projects, EPA would eventually interpret the "other purposes" provision to allow a road project.

## II.    EPA's Assessment Arbitrarily Applied a Reduced Safety Threshold in Contravention of the Plain Language and History of Section 61.206.

While the "other purposes" framework in Subpart R is an unprecedented grant of authority and, as explained above, unlawful as applied to the Road Project, EPA is still bound by the plain language of the regulation and the clearly defined standard for which it must assess risk from other distributions of phosphogypsum. *Kisor*, 588 U.S. at 574–575. In assessing the risk presented by the Road Project, EPA ignores its own regulations and applies a risk threshold that more than triples the acceptable cancer risk from 9 in 100,000 to 3 in 10,000. EPA Assessment, Doc.

38

4 at 2. This is an independent basis for invalidating EPA's approval of the Road Project. *See Ft. Stewart Schools v. FLRA*, 495 U.S. 641, 654 (1990) ("an agency must abide by its own regulations").

EPA's mandate is clear: before it may approve a request for distribution of phosphogypsum for an "other purpose," it must ensure that the use be "at leas[t] as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. § 61.206(c). EPA has repeatedly defined this standard, concluding that disposal in a stack presents an individual lifetime cancer risk of 9 in 100,000. 1989 Rule at 51,675; 1992 Rule at 23,306. Thus, EPA's approval of phosphogypsum for any other purpose requires a finding by the EPA that the other use poses no more risk than the specific risk threshold of 9 in 100,000 cancer risk. 1989 Rule at 51,675; 1992 Rule at 23,306.

When EPA initially established the NESHAP for phosphogypsum stacks in 1989, it prohibited the uncontrolled dumping of phosphogypsum and instead required disposal in stacks as a means to protect public health, finding that this practice presented an individual lifetime cancer risk of 9 in 100,000. 1989 Rule at 51,675. EPA reiterated again in the 1992 Rule that resulted in the current regulations that the maximum individual risk of fatal cancer from radon from phosphogypsum stacks is 9 in 100,000. 1992 Rule at 23,306. In fact, the statements in the Federal Register preceding 40 C.F.R. § 61.206 affirmatively states that the

39

"estimated maximum individual lifetime risk of fatal cancer from radon emissions from phosphogypsum stacks is 9 x 10$^{-5}$" alternatively written as 9 in 100,000. *Id.*

EPA cannot arbitrarily change this risk threshold whenever it considers approving uses of phosphogypsum. EPA is instead required to follow a two-step decision-making process and set a risk threshold at the time it develops the NESHAP. *NRDC v. EPA*, 824 F.2d 1146, 1166 (D.C. Cir. 1987). In the context of phosphogypsum stacks, EPA first found that an individual risk above a 1 in 10,000 "benchmark" is unacceptable. 1989 Rule at 51,656. EPA was therefore required to "limit exposures such that an individual's lifetime excess cancer risk level is really no more than 1 in 10,000," with a specific requirement consider technological and economic feasibility in further reducing risks to a max of 1 in 1,000,000.[10] 1989 Rule at 51,657. Thus, EPA determined that "in reexamining all of the health-related factors" in conjunction with "cost, scientific certainty, and feasibility of control technology necessary to lower radon stacks" that individual risk threshold for phosphogypsum stacks was approximately 9 in 100,000. 1989 Rule at 51,675. EPA again identified 9 in 100,000 as the risk from phosphogypsum stacks in the 1992

---

[10] Phosphogypsum: Should We Just Let It All Go to Waste? Parts 1 & 2: Hearing Before the Subcomm. on Energy and Mineral Res., 108th Cong. 1–70 (2004) (statement of Elizabeth Cotsworth, U.S. EPA Director of the Office of Radiation and Indoor Air); *see also supra* n.5.

rule itself, which is a modest reduction from the 1 in 10,000 ceiling. 1992 Rule at 23,306.

