ORAL ARGUMENT NOT YET SCHEDULED

Case No. 25-10515

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.
*Respondents*,

MOSAIC FERTILIZER, LLC,
*Intervenor-Respondent*.

Petition for Review of Action of the
United States Environmental Protection Agency

**RESPONDENTS' BRIEF**

Of Counsel:

MEGAN MCLEAN
*Attorney*
United States Environmental
Protection Agency

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
MARIO A. LUNA
*Attorney*
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3357
Mario.Luna@usdoj.gov

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Eleventh Circuit Rules 26.1-1, 26.1-2, 26.1-3, and 28-1(b), the undersigned certifies that, to the best of his knowledge, the certificate of interested persons submitted by Petitioner in its Opening Brief on July 11, 2025, is complete and correct with the addition of the following interested persons:

1. Gustafson, Adam, Acting Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice (Counsel for Respondents).

2. Stander, Robert N., Deputy Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice (Counsel for Respondents)

3. Luna, Mario Alfonso, Environment and Natural Resources Division, United States Department of Justice (Counsel for Respondents).

4. McLean, Megan United States Environmental Protection Agency (Counsel for Respondents).

Dated: September 12, 2025.

*/s/ Mario A. Luna*
MARIO A. LUNA

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rules 28-1(c) and 34-3(c), Respondents respectfully request oral argument. Oral argument is appropriate to address further the Court's jurisdictional question on whether Petitioner, Center for Biological Diversity, has standing to challenge the agency action at issue. If the Court wishes to reach the merits, oral argument will also be useful to explain further the United States Environmental Protection Agency's review and approval, pursuant to 40 C.F.R. § 61.206, of a request to use phosphogypsum for a small-scale road pilot project on private land in Florida.

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.......................C-1

STATEMENT REGARDING ORAL ARGUMENT............................................... i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES............................................................................. iv

ACRONYMS AND ABBREVIATIONS............................................................ viii

INTRODUCTION .............................................................................................1

STATEMENT OF JURISDICTION ..................................................................2

STATEMENT OF THE ISSUES ......................................................................2

STATEMENT OF THE CASE...........................................................................3

    I.   Regulatory Background ........................................................................3

    II.  Procedural Background ........................................................................9

    III. Standard of Review..........................................................................14

SUMMARY OF ARGUMENT........................................................................15

ARGUMENT ..................................................................................................17

    I.   The Court Should Dismiss the Center's Petition for Lack of Standing. .......17

        A. Petitioner Lacks Standing Because It Has Not Demonstrated Injury in Fact. .....................................................................................................18

           1. Petitioner Has Failed to Establish That Its Members Face Increased Risks from Radon Exposure Traceable to the Approval of the Road Pilot Project. ..................................................................................20

           2. Petitioner Has Failed to Establish Its Members Face Any Increased Risk of Groundwater Contamination Traceable to the Approval of the Road Pilot Project.........................................................................23

           3. Petitioner Has Failed to Establish Its Members Face Any Increased Risk from Their Proximity to the Road Pilot Project..........................25

        B. Petitioner Lacks Standing Because It Has Not Demonstrated That Its Alleged Injuries Are Redressable.........................................................26

II. The Court Should Deny the Center's Petition Because EPA's Approval of the Road Pilot Project was an Appropriate Exercise of the Agency's Discretion to Approve the Use of Phosphogypsum for Other Purposes. ...................................27

    A. EPA's Regulations Give the Agency Discretion to Approve the Use of Phosphogypsum in Road Construction as an "Other Purpose." ..............29

        1. By Its Plain Language, the Regulation Authorizes EPA to Approve Road Construction as an "Other Purpose." ..........................................29

        2. The Preamble to the 1992 Rule Supports EPA's Interpretation............31

        3. EPA's Interpretation of Its Regulation Is Not a Change in Position.....34

    B. EPA Appropriately Considered All Relevant Evidence in Assessing the Road Pilot Project....................................................................................36

        1. EPA Reasonably Scaled Exposure Durations to Reflect the Actual Exposure Times Expected to Result from the Road Pilot Project........37

        2. EPA Properly Excluded the Reclaimer Scenario When Calculating the Road Pilot Project's Risks. ...............................................................43

        3. EPA Accepted Radium Sampling Consistent with the Regulation, Reflecting Levels Found in Other Florida Phosphogypsum Stacks and More Than Twice Mosaic's Reported Average. ..................................45

    C. EPA Appropriately Determined That Use of Phosphogypsum in the Road Pilot Project is at Least as Protective as Placement in a Stack. ...............49

        1. EPA Properly Applied a 3 in 10,000 Risk Threshold. ..........................49

        2. EPA Did Not Define at Least as Protective as Placement of Phosphogypsum in a Stack to Be 9 in 100,000. ...................................52

        3. Regardless of the Risk Threshold Used, the Road Pilot Project Is Well Below the Threshold.......................................................................53

III. Petitioners Are Not Entitled to Vacatur...........................................................54

CONCLUSION ......................................................................................................55

CERTIFICATE OF COMPLIANCE ....................................................................56

CERTIFICATE OF SERVICE .............................................................................57

# TABLE OF AUTHORITIES

**Cases**

*Advanced Energy United, Inc. v. FERC,*
  82 F.4th 1095 (D.C. Cir. 2023) ...................................................................................31

*Bischoff v. Osceola Cnty., Fla.,*
  222 F.3d 874 (11th Cir. 2000) ................................................................... 14, 17

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
  781 F.3d 1271 (11th Cir. 2015) ................................................................. 54, 55

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ...................................................................................37

*City Of Oxford, Ga. v. FAA,*
  428 F.3d 1346 (11th Cir. 2005) ................................................................. 14, 15

*Corbett v. TSA,*
  930 F.3d 1225 (11th Cir. 2019) ...................................................................18

*Ctr. for Biological Diversity v. EPA,*
  134 F.4th 1271 (10th Cir. 2025).................................................................55

*Ctr. for Biological Diversity v. EPA,*
  141 F.4th 153 (D.C. Cir. 2025) ..................................................................55

*Diamond Servs. Corp. v. Curtin Mar. Corp.,*
  99 F.4th 722 (5th Cir. 2024)........................................................................30

*FDA v. Wages and White Lion Invs., LLC,*
  145 S.CT. 898 (2025)..................................................................................48

*Fund for Animals, Inc. v. Rice,*
  85 F.3d 535 (11th Cir. 1996) .......................................................................14

*Georgia Republican Party v. SEC,*
  888 F.3d 1198 (11th Cir. 2018) ................................................................. 14, 18

*Golden Living Ctr. – Mt. View v. Sec'y of HHS,*
  832 Fed. Appx. 967 (6th Cir. 2020) .............................................................34

*Gose v. Native Am. Servs. Corp.*,
 109 F.4th 1297 (11th Cir. 2024) ................................................................29

*Harrell v. The Fla. Bar*,
 608 F.3d 1241 (11th Cir. 2010) ................................................................26

*Hunt v. Wash. State Apple Advert. Comm'n*,
 432 U.S. 333 (1977) ................................................................................18

*Kelley v. Selin*,
 42 F.3d 1501 (6th Cir. 1995) ....................................................................25

*Kisor v. Wilkie*,
 588 U.S. 558 (2019) ................................................................................30

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ........................................................................ 14, 18

*Miami-Dade Cnty. v. EPA*,
 529 F.3d 1049 (11th Cir. 2008) ...................................... 14, 37, 38, 46

*Muransky v. Godiva Chocolatier, Inc.*,
 979 F.3d 917 (11th Cir. 2020) .................................... 19, 22, 25

*Nat. Res. Def. Council v. EPA*,
 464 F.3d 1 (D.C. Cir. 2006) ....................................................................18

*New York v. Reilly*,
 969 F.2d 1147 (D.C. Cir. 1992) ..............................................................15

*Nuclear Energy Inst., Inc. v. EPA*,
 373 F.3d 1251 (D.C. Cir. 2004) ................................................ 25, 26

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
 513 F.3d 234 (D.C. Cir. 2008) ................................................................19

*R.S.B. Ventures, Inc. v. FDIC*,
 514 F. App'x 853 (11th Cir. 2013) ..........................................................39

*Rafferty v. Denny's, Inc.*,
 13 F.4th 1166 (11th Cir. 2021) ................................................................30

*Sierra Club v. EPA*,
  60 F.4th 1008 (6th Cir. 2023)........................................................55

*Sierra Club v. Johnson*,
  436 F.3d 1269 (11th Cir. 2006) ...................................................18

*Sierra Club v. Johnson*,
  541 F.3d 1257 (11th Cir. 2008) ...................................................14

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)....................................................................18

*Texas v. NRC*,
  78 F.4th 827 (5th Cir. 2023).......................................................26

*United States v. Hays*,
  515 U.S. 737 (1995)....................................................................17

*Utah v. Evans*,
  536 U.S. 452 (2002)....................................................................26

*West Virginia v. EPA*,
  362 F.3d 861 (D.C. Cir. 2004).....................................................37

*Wolff v. Cash 4 Titles*,
  351 F.3d 1348 (11th Cir. 2003) .............................................. 14, 17

**Statutes**

5 U.S.C. § 706(2) ...........................................................................14

42 U.S.C. § 7412...............................................................................3

42 U.S.C. § 7412(b)(1).......................................................................4

42 U.S.C. § 7607(d)(1).....................................................................14

Pub. L. No. 91-604, § 112, 84 Stat. 1676 (1970)...............................3

**Rules**

Fed. R. Evid. 201(b)(2) ...................................................................39

**Regulations**

40 C.F.R. § 61.204 ...........................................................................................................7

40 C.F.R. § 61.205 ...........................................................................................................7

40 C.F.R. § 61.206 ......................................................................................................8, 48

40 C.F.R. § 61.206(a) .......................................................................................................8

40 C.F.R. § 61.206(b)...................................................................................................8, 51

40 C.F.R. § 61.206(b)(6) ................................................................................................48