EPA's regulations require that the approval of phosphogypsum for use in roads meet this risk threshold, and any claim to the contrary ignores the "text, structure, history, and purpose of [the] regulation" governing approval of other uses. *Kisor*, 588 U.S. at 575. There is no plausible reading of the text and history of 40 C.F.R. § 61.206 that justifies EPA's assertion that it has "further defined" the risk from stack placement as 3 in 10,000. EPA Assessment, Doc. 4 at 2.

Considering "the plain language and regulatory history" of 40 C.F.R. § 61.206 and its accompanying statements in the Federal Register, it is implausible for EPA to define the risk from disposal in a stack as anything besides 9 in 100,000. *SEC v. Levin*, 849 F.3d 995, 1004 (11th Cir. 2017). Statements in the Federal Register "offer 'evidence of an agency's contemporaneous understanding of its proposed rules.'" *Blanco v. Samuel*, 91 F.4th 1061, 1076 (11th Cir. 2024) (quoting *Wy. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999)). The statements in the Federal Register accompanying the NESHAP contain the only definition of risks presented from disposal in a stack, and to that end, the rule text establishes EPA's "contemporaneous intent" to evaluate the approval of other uses of phosphogypsum under the 9 in 100,000 threshold. *Benitez v. City of Orlando*, 2025 U.S. Dist. LEXIS 99997, *8 (M.D. Fla. 2025). EPA has acted

arbitrarily in failing to assess the Road Project under this standard. *Ft. Stewart Schools,* 495 U.S. at 654.

EPA mischaracterizes the 1992 Rule to justify its reliance of a weaker risk threshold than what its own regulations require. EPA Assessment, Doc. 4 at 2. EPA improperly conflates the "disposal in a stack" standard found in 40 C.F.R. § 61.206(c) and described above with two separate and distinct findings made in relation to agricultural use, 40 C.F.R. § 61.204, and scientific study, 40 C.F.R. § 61.205, of phosphogypsum. In the 1992 Rule, EPA concluded that "*certain* uses of phosphogypsum," referring to scientific and agricultural use, "may be considered acceptable so long as those uses are restricted to limit the estimated lifetime risk to any individual to no more than 3 in 10 thousand." 1992 Rule at 23,313 (emphasis added). EPA then promulgated two separate rules, subject to notice and comment and judicial review, that did not require that the scientific and agricultural uses be "at leas[t] as protective as disposal in a stack" but instead contained specific work practice, storage, and quantity restrictions meant to minimize exposure and justify an alternative risk threshold. *Id.*

EPA came to the opposite conclusion in its assessment of roads. In that same rulemaking, EPA concluded that road construction was not one of these "certain uses" that could be limited with a modest work practice requirement or quantity restriction. 1992 Rule at 23,312. EPA declined to promulgate a specific regulation

42

for road use and instead found "that the use of phosphogypsum in road construction presents an unacceptable level of risk to public health" and prohibited this use. *Id*. EPA further explained that "in contrast" to agricultural and scientific use, "regardless of the radium-226 concentration in phosphogypsum, the use of phosphogypsum in road construction always resulted in an [maximum individual risk] significantly greater than the presumptive safe level." 1992 Rule at 23,311. The "other purposes" provision that EPA improperly relies upon to approve this road project does not include any similar work practice or quantity restrictions to justify an alternative threshold. *Compare* 40 C.F.R. §§ 61.204–205 *with* 40 C.F.R. § 61.206. Instead, EPA is required to assess whether distribution for other uses is at least protective, in the short and long term, as placement in a stack, a standard which it has repeatedly defined as 9 in 100,000. *Kisor*, 588 U.S. at 575.

EPA's application of this improper risk threshold is a significant error. *See Sierra Club v. EPA*, 895 F.3d 1, 13 (D.C. Cir. 2018) (granting petition "[b]ecause the EPA did not meet the [Clean Air Act] requirement to include an ample margin of safety in the health threshold."). EPA has previously rejected, unequivocally, the use of phosphogypsum in roads based on the appropriate risk threshold of 9 in 100,000, finding that this use "always" exceeded even the outer bound of the 1 in 10,000 ceiling. 1992 Rule at 23,306, 23,311. EPA has now tripled the allowable cancer risk in violation of its regulations, putting the public at risks of entirely

43

preventable severe and fatal cancers by permanently altering assessment of any future approval.