40 C.F.R. § 61.206(c).................................................... 8, 16, 27, 29, 30, 49, 54, 55

**Other Authorities**

44 Fed. Reg. 76738 (Dec. 27, 1979)................................................................................4

54 Fed. Reg. 38044 (Sept. 14, 1989) ...........................................................................4, 22

54 Fed. Reg. 51654 (Dec. 15, 1989) ..................................................... 4, 6, 52, 53

55 Fed. Reg. 13480 (Apr. 10, 1990) ................................................................................5

57 Fed. Reg. 23305 (June 3, 1992)............... 5, 6, 7, 8, 22, 31, 32, 33, 34, 35, 38, 50

85 Fed. Reg. 66550 (Oct. 20, 2020)............................................................................9, 36

86 Fed. Reg. 35795 (July 7, 2021)............................................................. 9, 36, 47

89 Fed. Reg. 81910 (Oct. 9, 2024)................................................................................12

89 Fed. Reg. 104535 (Dec. 23, 2024) ........................................................... 10, 13

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1989 Rule | National Emission Standards for Hazardous Air Pollutants; Radionuclides, 54 Fed. Reg. 51654 (Dec. 15, 1989) |
| 1992 BID | U.S. Environmental Protection Agency. Potential Uses of Phosphogypsum and Associated Risks: Background Information Document, EPA 402-R92-002 (May 1992), Pet'r's App'x Doc. 9 |
| 1992 Rule | National Emission Standards for Hazardous Air Pollutants; National Emissions Standards for Radon Emissions from Phosphogypsum Stacks, 57 Fed. Reg. 23305 (June 3, 1992) |
| The Agency | Environmental Protection Agency |
| EPA | Environmental Protection Agency |
| EPA Guidance | Applying to EPA for Approval of Other Uses of Phosphogypsum: Preparing and Submitting a Complete Petition Under 40 CFR 61.206, A Workbook, Pet'r's App'x Doc. 10 |
| EPA Assessment | Review of the Small-Scale Road Pilot Project on Private Land in Florida Submitted by Mosaic Fertilizer, LLC (Oct. 1, 2024), Pet'r's App'x Doc. 4 |
| Mosaic | Intervenor-Respondent Mosaic Fertilizer, LLC |
| Mosaic Application | Request For Approval of Additional Uses of Phosphogypsum Pursuant to 40 C.F.R. § 61.206, Pet'r's App'x Doc. 3 |
| Mosaic Revised Application | Request from The Mosaic Company to Use Phosphogypsum in Road Construction Pilot (August 2023), Resp't's App'x Doc. 1 |

| | |
|---|---|
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| Petitioner | Center for Biological Diversity |
| Road Pilot Project | 3,200-foot road construction pilot project containing phosphogypsum in the road base at Mosaic's private industrial facility |
| Subpart R | National Emission Standards for Radon Emissions from Phosphogypsum Stacks, 40 C.F.R. part 61, subpart R |
| The Center | Center for Biological Diversity |

## INTRODUCTION

Phosphogypsum is a byproduct of the production of agricultural fertilizers. Most often phosphogypsum is simply stored unused. But sometimes, with the Environmental Protection Agency's ("EPA" or "the Agency") approval, it can be repurposed and put to beneficial use. This action concerns EPA's approval for a single company—Intervenor-Respondent Mosaic Fertilizer, LLC ("Mosaic")—to construct a 3,200-foot road construction pilot project ("Road Pilot Project") containing phosphogypsum in the road base at Mosaic's private industrial facility where it stores that substance in large stacks. Petitioner Center for Biological Diversity ("Petitioner" or "the Center") challenges this approval as violative of EPA's own regulations.

Subject to some exceptions, EPA's regulations generally require storage of phosphogypsum in engineered stacks to limit public exposure to its radon emissions. EPA regulates the radon emissions from phosphogypsum stacks under the Clean Air Act's National Emission Standards for Hazardous Air Pollutants ("NESHAP") program. As relevant here, EPA may approve a request for a specific use of phosphogypsum if it determines that the proposed use is at least as protective of public health as placement of phosphogypsum in a stack. Pursuant to this exception, EPA approved Mosaic's request to use phosphogypsum in a small-scale road pilot project located entirely within its New Wales facility, which has

1

been mined for phosphate ore and contains two phosphogypsum stacks. Consistent with its regulations, EPA found that use of phosphogypsum for this limited use is at least as protective as placement in stacks.

At the outset, the Court should dismiss this petition because Petitioner has failed to establish standing. Specifically, Petitioner has failed to demonstrate that its members will suffer any actual or imminent injury that is traceable to the 3,200-foot Road Pilot Project (as opposed to the Mosaic facility's phosphogypsum stacks) that could be remedied through this lawsuit. In the alternative, the petition should be denied because EPA's findings are well supported by the record and are neither arbitrary nor capricious.

## STATEMENT OF JURISDICTION

As explained in Argument Part I *infra*, this Court lacks Article III jurisdiction because Petitioner has failed to demonstrate standing.

## STATEMENT OF THE ISSUES

1. Whether the Center for Biological Diversity has standing to challenge EPA's approval of Mosaic's request to use phosphogypsum for a small-scale road pilot project on private land, where Petitioner has failed to demonstrate that its members will suffer any actual or imminent injury caused by the project that can be remedied by this Court.

2.  Whether EPA's approval of Mosaic's request to use phosphogypsum for a small-scale road pilot project on private land was an appropriate exercise of the Agency's discretion to approve uses of phosphogypsum for "other purposes" under 40 C.F.R. § 61.206(c), where (1) the regulation does not preclude road construction as a potential "other purpose," (2) EPA fully and appropriately considered all relevant evidence regarding the risks of the project, and (3) EPA reasonably determined that the project is not only as protective of public health as placement of phosphogypsum in a stack, but presents at least an order of magnitude less risk than placement in stacks.

## STATEMENT OF THE CASE

### I.  Regulatory Background

Under section 112 of the Clean Air Act, EPA promulgates National Emission Standards for Hazardous Air Pollutants ("NESHAP").  42 U.S.C. § 7412.  Pursuant to section 112, EPA was required to publish, and subsequently revise, "a list which includes each hazardous air pollutant for which [it] intends to establish an emission standard."  Pub. L. No. 91-604, § 112(b)(1)(A), 84 Stat. 1676, 1685 (1970).  Once listed, EPA is required to identify sources of each hazardous air pollutant and set emission standards for each source category at a health threshold level that "provides an ample margin of safety to protect the public health."  *Id.* § 112(b)(1)(B).  In setting NESHAP, EPA estimates the maximum individual risk,

which is the estimated likelihood that a person living near an emissions source would develop fatal cancer after a lifetime of exposure to the maximum pollutant concentrations. EPA generally presumes that a maximum individual risk that is no higher than approximately 1 in 10,000 is considered safe or acceptable. 54 Fed. Reg. 38044, 38045-46 (Sept. 14, 1989). As the risk increases above this presumptively safe level, the Agency considers this risk with other factors (*i.e.*, number of people exposed, incidences of cancer within the exposed population, uncertainty associated with risk calculation, weight of the scientific evidence, etc.) in making an overall judgment on acceptability. *See id.*

EPA listed radionuclides (including radon) as a hazardous air pollutant in 1979. 44 Fed. Reg. 76738 (Dec. 27, 1979); *see also* 42 U.S.C. § 7412(b)(1). EPA subsequently promulgated emission standards to control radionuclide emissions from a number of different source categories, including phosphogypsum stacks. *See* 54 Fed. Reg. 51654 (Dec. 15, 1989) (the "1989 Rule").

The National Emission Standards for Radon Emissions from Phosphogypsum Stacks is codified in the Agency's regulations at 40 C.F.R. part 61, subpart R ("Subpart R"). In the 1989 Rule, EPA determined that the maximum individual risk associated with baseline emissions from a stack or mine was 9 in 100,000. *See id.* at 51675. This means that phosphogypsum stacks are not expected to increase the most exposed individual's chances of developing a fatal

cancer by more than 9 in 100,000 over a lifetime.  In Subpart R, EPA upheld the industry's practice of disposing of phosphogypsum in stacks or mines based on the Agency's determination that the risk associated with baseline emissions from a stack or mine was acceptable and the practice provided an ample margin of safety to protect public health.  *See* 54 Fed. Reg. at 51675.  Originally, EPA fully precluded any other uses of phosphogypsum because EPA wanted to ensure that phosphogypsum could not be "incorporated into other products or otherwise diffused throughout the country, such that the Agency will be unable to ensure that the phosphogypsum's radon emissions do not present an unacceptable risk to public health." *Id*.

In 1990, EPA granted limited reconsideration of the part of Subpart R that required all phosphogypsum to be disposed of in stacks or mines and commenced a study evaluating the risks associated with the use of phosphogypsum in agriculture, road construction, and research and development activities.  55 Fed. Reg. 13480 (Apr. 10, 1990).  During the subsequent rulemaking, EPA concluded that certain uses of phosphogypsum may be considered acceptable so long as those uses are restricted to limit the estimated maximum individual risk to no more than 3 in 10,000.  *See* 57 Fed. Reg. 23305, 23312 (June 3, 1992) (the "1992 Rule").  This means that if risk assessments show that a proposed use of phosphogypsum is not expected to increase the most exposed individual's chances of developing a fatal

5

cancer by more than 3 in 10,000 over a lifetime, or .03%, it meets the regulatory requirements and may be approved. Review of the Small-Scale Road Pilot Project on Private Land in Florida Submitted by Mosaic Fertilizer, LLC ("EPA Assessment"), Pet'r's App'x Doc. 4, at 14. This determination was based on the Agency's consideration of available information regarding potential exposures, other associated risks, and uncertainties in deriving the risk estimates. 57 Fed. Reg. at 23312. For context, "[e]very day each person is exposed to radiation from a variety of natural and manmade sources" and the "total background radiation from all [these] sources, including naturally occurring radon, results in a calculated individual lifetime risk of fatal cancer of approximately one in one hundred" (or 100 in 10,000, meaning EPA's risk threshold is approximately 3% of background radiation levels). *See* 54 Fed. Reg. at 51658-59.

EPA developed 12 scenarios to evaluate the radiological risks associated with the use of phosphogypsum in agriculture, road construction, and research and development activities. 57 Fed. Reg. at 23308. As for the road construction scenarios it analyzed, EPA modeled risks to the construction worker, road user, resident near the road, and the "reclaimer" scenario, in which the road is abandoned and a future resident lives directly on the road base that contains phosphogypsum with the pavement removed. *Id.* at 23310; Response to Comments (Dec. 11, 2024), Pet'r's App'x Doc. 5, at 6-7. EPA concluded that the

specific road construction scenarios considered in that rulemaking presented an unacceptable risk to public health. 57 Fed. Reg. at 23312. That determination was largely based on a concern about the risks to people living in a house constructed on land where roads built with phosphogypsum previously existed. Response to Comments, Pet'r's App'x Doc. 5, at 7. This reclaimer scenario was associated with the largest increases in risks. 57 Fed. Reg. at 23310. The scenario assumes not only that a future reclaimer lives directly on the exposed road base, but also that the reclaimer drills a well for water and plants a vegetable garden in the contaminated soil that provides 50 percent of the reclaimer's foodstuffs. EPA Assessment, Pet'r's App'x Doc. 4, at A-2.

Based on this study, EPA amended Subpart R to categorically allow, subject to certain conditions and restrictions: (1) the distribution and use of phosphogypsum for outdoor agricultural purposes, 40 C.F.R. § 61.204; and (2) the distribution and use of phosphogypsum for indoor research and development, 40 C.F.R. § 61.205. 57 Fed. Reg. at 23315-19. Based on the specific road construction scenarios analyzed in that rulemaking, EPA declined to categorically allow for the distribution and use of phosphogypsum for road construction at that time. *Id.* at 23312.