### III.    EPA's Approval Unlawfully Departs from the Required Analysis of "Other Purpose" Applications.

As discussed above, EPA entirely rejected the use of phosphogypsum in road construction when promulgating Subpart R, *supra* at 24–26, and now takes extraordinary action to approve this prohibited use by unlawfully reinterpreting the risk standard required under any "other purposes" approval. *Supra* at 38–44. While these actions independently invalidate EPA's approval and warrant vacatur, the assessment of the Road Project is also arbitrary and capricious because it contradicts the plain language of the regulation, reverses prior agency findings without rational explanation, and fails to consider important aspects of the problem. *Ft. Stewart Schools* at 654; *Defs. of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d at 1106, 1115; *BBX Capital,* 956 F.3d at 1,314–15. Specifically, EPA fails to analyze exposure pathways that historically resulted in the highest cancer risk to the public, and where it does assess exposure pathways, EPA arbitrarily limits exposure duration and accepts unverifiable, deficient radium-226 sampling data. Both actions are an independent basis for vacatur of EPA's Approval.

44

**A.    EPA fails to estimate maximum individual risk by neglecting pathways that consistently yielded the highest cancer risks and limiting others.**

An application to use phosphogypsum for an "other purpose" must include "an estimate of the maximum individual risk, risk distribution, and incidence associated with the proposed use . . ." for EPA's review. 40 C.F.R. § 61.206(b)(8). EPA's Assessment must compare the risks in any application against those presented by disposition of phosphogypsum into a stack, ensuring the proposed purpose it as "at leas[t] as protective" as that method. 40 C.F.R. § 61.206(c). By limiting reviewable pathways and shortening those it did consider, EPA fails to satisfy this mandate, unlawfully contradicting its own rulemaking and failing to consider an important aspect of the problem. *State Farm*, 463 U.S. at 43.

EPA defined maximum individual risk in the 1992 Rule as "the maximum additional cancer risk imposed on a person due to exposure to a pollutant for a 70-year lifetime." 1992 Rule at 23,311. In the NESHAP for benzene, EPA explained "the assumption of a 70-year, 24-hour per day exposure adds a degree of conservatism," which "may not necessarily reflect true risk," but it is designed to "display a conservative risk level which is an upperbound that is unlikely to be exceeded." 54 Fed. Reg. 38,044, 38,045 (Sept. 14, 1989).[11] EPA found that

---

[11] The NESAHP for Benzene holds significance, as it "first announced" the Administrator's approach for deciding what risk is "safe." 1992 Rule at 23,306.

continuous exposure over a 70-year lifetime is preferred to a "proportional impact" because the "assumption of continuous exposure is consistent with the steady-state nature of the analysis and with the stated purpose of making plausible, if conservative, estimates the potential health risks." *Id*. at 38,065.

When reviewing this application, EPA fails to analyze dose for more than one year at any point in the risk analysis, which not only fails to consider an important aspect of the problem, *BBX Capital,* 956 F.3d at 1314–15, but is an unreasoned decision that defies EPA's own regulations and rulemakings. EPA Assessment, Doc. 4 at 14–22; *Sierra Club*, 436 F.3d at 1273. For example, prior assessments for this use analyzed lifetime risks from 5-20 years of exposure for various construction workers, and 26-70 years for road users, nearest residents, and potential reclaimers. EPA Assessment, Doc. 4 at A-1—A-2.

Mosaic only evaluated the risks to road construction workers and truck drivers from the Road Project, and while the actual exposure will likely occur over a much longer duration, Mosaic limited exposure to a "period of a few weeks to a month." *Id.* at 6–7. Mosaic declined to evaluate the risk for nearest residents because "the closest residence is over 3 miles" away. *Id.* at 8. EPA unlawfully accepted this truncated analysis. EPA Assessment, Doc. 4 at 19–21.