In the same amendments, EPA also created a process whereby entities could request that EPA approve uses of phosphogypsum for "other purposes" on a case-

by-case basis.  40 C.F.R. § 61.206.  Under the "other purposes" provision, "[p]hosphogypsum may not be lawfully removed from a stack and distributed or used for any purpose not expressly specified in § 61.204 [outdoor agricultural purposes] or § 61.205 [indoor research and development] without prior EPA approval."  40 C.F.R. § 61.206(a).  Requests to use phosphogypsum for an "other purpose" must be submitted to EPA for approval in accordance with the requirements listed in 40 C.F.R. § 61.206(b).  EPA evaluates potential risks from each request to use phosphogypsum for an "other purpose" on a case-by-case basis.  *See* 57 Fed. Reg. at 23305.  Each proposed use is reviewed based on, among other things, how the phosphogypsum would be used, in what amounts, the risks posed by the proposed use, and the intended pollution control measures.  *See* 40 C.F.R. § 61.206(b).  Under 40 C.F.R. § 61.206(c), EPA has discretion to "grant a request that EPA approve distribution and/or use of phosphogypsum if [it] determines that the proposed distribution and/or use is at least as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine."

EPA's 2005 guidance on applying to EPA for approval of other uses of phosphogypsum lists "road base material" as an example of a "possible 'other use'" of phosphogypsum.  *See* Applying to EPA for Approval of Other Uses of Phosphogypsum: Preparing and Submitting a Complete Petition Under 40 CFR

8

61.206, A Workbook ("EPA Guidance"), Pet'r's App'x Doc. 10, at 6, 12, 16.  In 2020, EPA approved another application for a proposed use of phosphogypsum in road construction but later rescinded the approval on procedural grounds.  *See* 85 Fed. Reg. 66550 (Oct. 20, 2020); 86 Fed. Reg. 35795 (July 7, 2021).

## II.   Procedural Background

In 2022, Mosaic submitted to EPA a request for approval to use phosphogypsum in a small-scale road pilot project pursuant to 40 C.F.R. § 61.206.  Request For Approval of Additional Uses of Phosphogypsum Pursuant to 40 C.F.R. § 61.206 ("Mosaic Application"), Pet'r's App'x Doc. 3.  Mosaic submitted a revised request in 2023.  Request from The Mosaic Company to Use Phosphogypsum in Road Construction Pilot (August 2023) ("Mosaic Revised Application"), Resp't's App'x Doc. 1.  Mosaic's purpose for the project is to demonstrate the range of phosphogypsum road construction designs that meet the Florida Standard Specifications for Road and Bridge Construction.  Mosaic Application, Pet'r's App'x Doc. 3, at 4.

Mosaic's small-scale road pilot project will consist of a 3,200-foot road with eight sections: four 500-foot "test" sections with varying mixtures of phosphogypsum in the road base, each separated by four 300-foot "control" sections with standard materials in the road base.  EPA Assessment, Pet'r's App'x Doc. 4, at 4-6.  The test sections of the road will be 24 feet in width and will be

9

paved with 4 inches of asphalt containing no phosphogypsum.  *Id.*  The road base

containing phosphogypsum will be 10 inches thick and will be sealed below the 4-

inch asphalt surface.  *Id*.

**Figure 1:** Overhead view of the revised, lengthened pilot project.  Test sections are depicted in yellow, control sections in blue, and groundwater monitoring well locations in magenta.



| Segment | Length | Description | Approximate Amount of PG Required (tons) |
|---|---|---|---|
| PG Mix 1 | 500ft | 50% PG – 50% LR blend | 316 |
| Control 1 | 300ft | 100% LR | 0 |
| PG Mix 2 | 500ft | 50% PG – 50% RCA blend | 306 |
| Control 2 | 300ft | 100% RCA | 0 |
| PG Mix 3 | 500ft | 50% PG – 50 % RAP blend | 275 |
| Control 3 | 300ft | 50% Sand – 50 % RAP blend | 0 |
| PG Mix 4 | 500ft | 50% PG – 43% Sand – 7% Cement | 293 |
| Control 4 | 300ft | 93% Sand – 7% Cement | 0 |
| Total | 3200ft | — | 1190 |

Mosaic will construct the Road Pilot Project entirely at its New Wales

facility, a large, privately owned industrial site in Polk County, Florida, on land

which has been mined for phosphate ore.  *Id.* at 4, 20; 89 Fed. Reg. 104535 (Dec.

23, 2024).  The Road Pilot Project will use phosphogypsum from Mosaic's existing

New Wales South phosphogypsum stack and replace sections of an existing facility

road located in the immediate proximity (0.55 miles) of that stack.  EPA

Assessment, Pet'r's App'x Doc. 4, at 20.

**Figure 2:** Overhead view of New Wales facility. Location of the pilot project road and nearest residence are highlighted. Mosaic property is shown in blue.



EPA conducted a risk review in which it analyzed the risk posed by the Road Pilot Project for several scenarios, including to the nearest resident, but determined that the reclaimer scenario need not be analyzed for the Road Pilot Project. EPA Assessment, Pet'r's App'x Doc. 4, at 20-21. EPA determined that, in this particular case, a reclaimer scenario is not reasonably plausible because of the project's location at the New Wales industrial facility. *Id.* Should the New Wales facility ever be developed for a use other than phosphate mining and phosphogypsum storage, the radiological risk due to the existing presence of phosphate ore, phosphogypsum, and other phosphate production residuals would already have to

be carefully considered and remediated.  *Id.*  In addition, the Agency concluded that removing the proposed quantity of phosphogypsum from the stack and using it in the Road Pilot Project on the same site would not significantly change site characteristics or create additional risk to a future trespasser, reclaimer, or other member of the public.  *Id.*

EPA's review found that Mosaic's request contained all the required information under 40 C.F.R. § 61.206(b).  EPA Assessment, Pet'r's App'x Doc. 4, at 2.  EPA further found that Mosaic's risk assessment was technically acceptable and that the potential radiological risks from the Road Pilot Project met the regulatory requirements of 40 C.F.R. § 61.206(c)—that is, the project posed no greater radiological risk than maintaining the phosphogypsum in a stack.  *Id.*  On October 9, 2024, EPA published a proposed approval of Mosaic's Road Pilot Project in the Federal Register and solicited public comment.  89 Fed. Reg. 81910 (Oct. 9, 2024).  Petitioner submitted comments on the proposed approval in which it argued, *inter alia*, that EPA should evaluate the risk of the project by ensuring that the risk created by the project would not exceed 9 in 100,000 rather than the 3 in 10,000 EPA used in its analysis.  *See* Comment Submitted by the Center for Biological Diversity, Pet'r's App'x Doc. 7, at 1, 5-6.

In December 2024, EPA responded to comments and approved Mosaic's request.  Response to Comments, Pet'r's App'x Doc. 5; Letter from EPA on Final

12

Approval for Revised Mosaic Request, Pet'r's App'x Doc. 6; 89 Fed. Reg. at 104535.  The approval is narrow and conditioned.  It limits the project to the activities described in the application and adds a groundwater monitoring requirement.  EPA Assessment, Pet'r's App'x Doc. 4, at 21-22.  In addition, Mosaic must still comply with all other federal, state, or local laws, regulations, or restrictions on the use of phosphogypsum.  EPA Assessment, Pet'r's App'x Doc. 4, at 2.  The approval applies only to the Road Pilot Project and not any broader use.  Any other use would require a separate application, risk assessment, and approval.  89 Fed. Reg. at 104535.

Petitioner petitioned this Court for review of EPA's approval in February 2025.  Petition for Review, ECF No. 1-1.  The following week, the Court asked the parties to address whether it was the correct venue and whether Petitioner has standing.  Jurisdictional Questions, ECF. No. 2-1.  Petitioner and EPA agreed that the Eleventh Circuit is the correct venue because the challenged approval is a locally or regionally applicable final agency action.  EPA Response, ECF. No. 9, at 6-8; Center Response, ECF. No. 10, at 4-11.  On April 15, 2025, the Court held that venue is appropriate in this Circuit and carried EPA's challenge to Petitioner's standing to the merits of the case.  Jurisdictional Order, ECF. No. 16-1.

**III. Standard of Review**

Petitioner bears the burden of demonstrating this Court has jurisdiction over the petition. *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353-54 (11th Cir. 2003); *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 877-78 (11th Cir. 2000). This includes the requirement that Petitioner demonstrate standing with specific facts supported by affidavit or other evidence. *Georgia Republican Party v. SEC*, 888 F.3d 1198, 1201; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Under the Administrative Procedure Act, reviewing courts shall only "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); 42 U.S.C. § 7607(d)(1). This standard is "exceedingly deferential," *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996), and "provides the reviewing court with very limited discretion to reverse an agency's decision." *City Of Oxford, Ga. v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005); *see also Sierra Club v. Johnson*, 541 F.3d 1257, 1264 n.2 (11th Cir. 2008) (explaining that this Circuit applies "the deferential standard of review set forth in the Administrative Procedure Act" to Clean Air Act cases). Moreover, Courts "must be 'extremely deferential' when an agency's decision rests on the evaluation of complex scientific data within the agency's technical expertise." *Miami-Dade*

*Cnty. v. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) (quoting *New York v. Reilly*, 969 F.2d 1147, 1152 (D.C. Cir. 1992)); *see also City of Oxford, Ga.*, 428 F.3d at 1352.

## SUMMARY OF ARGUMENT

1. The Court should dismiss this petition because Petitioner fails to meet its burden to show any of its members has standing to challenge EPA's approval of Mosaic's Road Pilot Project. Petitioner shows no member who suffers a concrete, non-hypothetical injury from EPA's approval of the Road Pilot Project that is redressable by this Court. Petitioner's members complain of health effects that the members themselves attribute to their proximity to the Mosaic facility, *not* specifically to the Road Pilot Project. Moreover, the estimated risks of the Road Pilot Project to a nearby resident are orders of magnitude below even the level Petitioner itself suggests EPA should have used to evaluate the project, further demonstrating that Petitioner has failed to meet its burden to prove injury from EPA's approval of the project that is redressable by this Court. The Court thus should dismiss Petitioner's petition for lack of standing.

2. Even if Petitioner has standing, the petition still should be denied. EPA's approval of the Road Pilot Project was an appropriate exercise of EPA's authority under its regulation authorizing approval of use of phosphogypsum for "other purposes" on a case-by-case basis. Moreover, EPA reasonably determined

15

that use of phosphogypsum in the Road Pilot Project is at least as protective of public health as placement in stacks.