This is a stark contrast to EPA's prior analysis of the risk factor for disposal of phosphogypsum in stacks, which is to be directly compared to the use of

46

phosphogypsum for any "other purpose." 40 C.F.R. § 61.206(c). When analyzing emissions from stack systems, EPA found the highest risk of fatal cancer over a 70-year lifetime would come to those who lived within 80 km (**49.7 miles**) of the various stacks. 1992 Rule at 23,306 (emphasis added).

Most glaringly, EPA and Mosaic wholesale decline to evaluate the cancer risk posed to a potential reclaimer, a plausible scenario where, once the industry has ceased operations at the facility, a house or other residence is built on that land and the resident is exposed to lingering pollution. In so doing, EPA departs from all previous analyses of this use and fails to consider an important aspect of the problem. *BBX Capital,* 956 F.3d at 1314–15; *State Farm*, 463 U.S. at 43.

When previously determining that the use of phosphogypsum in road construction "presents an unacceptable level of risk to public health," EPA found the highest lifetime risk applied to "people living in a house constructed on land where roads built using phosphogypsum once existed." 1992 Rule at 23,310. As late as 2020, EPA again recognized the decision to prohibit road use was "largely based on a concern about the risks to people living in a house constructed on land where roads built using the phosphogypsum once existed." 2024 Response to Comments, Doc. 5 at 7.

The Road Project is the first and only time the reclaimer scenario has not been considered when evaluating the use of phosphogypsum in road construction.

EPA and Mosaic advance two arguments to justify the failure to consider the pathway previously relied on to deny this use: (1) A reclaimer scenario is not reasonably plausible because the road is on Mosaic property; (2) The New Wales Facility is already radioactive; therefore, any future residents will be exposed to radiation anyway. EPA Assessment, Doc. 4 at 20; Mosaic Application, Doc. 3 at 15.

Mosaic includes the first argument in its application, stating that the reclaimer scenario is "not applicable to this Petition because [phosphogypsum] will remain on the New Wales Facility." Mosaic Application, Doc. 3 at 15. EPA agrees, adding, because the site is "located in the immediate proximity of an existing phosphogypsum stack," paving approximately 1200 tons of phosphogypsum across 3200 feet of roadway near the stack "would not significantly change the site characteristics or create additional risk" to the public or a future reclaimer. EPA Assessment, Doc. 4 at 4.

However, Radium-226 has a 1,600-year half-life, meaning the threats from phosphogypsum will linger in the environment long after Mosaic's operations at the New Wales facility have likely ceased, and after most roads crumble. 1989 Rule at 51,654. Moreover, EPA is not permitted to cabin its assessment on its own speculation regarding the likelihood of the property around the stack leaving Mosaic's ownership. When EPA promulgated its 1992 Rule, it responded to a

48

comment that maximum individual risk should be evaluated by the probability of occurrence by reaffirming:

> EPA's NESHAPs, such as Subpart R, are based on the exposure to the maximally exposed individual, in conformance with the provisions of the Vinyl Chloride decision, using the framework of the Benzene NESHAP. In doing this, EPA ensures that the NESHAPs protect the health of even the most exposed individual **regardless of the likelihood of that individual's becoming exposed**.

Comments and Response to Comments, NESHAPS; National Emission Standards for Radon Emissions From Phosphogypsum Stacks, ("Doc. 8") at 8 (emphasis added).

Second, EPA cannot arbitrarily assume that a project's location is justification to ignore long-term risks of removing phosphogypsum from the stack for use in road construction as required by regulation.[12] Any distribution and use of phosphogypsum for "other purposes" must be at least as protective "both in the short term **and the long term**," as disposal of phosphogypsum in a stack. 40 C.F.R. § 61.206 (emphasis added). EPA is required to assess long-term risks, and it fails to do so by ignoring the reclaimer scenario. EPA's reliance on the unique location of this project to entirely forgo analysis of long-term risk is an irrational view of the regulatory mandate that runs counter to the evidence before the agency. *Defs. of Wildlife,* 733 F.3d at 1115; *BBX Capital,* 956 F.3d at 1314–15.

---

[12] EPA advances the same argument to decline reviewing the risk to nearby residents. EPA Assessment, Doc. 4 at 22.