A.      EPA's approval of the Road Pilot Project is authorized by its regulation.  The plain language of EPA's regulation gives EPA broad discretion to approve requests to use phosphogypsum for other purposes, including road construction, as long as the Agency determines that the proposed use is at least as protective of public health as placement in a stack.  40 C.F.R. § 61.206(c).  Petitioner points to nothing in EPA's regulations to suggest that road construction projects cannot be approved for other purposes, and although Petitioner cherry-picks statements from the preamble to the 1992 Rule promulgating the regulations, these statements similarly support EPA's action here.

B.      EPA fully and reasonably considered all evidence regarding the risks posed by the Road Pilot Project.  Because the analysis for the use of phosphogypsum for an "other purpose" is performed on a case-by-case basis, EPA necessarily considered the specific factual and technical context of the Road Pilot Project in assessing the risks of the project.  Specifically, EPA reasonably scaled its consideration of the length of time people would be exposed to phosphogypsum to reflect the specific nature of the project.  EPA also appropriately determined that it need not consider a "reclaimer scenario" in which a future landowner may remove the road and use the land for housing because the Road Pilot Project is located on

16

an industrial facility used for phosphate mining and phosphogypsum storage that would already require substantial remediation regardless of and beyond the Road Pilot Project. Finally, EPA appropriately accounted for Mosaic's preliminary data by adopting a conservative assessment of radium concentration data and requiring subsequent confirmatory testing.

C. Based on EPA's full assessment of the evidence, EPA reasonably concluded that the Road Pilot Project is at least as protective of human health as placement of phosphogypsum in stacks. EPA appropriately assessed the risk of the Road Pilot Project by ensuring it would not increase the risk by more than 3 in 10,000, pursuant to its longstanding policy. But even if Petitioner is correct that EPA should have used a threshold of 9 in 100,000, the data demonstrates that the Road Pilot Project is still substantially below that threshold.

## ARGUMENT

I. **The Court Should Dismiss the Center's Petition for Lack of Standing.**

Article III of the Constitution confines the reach of federal jurisdiction to "cases" and "controversies." *Wolff*, 351 F.3d at 1353. Standing "is perhaps the most important of [the jurisdictional] doctrines." *Bischoff*, 222 F.3d at 878, 884 (citing *United States v. Hays*, 515 U.S. 737 (1995)) (cleaned up). As an organization, Petitioner bears the burden of establishing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Sierra Club v. Johnson*, 436 F.3d 1269, 1276 (11th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Petitioner fails to demonstrate that "(1) [any of its members] has suffered an 'injury in fact' ... (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Georgia Republican Party*, 888 F.3d at 1202. Because Petitioner failed to establish that its members suffered any injuries satisfying these three elements, the petition must be dismissed for lack of jurisdiction.

### A. Petitioner Lacks Standing Because It Has Not Demonstrated Injury in Fact.

The Supreme Court has made clear that an injury in fact must be "(a) concrete and particularized" and "(b) "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation omitted); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016); *Corbett v. TSA*, 930 F.3d 1225, 1232 (11th Cir. 2019). In particular, environmental and health injuries often are probabilistic, and although increases in risk can constitute injuries in fact sufficient to confer standing, if "all purely speculative 'increased risks' [were] deemed injurious, the entire requirement of 'actual or imminent injury' would be rendered moot." *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006) (internal citation omitted).

18

Therefore, in increased-risk-of-harm cases, the courts have required demonstration of "at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 513 F.3d 234, 237 (D.C. Cir. 2008) (emphasis in original; citations omitted); *see also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 933 (11th Cir. 2020) (finding that appellee failed to plead an injury in fact when it did not plead facts that "plausibly allege a material risk, or *significant risk*, or *substantial risk*, or anything approaching a *realistic danger*.") (emphasis added).

Petitioner claims that two of its members, Michael Lexner and Elise Pautler Bennett, live near the Road Pilot Project site and "are injured by hazardous air pollutant exposure and increased aquifer and groundwater contamination from this project." Pet'r's Opening Br., ECF No. 24-1, at 21. Specifically, Petitioner claims that these "members residing and recreating near the facility are threatened by increased radon exposure and toxic and heavy metal contamination to nearby groundwater and their drinking water." Pet'r's Opening Br., ECF No. 24-1, at 22. Petitioner further argues that its members' mere proximity to Mosaic's facility somehow demonstrates injury from this specific project. As explained below, the supporting declarations fail to evidence any of these assertions.

**1. Petitioner Has Failed to Establish That Its Members Face Increased Risks from Radon Exposure Traceable to the Approval of the Road Pilot Project.**

Petitioner offers no evidence that its members face increased risk from radon exposure as a result of EPA's approval of the use of phosphogypsum in the road base of four 500-foot sections of road located entirely within a large industrial site where large amounts of phosphogypsum are stored in stacks. Petitioner cites two declarations in support of this assertion, but both declarants assert their generalized concerns about living near the Mosaic facility, *not* concerns regarding the Road Pilot Project at issue here. *See* Pet'r's Opening Br., ECF No. 24-1, at 22-23 (citing Declaration of Michael Lexner ("Lexner Decl."), ECF No. 24-2, ¶¶ 3-9; Declaration of Elise Pautler Bennett ("Bennett Decl."), ECF No. 24-3, ¶¶ 12, 14-15).

Mr. Lexner states that Mosaic's "facility is located very close to [his] home," and that he is concerned about "radioactive particulate matter" for "communities within a 7.5-mile distance from these stacks . . . ." Lexner Decl. ¶¶ 3, 7. But proximity of Mr. Lexner's home to the Mosaic facility stacks is not affected by the Road Pilot Project.

Similarly, Ms. Bennet asserts that she is concerned about "radionuclides from phosphogypsum stacks" because she "live[s] within 80 km of . . . Mosaic's New Wales facility" and has "driven by the mountains of toxic, radioactive waste

at the New Wales Facility." Bennett Decl. ¶ 15. But her proximity to the stacks is similarly unaffected by the Road Pilot Project.

Although Mr. Lexner also asserts that he is concerned that "construction crews will take phosphogypsum from the stacks and spread it across the ground," which he believes "will lead to additional radioactive particulate matter exposure," Lexner Decl. ¶ 8, Mr. Lexner seems to misapprehend that the phosphogypsum in the Road Pilot Project will be mixed in the underground road base that will be sealed below a 4-inch asphalt surface. EPA Assessment, Pet'r's App'x Doc. 4, at 4-6. Furthermore, EPA has determined that the maximum individual risk posed by this project to nearby residents is less than 1 in 1 million, less than 1% of Petitioner's preferred 9 in 100,000 risk threshold. *See id.* at 17.

Petitioner's concerns regarding the Mosaic site thus fail to demonstrate any actual injury resulting specifically from the Road Pilot Project, the sole agency action at issue in this litigation.

Although Petitioner argues its members also have concerns about an EPA guidance document estimating that storing phosphogypsum in stacks poses a maximum individual risk level of no more than 3 in 10,000, this document similarly cannot establish standing to challenge the Road Pilot Project at issue here. Petitioner's members assert that EPA has issued a guidance document in which EPA *might* in some *future* agency action approve a use of phosphogypsum

21

for which the maximum individual risk is up to 3 in 10,000, which is higher than their preferred risk threshold. Lexner Decl. ¶ 10; Bennett Decl. ¶ 9. But that guidance document is not the agency action at issue in this litigation. And it is undisputed that the maximum individual risk presented by the Road Pilot Project to an individual living even *closer* than Petitioner's closest-living member is less than 1 in *1,000,000*, substantially *lower* than Petitioner's preferred 9 in 100,000 risk threshold. EPA Assessment, Pet'r's App'x Doc. 4, at 19-20.

Indeed, in the National Emission Standards for Hazardous Air Pollutants ("NESHAP") context, EPA has determined that emissions that would result in no more than one additional fatal cancer case in a population of 10,000 of the most exposed individuals over a lifetime—a risk nearly *100 times* greater than the risk EPA assessed for the nearest resident to the Road Pilot Project—are presumptively safe. *See* 54 Fed. Reg. at 38045-46; *see also* 57 Fed. Reg. at 23306. Petitioner simply has not and cannot establish that moving phosphogypsum from a stack on the Mosaic property—when EPA has determined stacks pose a 9 in 100,000 maximum individual risk—to the Road Pilot Project, where it presents a risk of less than 1 in 1,000,000—constitutes an actual or imminent injury. *Muransky*, 979 F.3d at 933 (finding that appellee failed to plead an injury in fact when it did not plead facts that "plausibly allege a material risk, or significant risk, or substantial risk, or anything approaching a realistic danger.").

22

**2. Petitioner Has Failed to Establish Its Members Face Any Increased Risk of Groundwater Contamination Traceable to the Approval of the Road Pilot Project.**

Petitioner similarly has failed to produce evidence demonstrating that its members face an increased risk of groundwater contamination. The sole declaration Petitioner cites in its brief for this alleged injury explicitly states the member stopped using groundwater in *2016*. *Compare* Pet'r's Opening Br., ECF No. 24-1, at 22 (identifying only one member, Michael Lexner, as a member who "draws water from a well near the facility") *with* Lexner Decl. ¶ 4. Mr. Lexner explicitly attests that as a result of an incident at the Mosaic facility in 2016, he and his family "stopped drinking well water on [their] property" and instead "bring in jugs of water to use for drinking, food preparation, coffee, and other purposes." *Id*. Mr. Lexner further attests that, because of his concerns regarding the groundwater due to the incident in 2016, he does not grow food or keep livestock on the property. *Id*. ¶¶ 5-6.

Because the sole member Petitioner cites in its brief as experiencing any injury from groundwater expressly disavows using groundwater for nearly a *decade* before EPA even took the agency action at issue in this litigation, Petitioner has failed to establish any actual or imminent injury from any possible increased risk of groundwater contamination.

Moreover, it is worth noting that Petitioner failed to produce any evidence demonstrating that the Road Pilot Project would actually increase any likelihood of groundwater contamination due to the Road Pilot Project. *See* Pet'r's Opening Br., ECF No. 24-1, at 21-23. And EPA's analysis did not identify *any* scenario in which phosphogypsum road construction was expected to result in significant impacts to surface or groundwater. EPA Assessment, Pet'r's App'x Doc. 4, at 21-22. In the Background Information Document in support of the 1992 Rule, EPA evaluated the following exposure pathways to determine the total risks for a resident living near a road containing phosphogypsum: direct gamma exposure; ingestion of drinking water from a contaminated well; and ingestion of foodstuffs contaminated by well water. EPA, Background Information Document, Potential Uses of Phosphogypsum and Associated Risks ("1992 BID"), Pet'r's App'x Doc. 9, at 4-10. According to the results of the 1992 BID, "no radionuclides were calculated to reach an on-site well via the groundwater pathway for almost 10,000 years." EPA Assessment, Pet'r's App'x Doc. 4, at 19; 1992 BID, Pet'r's App'x Doc. 9, at 4-31–4-34. As a result, the risks from exposure from well water were determined to be "negligible" and do not contribute to the total risks of the use of phosphogypsum in road construction. EPA Assessment, Pet'r's App'x Doc. 4, at 19; 1992 BID, Pet'r's App'x Doc. 9, at 4-31–4-34. Accordingly, Petitioner has not and cannot demonstrate any actual or imminent risk of groundwater exposure that is traceable

to the Road Pilot Project. *Muransky*, 979 F.3d at 933. Nonetheless, the site is already subject to permitted groundwater protection and monitoring requirements. EPA Assessment, Pet'r's App'x Doc. 4, at 21.