Finally, EPA has distinguished phosphogypsum in roads and in stacks as separate and distinct activities that must be assessed individually. 40 C.F.R. § 61.202–6; 1992 Rule at 23,311. EPA's new position that phosphogypsum paved into a road near a stack presents no difference from keeping the phosphogypsum in the stack contradicts its own regulations and prior rulemaking without a reasoned explanation. EPA, thereby, fails to satisfy the heavy obligation to explain its reasoning when "assessing the public health." *Am. Lung Ass'n v. EPA*, 134 F.3d at 392 (D.C. Cir. 1998).

Additionally, EPA's justification to ignore and minimize exposure pathways also contradicts the described purpose and objectives of a pilot project. This small-scale, pilot project is to serve as "the intermediate step between laboratory testing and full-scale implementation of the alternative use." EPA Guidance, Doc. 10 at 9. To accomplish this goal, projects should be "designed to simulate alternative use conditions as much as possible." *Id*. The Road Project cannot meaningfully serve as an "intermediate step" toward full-scale implementation if it purposefully dismisses risk pathways that previously justified a prohibition of this use merely due to the unique characteristics of the site. Similarly, all environmental monitoring of this site will cease within eighteen months of construction, which EPA admits "may not necessarily be sufficient to support conclusions about longer

50

term use in a full-scale project." EPA Assessment, Doc. 4 at 21–22. This is, therefore, not an "intermediate step" to full-scale implementation of road use.

EPA limits lengths of exposures for the pathways considered, and fails to examine the reclaimer scenario and risk to nearby residents in approving a novel use of radioactive waste, contradicting its prior rulemakings and contravening the requirement that disposal of phosphogypsum for "other purposes" must be as protective in the short and long term as disposal in a stack. 40 C.F.R. § 61.206(c); *BBX Capital,* 956 F.3d at 1314–15; *State Farm*, 463 U.S. at 43. This is a serious error considering the subject matter of the analysis—cancer risks posed to the public from radioactive waste—and EPA cannot rationally claim its approval of the Road Project was valid if it fails to comply with these requirements. *Defs. of Wildlife,* 733 F.3d at 1115 (holding courts should defer to an agency only "as long as its conclusions are rational" (internal citations omitted)).

### B.    EPA unlawfully accepted stale, unverifiable radium-226 testing data in contravention of its own guidance.

Mosaic provided, and EPA accepted, woefully deficient data regarding the concentration of radium-226 within the phosphogypsum to be used in the Road Project. In doing so, EPA agreed with Mosaic that its own published guidance "exceeded the legal requirements of the regulation." EPA Assessment, Doc. 4 at 11. EPA's position is arbitrary, and this "inconsistent treatment" of radium-226

sampling requirements is "the hallmark of arbitrary agency action." *Catawba County v. EPA*, 571 F.3d at 51.

Applications for "other uses" of phosphogypsum must include "the average concentration of radium-226 in the phosphogypsum to be used." 40 C.F.R. § 61.206(6). EPA's guidance requires that the sampling "must have been done within the past 12 months according to the procedures in 40 CFR § 61.207." EPA Guidance, Doc. 10 at 30. EPA prescribes analytic procedures for an applicant to comply with the sampling requirements of 40 CFR § 61.207, including the requirement that 30 samples "be taken at regularly spaced intervals across the location of the stack." *Id*. at 25.

Mosaic's application contained only 10 samples, now over six years old, compiled in a table with no information on sampling or testing methodology, and accompanied by a statement that the concentration of radium-226 was expected to be <35 pCi/g, which was the average radium concentration used in the incorporated risk assessment from 2019. EPA Assessment, Doc. 4 at 11.