### 3. Petitioner Has Failed to Establish Its Members Face Any Increased Risk from Their Proximity to the Road Pilot Project.

Petitioner seems to argue that its members' proximity to the Road Pilot Project alone is sufficient to establish standing. *See* Pet'r's Opening Br., ECF No. 24-1, at 21-22 (collecting cases citing proximity to nuclear waste storage). However, the cases on which Petitioner relies are inapposite. They involved the storage of large volumes of nuclear waste, *see e.g.*, *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1258 (D.C. Cir 2004) not the use of phosphogypsum in a carefully conditioned, small-scale road pilot project on a private industrial property. *See* Notice of Approval, Pet'r's App'x Doc. 2. The risks associated with the storage of nuclear waste are fundamentally different from the risks at issue in this context. For example, the Yucca Mountain waste repository was expected to "house up to 70,000 metric tons of radioactive waste", *Nuclear Energy Inst., Inc.,* 373 F.3d at 1261. Mosaic, on the other hand, is only approved to use up to 1,200 tons of phosphogypsum in its Road Pilot Project, and in the same location where phosphogypsum already is stored in large quantities. Notice of Approval, Pet'r's App'x Doc. 2, at 1-2; EPA Assessment, Pet'r's App'x Doc. 4, at 15. Again, plaintiffs in *Kelley v. Selin* also challenged the storage of spent nuclear fuel, not

phosphogypsum.  42 F.3d 1501, 1505, 1507 (6th Cir. 1995); *Nuclear Energy Inst., Inc.,* 373 F.3d at 1258.  In addition, Mosaic will not be transporting spent nuclear fuel through members' communities as part of the Road Pilot Project.  *Compare Texas v. NRC*, 78 F.4th 827, 836 (5th Cir. 2023) *with* EPA Assessment, Pet'r's App'x Doc. 4, at 15.

Consequently, this Court should find that Petitioner's members have failed to show that they face a substantial or meaningful probability of harm from EPA's approval of the Road Pilot Project and have not demonstrated an actual or imminent injury-in-fact.

### B. Petitioner Lacks Standing Because It Has Not Demonstrated That Its Alleged Injuries Are Redressable.

This Court has held that "[r]edressability is established … when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'"  *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (citing *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Here, Petitioner fails to show that vacating EPA's approval of the Road Pilot Project would significantly increase the likelihood that its members would obtain relief that directly redresses their alleged injuries.  *See* Pet'r's Opening Br., ECF 24, at 21-23.  The Road Pilot Project will source its phosphogypsum from an existing stack at the New Wales facility.  EPA Assessment, Doc. 4, at 20.  This

means that no additional phosphogypsum will be introduced into the area as a result of the road's construction. Consequently, regardless of any relief granted in this case, the amount of phosphogypsum at the site as a whole will remain the same regardless of whether the project proceeds. Glaringly, Petitioner offers no evidence to the contrary. *See* Pet'r's Opening Br., ECF 24, at 21-23. In other words, Petitioner has not demonstrated that the alleged harm will change as a result of the relief sought in this case. Because standing requires some plausible redress path, the Court lacks Article III jurisdiction. Petitioner simply has not met its burden.

Because Petitioner has failed to demonstrate that any of its members will imminently suffer any harm that is fairly traceable to EPA's approval of the Road Pilot Project and can be redressed by this Court, the petition must be dismissed for lack of jurisdiction.

## II. The Court Should Deny the Center's Petition Because EPA's Approval of the Road Pilot Project was an Appropriate Exercise of the Agency's Discretion to Approve the Use of Phosphogypsum for Other Purposes.

EPA has broad discretion to grant a request for approval to use phosphogypsum as long as the Agency determines that "the proposed distribution and/or use is at least as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. § 61.206(c). Here, the radiological risk assessments for the Road Pilot Project

27

showed that risks were an order of magnitude lower than that risk. EPA Assessment, Doc. 4, at 17. As a result, EPA appropriately concluded that the Road Pilot Project is at least as protective of public health as maintaining the phosphogypsum in a stack. *Id.* at 2-3. Thus, EPA appropriately exercised its discretion to approve, subject to certain conditions, Mosaic's request for a small-scale road pilot project.

Petitioner raises three substantive arguments in its opening brief, none of which has merit. First, Petitioner argues, based solely on a mischaracterization of two sentences in the preamble to the 1992 Rule, that EPA's regulations somehow preclude the Agency from *ever* approving any road construction projects regardless of the associated risks. *See, e.g.*, Pet'r's Opening Br., ECF 24, at 34-49. Second, Petitioner claims that EPA's risk assessment methodology was arbitrary and unlawful even though the Agency explained in its risk assessment why its methodology was appropriate for the purposes of reviewing the Road Pilot Project. *Id.* at 55-64. Third, Petitioner argues that EPA should have used a different risk threshold but does not dispute that the risks from the Road Pilot Project are well below even Petitioner's preferred risk threshold. *Id.* at 49-55. Each of these arguments fails, as detailed below.

**A. EPA's Regulations Give the Agency Discretion to Approve the Use of Phosphogypsum in Road Construction as an "Other Purpose."**

The plain language of 40 C.F.R. § 61.206(c) authorizes EPA to consider *any* "other purposes," and does not preclude EPA from considering road construction as an "other purpose." Although Petitioner urges this Court to ignore the plain language of the regulation and look instead to its cherry-picked statements from the preamble to the 1992 Rule amending the regulation, the preamble supports EPA's interpretation. Moreover, Petitioner incorrectly argues that EPA changed its interpretation of the regulatory language from Petitioner's own atextual interpretation without giving the public "fair notice." *See, e.g.*, Pet'r's Opening Br., ECF No. 24-1, at 39-42. This argument similarly fails because Petitioner's novel interpretation has never been endorsed by the Agency.

**1. By Its Plain Language, the Regulation Authorizes EPA to Approve Road Construction as an "Other Purpose."**

The plain language of a regulation is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear. *Gose v. Native Am. Servs. Corp.,* 109 F.4th 1297, 1310 (11th Cir. 2024) ("If the statute's or regulation's meaning is plain and unambiguous, there is no need for further inquiry.") (cleaned up). Here, the plain language of the regulation demonstrates that EPA has authority to approve a request to use phosphogypsum for road construction.

29

The regulation states:

> The Assistant Administrator for Air and Radiation may decide to grant a request that EPA approve distribution and/or use of phosphogypsum if he determines that the proposed distribution and/or use is at least as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine.

40 C.F.R. § 61.206(c) (Distribution and use of phosphogypsum for other purposes). This language plainly does not exclude EPA's consideration and approval of the use of phosphogypsum in road construction provided the Agency determines such use is at least as protective of public health as placement in a stack.

Even if the regulatory language were ambiguous (and it is not), EPA is entitled to deference in interpreting its own rules. *See Kisor v. Wilkie*, 588 U.S. 558, 558 (2019) ("Congress intended for courts to defer to agencies when they interpret their own ambiguous rules."). Under *Kisor*, if this Court finds the regulations to be "genuinely ambiguous," it should defer to EPA's interpretation if it is both "reasonable" and "worthy of controlling weight." *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (quoting *Kisor*, 588 U.S. at 575-76; *see also Diamond Servs. Corp. v. Curtin Mar. Corp.*, 99 F.4th 722, 734 (5th Cir. 2024) ("*Kisor* requires only that the agency's reading must 'fall within the bounds of reasonable interpretation,' not that the agency's interpretation must align with a party's preferences") (internal citations omitted).

Here, EPA's interpretation of its authority under 40 C.F.R. § 61.206 to approve uses of phosphogypsum for other purposes, to include road construction, falls well within the bounds of a reasonable interpretation.

**2. The Preamble to the 1992 Rule Supports EPA's Interpretation.**

Relying solely on a mischaracterization of the preamble to the 1992 Rule amending the regulation, Petitioner asks this Court to interpret the regulation as precluding EPA from *ever* considering the use of phosphogypsum in road construction as an "other purpose." Notably, Petitioner does not even attempt to root its interpretation in the language of the regulation. Petitioner instead urges this Court to look beyond the regulation's plain language for "other indications of the [agency's] intent at the time of the regulation's promulgation." Pet'r's Opening Br., ECF No. 24-1, at 27 (quoting *Advanced Energy United, Inc. v. FERC,* 82 F.4th 1095 (D.C. Cir. 2023)). Not even the preamble to the 1992 Rule can support Petitioner's interpretation.

First, Petitioner alleges that EPA rejected road construction as an "other purpose" in the preamble to the 1992 Rule. Pet'r's Opening Br., ECF No. 24-1, at 24. This is incorrect. EPA amended Subpart R to allow distribution and use of phosphogypsum for outdoor agricultural purposes, indoor research and development, and for "other purposes," with prior approval by EPA on a case-by-case basis. 57 Fed. Reg. 23305. At that time, EPA also considered *categorically*

31

authorizing the use of phosphogypsum in road construction but decided not to do so. *Id.* In so doing, EPA did not foreclose any or all uses of phosphogypsum in road construction that could ever arise in the future, but simply declined, at that time, to categorically authorize—as for agricultural or research and development uses—use of phosphogypsum in road construction. Response to Comments, Pet'r's App'x Doc. 5, at 6-7. EPA left open the possibility of considering road construction on a case-by-case evaluation. *Id*.

Second, Petitioner argues that EPA concluded in the preamble to the 1992 Rule that *all* roads were too dangerous to be considered an "other purpose." Pet'r's Opening Br., ECF No. 24-1, at 33. This too is incorrect. To support this statement, Petitioner selectively quotes from two sentences in the preamble to the 1992 Rule: "regardless of the radium[] concentration in phosphogypsum, the use of phosphogypsum in road construction always resulted in a [maximum individual risk] significantly greater than the presumptively safe level" and "[t]herefore, EPA has determined that the use of phosphogypsum in road construction presents an unacceptable level of risk to public health." 57 Fed. Reg. at 23311-12. In so arguing, Petitioner misconstrues both the underlying data and context of EPA's statements. The previous sentence makes clear that EPA was describing risks associated with specific scenarios, not making broad generalizations: "*For the road construction scenarios analyzed*, the use of phosphogypsum always resulted in a

32

[maximum individual risk] greater than the outer bound of the presumptively safe level of approximately $1 \times 10^{-4}$. Therefore, EPA has determined that the use of phosphogypsum in road construction presents an unacceptable level of risk to public health." 57 Fed. Reg. at 23312 (emphasis added). Omitting the language explicitly limiting EPA's 1992 determination to *only* the specific scenarios EPA analyzed at that time mischaracterizes the import and meaning of this language.