EPA arbitrarily accepted Mosaic's "summary data for [radium-226] sampling" as "adequate for the purposes of reviewing the small-scale pilot project," now believing its guidance "exceeds the legal requirements of the regulation." *Id*. at 11. EPA justified disavowing prior guidance because the few risks analyzed were based on radium-226 activity of 35 pCi/g, which is "roughly

double the average value reported by Mosaic." *Id*. EPA thus assumed the risk assessment would remain valid even if the radium-226 concentrations "turns out to be higher." *Id.*

Not only does this assumption irrationally attempt to alleviate EPA of a regulatory obligation, but it is factually inaccurate as EPA has previously established that the concentration of radium-226 in Florida stacks can range from 16-81 pCi/g. EPA Guidance, Doc. 10 at 2–7. EPA has not provided a reasoned explanation for this change-in-policy. *See State Farm,* 463 US at 52, 57; *see also FDA v. Wages*, 145 S. Ct. 898, 918 (2025) (finding a change-in-policy exists when an agency "acts inconsistently with an earlier position," or "performs a reversal of its former views as to the proper course," when an agency "abandoned a decades-old practice applied in enforcement actions.").

Together, these significant errors form the basis of EPA's unlawful Approval. EPA's determination that this proposed use of phosphogypsum will be as safe as placement in stacks "both in the short term and in the long term," is arbitrary, irrational, and unlawful.

## IV.    Remedy.

Vacatur of the EPA's approval of the Road Project is the appropriate and necessary remedy. As this Court recognizes, "vacatur of unlawful agency action is the ordinary APA remedy." *Sierra Club v. Flowers*, 526 F.3d 1353, 1369 (11th Cir. 2008).  Because vacatur is the presumptive remedy, the burden is on EPA to show why equity requires anything less than vacatur of its unlawful agency actions. *NRDC v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) (vacatur places "the burden where it should be—on the losing agency").

Vacatur is also appropriate if the Court applies the D.C. Circuit's *Allied-Signal* test to evaluate vacatur, which it has previously. *See, e.g.*, *Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)). Pursuant to case law applying this test, "[v]acatur is also the normal remedy" where, as here, an agency action is unlawful. *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1196 (D.C. Cir. 2023) (cleaned up). =

Pursuant to *Allied-Signal*, courts consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," as well as "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–151 (quotation omitted). The latter factor requires a balancing of the equities. *Black Warrior Riverkeeper*, 781 F.3d at 1290;

54

*see also Sierra Club v. Flowers*, 526 F.3d at 1369 (Kravitch, J., concurring in part and dissenting in part) ("[I]t is appropriate to consider the balance of equities and the public interest, along with the magnitude of the agency's errors and the likelihood that they can be cured."). Among the equities to be balanced are "both the disruptive consequences to the [] industry, as well as the potential environmental damage that might continue unabated while [EPA] revisits its determinations." *Black Warrior Riverkeeper*, 781 F.3d at 1290.

First, the agency's error was serious and woefully deficient. This is not an error that can be fixed simply by supplementing the record on remand. EPA has summarily rejected the use of phosphogypsum in roads, rendering its review of the Road Project pursuant to the "other purposes" provision unlawful. *Supra* at 24–26. Even putting that threshold issue aside, EPA's review of the Road Project triples the acceptable cancer risk to the public, directly contradicting the regulations. *Supra* at 38–44. Further, EPA disavows its own guidance and all previous risk analyses by declining to review cancer pathways that yield the highest results and accepting deficient radium-226 sampling data, fundamentally undermining the outcome of its assessment. *Supra* at 44–53.

Second, the harms to public health and the environment—in the form of the heightened threat of cancer—outweigh the insubstantial consequences of vacatur for Mosaic. Economic disruption is not a basis for declining to vacate agency

55

action. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021); *cf. Cal. Cmty. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (only vacating where delay of a "much needed" power plant would cause blackouts and necessitate the use of polluting diesel generators, but would also be "economically disastrous" given the "billion-dollar venture.")

## CONCLUSION

For the reasons stated above, the Court should vacate the Notice of Approval.

Respectfully submitted,

 */s/ Ragan Whitlock*
Ragan Whitlock
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

Ryan Maher
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street, NW, Suite 1300
Washington, DC 20005
Tel: (781) 325-6303
Email: rmaher@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*

DATED: July 11, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,968 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14.

*/s/ Ragan Whitlock*
Ragan Whitlock