In the 1992 Rule, EPA modeled risks to the construction worker, road user, resident near the road, and the "reclaimer" scenario. 57 Fed. Reg. at 23310; Response to Comments, Pet'r's App'x Doc. 5, at 6-7. The reclaimer scenario assumed the road was abandoned and a future resident would build and live in a house directly on the exposed road base that contains phosphogypsum. Response to Comments, Pet'r's App'x Doc. 5, at 6-7. In addition, the reclaimer scenario assumed the reclaimer would drill a well for water and plant a vegetable garden in the contaminated soil that would provide 50 percent of the reclaimer's foodstuffs. EPA Assessment, Pet'r's App'x Doc. 4, at A-2. EPA's analysis indicated that the reclaimer scenario was associated with the largest increases in risks. 57 Fed. Reg. at 23310. Looking at the road construction scenarios analyzed, and using the highest radium concentration, the reclaimer scenario was the only exposure pathway that resulted in a lifetime risk greater than 3 in 10,000. EPA Assessment, Pet'r's App'x Doc. 4, at A-1–A-2; 1992 BID, Pet'r's App'x Doc. 9, at 4-31–4-34.

33

As it did when evaluating categorical approval of the use of phosphogypsum for outdoor agricultural purposes and indoor research and development, EPA considered whether to categorically allow the use of phosphogypsum in road construction. Given the potentially pervasive and widespread nature of road construction, if it were categorically allowed rather than considered on a case-by-case basis, it made sense for EPA to include the reclaimer scenario in its risk assessment. And based on that specific assessment (*i.e.*, "[f]or the road construction scenarios analyzed"), EPA concluded that phosphogypsum in road construction presented an unacceptable level of risk to public health, which did not support categorical approval. 57 Fed. Reg. at 23312. However, EPA never determined that *all* road applications, no matter how narrow, would present an unacceptable risk to public health such that they could not be approved on a case-by-case basis.

### 3. EPA's Interpretation of Its Regulation Is Not a Change in Position.

Finally, Petitioner incorrectly argues that EPA changed its interpretation of its regulation through its approval of the Road Pilot Project and that its approval is tantamount to amending the regulation. Pet'r's Opening Br., ECF No. 24-1 (quoting *Golden Living Ctr. – Mt. View v. Sec'y of HHS*, 832 Fed. Appx. 967 (6th Cir. 2020)). But EPA neither changed its position nor amended its regulation; EPA

34

has never endorsed Petitioner's interpretation of the regulation as excluding all road projects from the definition of "other purposes" for phosphogypsum.

Despite Petitioner's repeated attempts to make the point, this is not a matter of a rule revision or reinterpretation. It is Petitioner's reading, not EPA's longstanding interpretation, that strains the plain language of the regulation and is unsupported by the context and data underlying the 1992 Rule. If anything, Petitioner engaged in revisionist history by claiming that EPA concluded "all roads were too dangerous as an 'other purpose'" and that EPA categorically rejected "road construction projects as an other purpose." Pet'r's Opening Br., ECF No. 24-1, at 33, 35. EPA never did such a thing. Rather, contrary to Petitioner's statement, EPA explicitly qualified its analysis of phosphogypsum in road construction when it determined that the use presented an unacceptable risk only "[*f*]*or the road construction scenarios analyzed*." 57 Fed. Reg. at 23312 (emphasis added).

Petitioner does not point to anywhere else where the Agency supposedly endorsed Petitioner's novel interpretation. *See* Pet'r's Opening Br., ECF No. 24-1, at 23-34. Nor can it. There is nothing in the EPA's 2005 guidance on applying for approval for other uses of phosphogypsum to support Petitioner's interpretation. *See* EPA Guidance, Pet'r's App'x Doc. 10. To the contrary, in section 3.0, EPA lists "[r]oad base material" as a "possible 'other use[].'" EPA Guidance, Pet'r's

App'x Doc. 10, at 8; *see also id.* at 6, 16 (explaining that if an applicant proposes to use phosphogypsum in a road base, the EPA may require a ground water monitoring program). Indeed, in 2020, EPA approved another application for a proposed use of phosphogypsum in road construction. *See* 85 Fed. Reg. 66550. Although EPA ultimately rescinded that approval on procedural grounds related to the information requirements under 40 C.F.R. § 61.206(b), *see* 86 Fed. Reg. 35795, EPA's position regarding road construction as a possible "other purpose" has remained consistent.

In short, EPA's regulation has always allowed the Agency to consider road construction as an "other purpose," and Petitioner's arguments to the contrary are simply incorrect.

### B. EPA Appropriately Considered All Relevant Evidence in Assessing the Road Pilot Project.

As is inherent in a case-by-case analysis, EPA properly tailored its consideration of the Road Pilot Project to the specific context of that project. First, EPA considered appropriate durations in the scenarios in light of the limited test project evaluated. Second, EPA properly declined to consider a "reclaimer scenario" in which the location of the Road Pilot Project would revert to a non-road use because the project will be constructed entirely on an industrial property that is already used for phosphogypsum storage. And finally, EPA properly relied

36

on the radium concentration data available.  *Contra* Pet'r's Opening Br., ECF No. 24-1, at 44-53.

Notably, EPA's risk assessment methodology is a matter of "technical judgment lying fully within the scope of the EPA's agency discretion."  *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1070 (11th Cir. 2008) (concluding that "the technical judgment made by the EPA was reasonable").  "The law does not require selection of the single best methodology in any case, but only a study 'based on a consideration of the relevant factors' and in the construction of which there has been no 'clear error of judgment.'" *Id.* at 1069 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)) (citation modified).  In matters such as this, courts "give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'"  *West Virginia v. EPA*, 362 F.3d 861, 866-68 (D.C. Cir. 2004) (deference is due to an agency's modeling of complex phenomena, so long as "model assumptions . . . have a 'rational relationship' to the real world") (citations omitted).  Here, EPA's "Risk Assessment's methodology was appropriate for the problem it addressed." *Miami-Dade Cnty. v. EPA*, 529 F.3d at 1069.

### 1. EPA Reasonably Scaled Exposure Durations to Reflect the Actual Exposure Times Expected to Result from the Road Pilot Project.

EPA expressly stated that "the level of restrictions placed on a particular application should be commensurate with the level of risk associated with the

application." 57 Fed. Reg. at 23315. Accordingly, EPA reasonably scaled risk estimates developed for an annual or lifetime exposure to reflect the actual exposure times that are expected to result from the Road Pilot Project. EPA Assessment, Pet'r's App'x Doc. 4, at 15; *contra* Pet'r's Opening Br., ECF No. 24-1, at 51.

EPA applied a one-month exposure duration for the modeled construction worker and truck driver transporting phosphogypsum who would construct the test road, consistent with the estimated timeframe for that construction. EPA Assessment, Pet'r's App'x Doc. 4, at 17-18. This approach is reasonable. *Miami-Dade Cnty*, 529 F.3d at 1070 (concluding that "the technical judgment made by the EPA was reasonable" because assumptions used in EPA's modeling of different risk scenarios had a "rational relationship to the real world"). Although Petitioner argues that EPA must assume a 70-year exposure period to evaluate the risks posed by the Road Pilot Project, Pet'r's Opening Br. at 46, nothing dictates that criterion. Indeed, where a construction worker is only expected to spend one month on-site during the road's construction, it would be nonsensical to assume an exposure duration spanning decades. Mosaic Application, Pet'r's App'x Doc. 3, at 6-7 (stating that the time to construct the test road will be a few weeks to a month given its small size). Similarly, although the risk of public exposure to the road is low due to the very limited number of people who can access the road within

Mosaic's facility, EPA nonetheless reasonably assumed a worker would traverse the Road Pilot Project for a total of 250 hours in a 2,000-hour work year, consistent with the 1992 BID risk assessment. EPA Assessment, Pet'r's App'x Doc. 4, at 18-19. Lastly, EPA used a residential exposure duration of 30 years to calculate the risk to the nearby resident.[1] EPA Assessment, Pet'r's App'x Doc. 4, at 19-20.

The total risks to a road construction worker, truck driver transporting phosphogypsum, road user (site employee), and nearby residents are all less than 2 in 1 million. EPA Assessment, Pet'r's App'x Doc. 4, at 17. EPA derived these estimates from the 1992 BID except for the truck driver scenario, which is a risk category uniquely relevant to the Road Pilot Project and not assessed in the 1992 BID.

---

[1] *See* U.S. EPA, *OSWER Directive 9200.1-120, Human Health Evaluation Manual, Supplemental Guidance: Update of Standard Default Exposure Factors (2014)*, https://www.epa.gov/risk/oswer-directive-92001-120 (recommending a "Resident Exposure Duration" of 26 years); *see also* U.S. EPA, *Exposure Factors Handbook – 2011 Edition, Table 16-10*8, https://www.epa.gov/expobox/exposure-factors-handbook-2011-edition (identifying 26 years as the 90th percentile value for residential exposure duration); U.S. EPA, *Frequently Asked Questions about Update of Standard Default Exposure Factors, 2 (2015)*, https://www.epa.gov/risk/faqs-about-update-standard-default-exposure-factors (explaining how 26 years was selected as the default value for residential exposure duration). The Court may take judicial notice of documents published on an agency's website. Fed. R. Evid. 201(b)(2); *R.S.B. Ventures, Inc. v. FDIC*, 514 F. App'x 853, 856 n.2 (11th Cir. 2013) (taking judicial notice of information found on the FDIC's website); Pet'r's Opening Br., ECF 24-1, at 8 n.5, 9 nn.6-7, 40 n.10 (requesting this Court take judicial notice of documents on federal government websites).

Petitioner asserts, without evidence, that "the actual exposure will likely occur over a much longer duration." Pet'r's Opening Br., ECF No. 24-1, at 46. For argument's sake, even if the construction of a 3,200-foot road took one year to complete instead of one month, the total risk to, for example, the construction worker, which is the highest-exposure scenario, would still be fewer than 2.4 in 100,000 (calculated as 2 in 1 million multiplied by 12), well below the acceptable risk threshold of 3 in 10,000. EPA Assessment, Pet'r's App'x Doc. 4, at 17. And 2.4 in 100,000 would be the maximum individual risk. Meaning that EPA would expect fewer than 2.4 additional cases in a population of 100,000 of the most exposed construction workers, or 0.0024%. For illustrative purposes, assuming a group of 1,000 maximally exposed construction workers, a risk of 0.0024% would equal fewer than 0.024 cases for that group. Statistically, that would mean no additional cases of fatal cancer.

Additionally, the total risks to a road user are less than 1 in 1 million, and likely an order of magnitude less. EPA Assessment, Pet'r's App'x Doc. 4, at 18-19. The 1992 BID found the risk per year of exposure to a person driving on the road to be 8.2 in 100 million. *Id.* at A-1; 1992 BID, Pet'r's App'x Doc. 9, at 4-31–4-32. Given that risk scales linearly with radium concentration, scaling the radium concentration in the 1992 BID (26 pCi/g) to match the one used to evaluate the Road Pilot Project (35 pCi/g) gives us a *risk per year* of exposure of this Road

Pilot Project to a road user of approximately 1.1 in 10 million.  EPA Assessment,

Pet'r's App'x Doc. 4, at 16 ("For these risk assessment scenarios, dose rates and

risk may be scaled linearly based on the concentration of [radium] in the

phosphogypsum used.").  Meaning, again for argument's sake, that even assuming

a person driving on the road would have 70 years of exposure, as Petitioner

suggests, the increased risk caused by the road would still only be approximately

7.7 in 1 million (calculated as 1.1 in 10 million multiplied by 70).  Pet'r's Opening

Br., ECF No. 24-1, at 46.

EPA estimated the total risks of the Road Pilot Project to the nearest resident,

who is 2.4 miles away, to be less than 1 in 1 million.  EPA Assessment, Pet'r's

App'x Doc. 4, at 17, 19-20.  As one way to evaluate this risk, EPA scaled the

radium concentrations in phosphogypsum used in two of the road construction

scenarios analyzed in the 1992 Rule, which solely modeled phosphogypsum in the

road base, like Mosaic's project, to match the radium concentrations used in this

project.  EPA Assessment, Pet'r's App'x Doc. 4, at 19, A-1–A-2; *see also* 1992

BID, Pet'r's App'x Doc. 9.  In doing so, EPA estimated that the total lifetime risks

of the Road Pilot Project for 30 years of exposure to a nearby resident would

actually be 6.6 in 10 million.  EPA Assessment, Pet'r's App'x Doc. 4, at 19.

Using this 1992 BID risk assessment, however, overestimates the actual

risks associated with the Road Pilot Project.  The 1992 BID evaluated risks to a

person living 100 or 1,000 meters from the road.  EPA Assessment, Pet'r's App'x Doc. 4, at 19.  Because doubling the distance reduces the dose rate by a factor of four and does rates and risk are scaled linearly, a person living 2.4 miles away (approximately 3,862 meters) from the Road Pilot Project would at the very least be almost four times as far and, consequently, have a dose rate roughly 16 times lower, equaling a maximum individual risk of approximately 4.125 in 100 million (calculated as 6.6 in 10 million divided by 16).  EPA Assessment, Pet'r's App'x Doc. 4, at 20 ("dose to the receptor is reduced at an exponential rate according to the inverse square law"); EPA Assessment, Pet'r's App'x Doc. 4, at 16.  In addition, the 1992 BID found that increasing the nearby resident's exposure from 26 years to 70 years only increased the estimated lifetime risk by 1 in 1 million— and this is before you decrease dose by a factor of four for each doubling of distance.  EPA Assessment, Pet'r's App'x Doc. 4, at A-2.  Therefore, even scaling the exposure duration of a nearby resident from 30 years to 70 years would be equally negligible.

EPA thus reasonably confined the exposure durations to the actual exposure times expected to result from the Road Pilot Project and determined that the risk was less than the risk of placement of phosphogypsum in stacks.  This provides realistic risk estimates for the project.  To the extent Petitioner complains about the durations used, even extending the time to complete the road to one year and the

lifetime exposure of road users and nearby residents to 70 years still yields results that are at least as protective of public health as placement of phosphogypsum in a stack.

### 2. EPA Properly Excluded the Reclaimer Scenario When Calculating the Road Pilot Project's Risks.

EPA properly did not consider a "reclaimer scenario" when assessing the risk of the Road Pilot Project because the project exclusively exists on a site already used for phosphogypsum storage that has institutional controls in place. Response to Comments, Pet'r's App'x Doc. 5 at 10; *contra* Pet'r's Opening Br., ECF No. 24-1, at 47, 50.

EPA's determination that the reclaimer analysis is not pertinent to this site was reasonable given that the Road Pilot Project will be located on a private industrial site where phosphate ore mining, phosphoric acid production, and phosphogypsum storage already takes place. Response to Comments, Pet'r's App'x Doc. 5, at 10. If Mosaic's industrial site was redeveloped, a developer would need to remediate the site and address all the "radiological risk due to the presence of phosphate ore, phosphogypsum, and other phosphate production residuals … along with other risks inherent to any former industrial site." EPA Assessment, Pet'r's App'x Doc. 4, at 20. Because reclamation of the 3,200-foot road is not segregable from analysis of the contamination of the entire site and a reclaimer scenario in which only the 3,200-foot road were reclaimed is not

reasonably plausible, EPA correctly determined that such a hypothetical reclaimer at some point in the future did not realistically reflect the risks, long-term or otherwise, posed by the Road Pilot Project. As such, EPA appropriately concluded that "[r]emoving the proposed quantity of phosphogypsum from the stack and using it in the proposed pilot project on the same site would not significantly change site characteristics or create additional risk to a future trespasser, reclaimer, or other member of the public." EPA Assessment, Pet'r's App'x Doc. 4, at 20.

Furthermore, to the extent Petitioner argues that a reclaimer scenario is necessary because the Road Pilot Project is designed to serve as an intermediary step toward full-scale implementation, the argument misses the mark. Pet'r's Opening Br., ECF No. 24-1, at 50. EPA made clear that the Road Pilot Project's approval did "not imply any conclusions about the risks to future reclaimers at other sites, which may be further from phosphogypsum stacks and may lack the institutional controls present at the Mosaic facility." EPA Assessment, Pet'r's App'x Doc. 4, at 21. EPA stressed the need to "consider [reclaimer] scenarios as part of any subsequent request for any [road construction] use proposed to take place outside the Mosaic property." EPA Assessment, Pet'r's App'x Doc. 4, at 21. In its final agency action, EPA reiterated that this "approval applies only to the proposed pilot project and not any broader use. Any other use would require a separate application, risk assessment, and approval." Notice of Approval, Pet'r's

App'x Doc. 2.  Because any future road project would require separate analysis and approval by EPA and a separate final agency action, it is outside the scope of the agency action challenged here and this litigation.

### 3. EPA Accepted Radium Sampling Consistent with the Regulation, Reflecting Levels Found in Other Florida Phosphogypsum Stacks and More Than Twice Mosaic's Reported Average.

EPA properly considered sufficient radium testing data when assessing Mosaic's request for the Road Pilot Project.  Specifically, EPA reasonably assessed the project using the assumption that the radium concentration of the stacks was 35 pCi/g and properly conducted its analysis based on the data Mosaic provided.  Moreover, EPA conditioned its approval on Mosaic providing additional radium sampling pursuant to § 61.207 that confirms results consistent with Mosaic's reported radium concentration prior to construction of the Road Pilot Project.  *Contra* Pet'r's Opening Br., ECF No. 24-1, at 51.

Mosaic's application reports that the mean concentration of radium in samples taken from its New Wales stack is 15.1 pCi/g, which is consistent with EPA's data regarding other phosphogypsum stacks in central Florida.  EPA Assessment, Pet'r's App'x Doc. 4, at 16-17; Response to Comments, Pet'r's App'x Doc. 5, at 11.  To ensure it was conservative in its consideration of the risks of the Road Pilot Project, EPA based its analysis of the Road Pilot Project on a radium concentration of 35 pCi/g "to be certain that the generic risk assessments would be

inclusive of all domestic sources of phosphogypsum."  EPA Assessment, Pet'r's App'x Doc. 4, at 16.  EPA reasonably overestimated the concentration of radium so that the conclusions of the risk assessment will remain valid even if the radium concentration in the phosphogypsum that is used turns out to be higher than the preliminary data submitted by Mosaic.  EPA Assessment, Pet'r's App'x Doc. 4, at 11; *see also Miami-Dade Cnty.*, 529 F.3d at 1069-1070 (concluding "address[ing] these uncertainties by making conservative assumptions" in a risk assessment model was a "legitimate discretionary decision on the part of the EPA").

Petitioner misrepresents that data when it states that "EPA has previously established that the concentration of radium[] in Florida stacks can range from 16-81 pCi/g."  Pet'r's Opening Br., ECF No. 24-1, at 53.  In the 1992 BID, EPA sampled phosphogypsum stacks across Florida for radium concentrations, *one* of which had a concentration range of 23-81 pCi/g, but a *mean* concentration of 34 pCi/G.  1992 BID, Pet'r's App'x Doc. 9, at 2-7.  EPA's selection of 35 pCi/g as the radium concentration to evaluate the Road Pilot Project thus ensured that its risk assessments would be inclusive of even the highest measured phosphogypsum stack in Florida.

Moreover, EPA has conditioned its approval on Mosaic providing additional radium sampling that conforms to § 61.207 prior to construction of the Road Pilot Project: "Mosaic shall perform sampling that conforms with § 61.207 on the actual

46

phosphogypsum used for the project prior to its removal from the stack. …[T]he results of sampling for radium[], including raw analytical data," must be submitted to EPA "prior to the construction of the test road base containing phosphogypsum." Letter from EPA on Final Approval for Revised Mosaic Request, Pet'r's App'x Doc. 6, at 2. EPA did not, as Petitioner states, assume "the risk assessment would remain valid even if the radium[] concentrations turns out to be higher." Pet'r's Opening Br., ECF No. 24-1, at 53 (quotations omitted). By explicitly conditioning its approval on this later testing, EPA has left open the option to rescind its approval if the risk is greater than anticipated.[2] Alternatively, EPA could require a revised request if the actual conditions depart significantly from those in the original request, or if conditions of the approval were not met. Therefore, EPA's analysis of the Road Pilot Project was reasonable because it assessed the project request in accordance with its regulations, based its analysis on an assumed radium concentration above even the highest measured phosphogypsum stack in Florida, and conditioned its approval on receiving additional compliant data.

Petitioner incorrectly asserts that EPA had a "regulatory obligation" to consider radium testing from 30 samples across the entire "location of the stack" that are taken within "the past 12 months." Pet'r's Opening Br., ECF No. 24-1, at

---

[2] Indeed, EPA has previously rescinded approval of road construction projects based on later acquired information. *See* 86 Fed. Reg. 35795.

52. EPA's regulation for "other purposes" requests does not set any sampling requirements for radium analysis. *See* 40 C.F.R. § 61.206. It only requires applicants to provide "[t]he average concentration of [radium] in the phosphogypsum to be used" for purposes of the request. 40 C.F.R. § 61.206(b)(6). Although EPA has promulgated non-binding guidance that provides applicants with a "Completeness Checklist" to guide their provision of information to EPA, neither that document nor any regulation constrains the information EPA may consider as part of its analysis. *See* EPA Assessment, Pet'r's App'x Doc. 4, at 11; EPA Guidance, Pet'r's App'x Doc. 10, at 4; Pet'r's Opening Br., ECF No. 24-1, at 53.

Moreover, EPA provided a reasoned explanation for its acceptance of data that did not completely conform to the non-binding 2005 EPA Guidance in this instance. *Contra* Pet'r's Opening Br., ECF No. 24-1, at 53 (citing *FDA v. Wages and White Lion Invs., LLC*, 145 S.CT. 898, 918 (2025)). The Agency explained that, because the risk assessment scenarios reviewed by EPA were based on radium activity concentration values that are roughly double the average value reported by Mosaic, it had sufficient information to conditionally approve the request contingent on Mosaic providing additional data. EPA Assessment, Pet'r's App'x Doc. 4, at 11.

Accordingly, EPA fully considered all relevant radium testing information and reasonably approved Mosaic's request.

## C. EPA Appropriately Determined That Use of Phosphogypsum in the Road Pilot Project is at Least as Protective as Placement in a Stack.

EPA properly assessed the Road Pilot Project by ensuring that the maximum individual risk from the project will not exceed 3 in 10,000 when assessing whether phosphogypsum in the Road Pilot Project is at least as protective of public health as placement in a stack. Petitioner incorrectly asserts that the proper threshold is 9 in 100,000. Pet'r's Opening Br., ECF No. 24-1, at 38-44. But ultimately the threshold is irrelevant because the total risk to a road construction worker, truck driver transporting phosphogypsum, road user (site employee), and nearby resident are all less than 2 in 1 *million*.

### 1. EPA Properly Applied a 3 in 10,000 Risk Threshold.

EPA properly used a risk threshold that assessed whether the Road Pilot Project would be "at least as protective … as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. § 61.206(c). EPA has considered a maximum individual risk of 3 in 10,000 to be the acceptable threshold for assessing risks associated with phosphogypsum uses since 1992.

> EPA has determined that the risks represented by uses of phosphogypsum in which the [maximum individual risk] does not exceed the presumptively safe level of approximately $1 \times 10^{-4}$ [1 in 10,000] are acceptable. In earlier radionuclide NESHAP rulemakings implementing the criteria in the Administrator's benzene decision, EPA

49

determined that in some instances that emissions corresponding to estimated maximum individual lifetime risks as high as $3\text{x}10^{-4}$ [3 in 10,000] were acceptable. In the case of phosphogypsum, considering all of the information available on potential exposures and the associated risks, as well as the uncertainties inherent in deriving risk estimates, *EPA has concluded that certain uses of phosphogypsum may be considered acceptable so long as those uses are restricted to limit the estimated lifetime risk to any individual to no more than 3 in 10 thousand.*

57 Fed. Reg. at 23311-12 (emphasis added).

EPA applied the threshold risk level of 3 in 10,000 when evaluating the categorical approval of the use of phosphogypsum for agricultural and research and development purposes. *Id.* at 23312. It makes sense that the Agency would apply the same risk threshold to its approval of "other purposes" as it did in its categorical approvals for agricultural and research and development uses. Petitioner attempts to distinguish these inconvenient examples by stating that the analysis for agricultural and research and development uses also "contained specific work practice[s], storage, and quantity restrictions meant to minimize exposure and justify [their] alternative risk threshold." Pet'r's Opening Br., ECF No. 24-1, at 42. However, any distinction melts away when considering the "work practice, storage, and quantity restrictions" imposed by EPA in its approval of the Road Pilot Project. *See generally* Letter from EPA on Final Approval for Revised Mosaic Request, Doc. 6 (limiting the allowable activities to those described in

50

Mosaic's application); *see also* Mosaic Revised Application, Resp't's App'x Doc. 1, at 2 (setting the quantity of phosphogypsum used to 1,200 tons).[3]

EPA's interpretation also has remained consistent over time, including in EPA's 2005 Guidance on applying to EPA for approval of other uses of phosphogypsum. EPA Guidance, Pet'r's App'x Doc. 10, at 13 ("The risk assessment must demonstrate that the proposed other use will not cause a threat to the public or environment greater than if the phosphogypsum were left in the stack. This means that the risk assessment must show that the chance of developing a fatal cancer in people who are exposed to phosphogypsum as a result of the use for which you are applying must not be more than three in ten thousand ($3x10^{-4}$).").

Moreover, EPA's use of the 3 in 10,000 threshold is similarly in line with its prior consideration of risk in other NESHAPs. In EPA's first set of NESHAPs regulating radionuclide emissions from various source categories, including phosphogypsum stacks, EPA explained:

> In establishing the policy for setting NESHAPS … the Agency
> determined that emissions resulting in a lifetime [maximum individual

---

[3] *See also* 40 C.F.R. § 61.206(b) (describing the detailed information applicants must provide: "(2) A description of the proposed use, including any *handling* and *processing* that the phosphogypsum will undergo. (3) The *location* of each facility … where any use, handling, or processing of the phosphogypsum will take place. (5) The *quantity* of phosphogypsum to be used by each facility. (6) The *average concentration of radium-226* in the phosphogypsum to be used. (7) A description of any *measures* which will be taken to prevent the uncontrolled release of phosphogypsum into the environment. [and] (9) A description of the intended *disposition* of any unused phosphogypsum.") (emphasis added).

risk] no greater than approximately $1x10^{-4}$ [1 in 10,000] are presumptively acceptable. In light of the numerous uncertainties in both establishing the parameters for the risk assessment and in modelling actual emission and exposure, as well as the recognition that in achieving compliance sources will generally control so as to ensure that a buffer exists below the actual level of a standard, EPA judges that *the [maximum individual risk] of $3x10^{-4}$ [3 in 10,000] is essentially equivalent to the presumptively safe level of approximately $1x10^{-4}$ [1 in 10,000].*

54 Fed. Reg. at 51677 (emphasis added).

Thus, EPA's use of the 3 in 10,000 threshold in this instance was entirely reasonable.

## 2. EPA Did Not Define at Least as Protective as Placement of Phosphogypsum in a Stack to Be 9 in 100,000.

Petitioner incorrectly claims that a risk threshold of 9 in 100,000 is the only threshold consistent with the "plain language and history" of 40 C.F.R. § 61.206. Pet'r's Opening Br., ECF No. 24-1, at 41. At the outset, the "plain language" of the regulation does not identify 9 in 100,000 as the risk threshold, it just requires that to be approved, a proposed use must be at least as protective as maintaining the phosphogypsum in a stack. And, as explained in Section II.C.1, *supra*, EPA has long considered a threshold of 3 in 10,000 to be acceptable.

Petitioner points to EPA's calculation of the risk of emissions from phosphogypsum stacks as 9 in 100,000, and argues that this figure is the only appropriate threshold EPA may use. In the 1989 Rule, EPA performed an assessment of radon releases at 58 phosphogypsum stacks and found that the

estimated maximum individual risk from radon emissions from those phosphogypsum stacks was 9 in 100,000. 54 Fed. Reg. at 51674-75. Because this risk was less than EPA's presumptively safe level of 1 in 10,000 in the NESHAP context, EPA concluded that the baseline risk from phosphogypsum stacks was acceptable. *Id.* at 51656.

Contrary to Petitioner's assertions, this was not EPA setting a limit to ensure that the maximum individual lifetime risk for phosphogypsum stacks did not exceed 9 in 100,000. *See id.*; Pet'r's Opening Br., ECF No. 24-1, at 39-41 (characterizing 9 in 100,000 as "a modest reduction from the 1 in 10,000 ceiling"). It was simply an estimate that led to the conclusion that industry's existing practice of storing phosphogypsum in stacks was presumptively safe. *Id.*

### 3. Regardless of the Risk Threshold Used, the Road Pilot Project Is Well Below the Threshold.

As detailed in Section II.B.1 above and discussed further below, the total risks from the Road Pilot Project are at least an order of magnitude below *both* EPA's risk threshold (3 in 10,000) and Petitioner's preferred risk threshold (9 in 100,000) for each of the modeled exposure scenarios. The total risks to a road construction worker, truck driver transporting phosphogypsum, road user (site employee), and nearby residents are all less than 2 in 1 million, less than 1% of the 9 in 100,000 threshold Petitioner asserts is appropriate. EPA Assessment, Pet'r's App'x Doc. 4, at 17. Thus, the total risks associated with the Road Pilot Project

are so low that, even using Petitioner's preferred standard, the project is still "at least as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. § 61.206(c). Furthermore, because these risk assessments assume radium concentrations that are more than double the value submitted by Mosaic, they likely overestimate the actual risks associated with the Road Pilot Project. EPA Assessment, Pet'r's App'x Doc. 4, at 17. Thus, regardless of the risk threshold used, EPA appropriately determined that use of phosphogypsum in the Road Pilot Project is at least as protective of public health as placement in a stack as required by 40 C.F.R. § 61.206(c).

Accordingly, EPA properly determined that the Road Pilot Project is at least as protective as placement of phosphogypsum in stacks, and Petitioner's petition should be denied.

## III. Petitioners Are Not Entitled to Vacatur.

As demonstrated above, EPA properly approved the Road Pilot Project as a use of phosphogypsum for "other purposes" that is at least as protective of human health as placement of phosphogypsum in stacks. But if the Court is inclined to grant Petitioner's petition, it should remand this matter without vacatur. Remand without vacatur is within this Court's equitable powers. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir.

2015); *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 182-83 (D.C. Cir. 2025) (remanding Clean Air Act case without vacatur); *Sierra Club v. EPA*, 60 F.4th 1008, 1022-23 (6th Cir. 2023) (same); *Ctr. for Biological Diversity v. EPA*, 134 F.4th 1271, 1280-81 (10th Cir. 2025) (same).

Among the equities to be balanced are the seriousness of the agency's deficiencies and the likelihood that the agency's error can be cured on remand. *Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1290. Here, the deficiencies that Petitioner alleges, at most, require additional or revised explanation.

At bottom, EPA approved a site-specific project presenting total risks that are at least an order of magnitude less than placement of phosphogypsum in a stack. 40 C.F.R. § 61.206(c). Accordingly, if the Court grants Petitioner's petition, it should remand this matter to EPA for further explanation of its decision.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this petition because Petitioner has failed to demonstrate Article III standing. In the alternative, the Court should deny the petition.

# CERTIFICATE OF COMPLIANCE

I hereby certify:

1.      This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,896 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.


*/s/ Mario A. Luna*
Mario A. Luna

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Respondents' Responses to Court's Questions has been filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit this 12th day of September, 2025, using the CM/ECF System, which will electronically serve all counsel of record registered to use the CM/ECF system.

*/s/ Mario A. Luna*
Mario A. Luna