No. 25-10515

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and

LEE ZELDIN, in his official capacity as Administrator
of the United States Environmental Protection Agency,

*Respondents*,

MOSAIC FERTILIZER, LLC

*Intervenor-Respondent.*

On Petition for Review of an Order of the
Environmental Protection Agency

## BRIEF OF INTERVENOR-RESPONDENT MOSAIC FERTILIZER, LLC

Elissa J. Preheim
Elisabeth S. Theodore
Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
elisabeth.theodore@arnoldporter.com

## CERTIFICATE OF INTERESTED PARTIES AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1(a)(1) and 26.1-2(c), intervenor-respondent Mosaic Fertilizer, LLC, through undersigned counsel, hereby submits this Certificate of Interested Persons and Corporate Disclosure Statement.

- Mosaic Fertilizer, LLC is a Delaware limited-liability company and a wholly-owned subsidiary of The Mosaic Company (NYSE: MOS), a publicly held corporation.

I hereby certify that the disclosure of interested parties submitted by Petitioner is complete and correct except for the following additional interested persons:

1. Mario A. Luna, *Attorney for Respondents*

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore

*Counsel for Mosaic Fertilizer, LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Mosaic takes no position on whether oral argument is appropriate here. Mosaic believes that the Court could deny the petition on the papers, particularly given the absence of petitioner's standing, but asks to participate in oral argument if the Court chooses to schedule it.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT ..................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ....................................................i

TABLE OF CONTENTS................................................................................. ii

TABLE OF AUTHORITIES .........................................................................iv

JURISDICTIONAL STATEMENT ...............................................................ix

INTRODUCTION ..........................................................................................1

STATEMENT OF THE ISSUES....................................................................3

STATEMENT OF THE CASE........................................................................4

      A.    EPA's Regulations Governing Storage and Use of Phosphogypsum.............................................................................4

      B.    EPA's Approval of Mosaic's Pilot Project .........................................10

      C.    Procedural History..................................................................19

STANDARD OF REVIEW ...........................................................................20

SUMMARY OF THE ARGUMENT .................................................................21

ARGUMENT ..............................................................................................22

I.    Petitioner Lacks Standing to Challenge the Pilot Project Approval .............22

II.    EPA Lawfully and Reasonably Applied its Regulations in Approving the Pilot Project..................................................................................29

      A.    EPA's Regulations Allow Use of Phosphogypsum in Road Construction as a Permissible "Other Purpose"..................................30

      B.    EPA's 1992 Regulatory Preamble Did Not Impliedly Exempt Road Construction from the Scope of the "Other Purpose" Regulation ........................................................................31

      C.    Petitioner's Procedural Challenges to the Pilot Approval Fail ..........38

1.     EPA has not changed its position. ...........................................39

2.     EPA has not amended the Subpart R regulations. ....................39

3.     The fair notice doctrine is inapplicable.....................................39

4.     The pilot approval is not nationally applicable.........................41

III.   EPA Reasonably Applied the Proper Safety Threshold to Mosaic's Pilot........................................................................................................42

IV.   EPA's Assessment of Mosaic's Pilot Project Was Reasonable and Reasonably Explained ................................................................................43

     A.    EPA Considered the Appropriate Exposure Pathways and Populations in Evaluating the Pilot.....................................................44

     B.    EPA Reasonably Accepted Mosaic's Radium Sampling Data ...........50

V.    Remand Without Vacatur is the Proper Remedy for Any Error ...................52

CONCLUSION ....................................................................................................54

CERTIFICATE OF SERVICE ............................................................................55

CERTIFICATE OF COMPLIANCE ...................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Energy United, Inc. v. FERC,*
82 F.4th 1095 (D.C. Cir. 2023).................................................................36

*Ala. Env't Council v. EPA,*
711 F.3d 1277 (11th Cir. 2013) ..............................................................20

*Ali v. Fed. Bureau of Prisons,*
552 U.S. 214 (2008)..................................................................................31

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
988 F.2d 146 (D.C. Cir. 1993)..................................................................53

*Auer v. Robbins,*
519 U.S. 542 (2021)..................................................................................35

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
781 F.3d 1271 (11th Cir. 2015) ...............................................................53

*Blanco v. Samuel,*
91 F.4th 1061 (11th Cir. 2024) ................................................................35

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.,*
115 F.4th 1266 (11th Cir. 2024) ..............................................................24

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,*
220 F.3d 683 (5th Cir. 2000) ..............................................................27, 28

*City of Idaho Falls v. FERC,*
629 F.3d 222 (D.C. Cir. 2011)..............................................................37, 38

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)..............................................................................24, 25

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,*
941 F.3d 1288 (11th Cir. 2019) .................................................................5

*Elend v. Basham,*
471 F.3d 1199 (11th Cir. 2006) ................................................................25

*Encino Motorcars, LLC v. Navarro,*
584 U.S. 79 (2018)..................................................................................31

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012)................................................................................40

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021)...........................................................................20, 48

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024)................................................................................23

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015)...............................................................25

*Freeman v. Nat'l Broad. Co.,*
80 F.3d 78 (2d Cir. 1996) .......................................................................51

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167 (2000)...........................................................................23, 28

*Ga. Republican Party v. SEC,*
888 F.3d 1198 (11th Cir. 2018) ..............................................................26

*Gelber v. Akal Sec., Inc.,*
14 F.4th 1279 (11th Cir. 2021) ...............................................................51

*Gen. Elec. Co. v. EPA,*
53 F.3d 1324 (D.C. Cir. 1995)................................................................40

*Gray Television, Inc. v. FCC,*
130 F.4th 1201 (11th Cir. 2025) ..................................................20, 48, 52

*IAL Aircraft Holding, Inc. v. FAA,*
206 F.3d 1042 (11th Cir. 2000) ..............................................................37

*IAL Aircraft Holding, Inc. v. FAA,*
216 F.3d 1304 (11th Cir. 2000) ..............................................................37

*Jacobson v. Fla. Sec'y of State,*
974 F.3d 1236 (11th Cir. 2020) ..............................................................23

*Kisor v. Wilkie*,
588 U.S. 558 (2019)..................................................................35, 37

*Lewis v. City of Union City*,
934 F.3d 1169 (11th Cir. 2019) ...................................................51

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) .................................................23, 24

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)......................................................................20

*Nat'l Mining Ass'n v. Sec'y of Lab.*,
589 F.3d 1368 (11th Cir. 2009) ...................................................51

*NetworkIP, LLC v. FCC*,
548 F.3d 116 (D.C. Cir. 2008) ....................................................39

*Nicklaw v. Citimortgage, Inc.*,
839 F.3d 998 (11th Cir. 2016) .....................................................28

*Pace v. Capobianco*,
283 F.3d 1275 (11th Cir. 2002) ...................................................26

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015)........................................................................39

*Rafferty v. Denny's, Inc.*,
13 F.4th 1166 (11th Cir. 2021) ....................................................35

*Ryder Truck Lines, Inc. v. United States*,
716 F.2d 1369 (11th Cir. 1983) ...................................................51

*Salmeron-Salmeron v. Spivey*,
926 F.3d 1283 (11th Cir. 2019) ...................................................43

*SEC v. Ibrahim Almagarby*,
92 F.4th 1306 (11th Cir. 2024) ....................................................40

*Sierra Club v. Johnson*,
436 F.3d 1269 (11th Cir. 2006) ...................................................20

*Sierra Club v. Johnson*,
541 F.3d 1257 (11th Cir. 2008) ...........................................20

*Suburban Air Freight, Inc. v. TSA*,
716 F.3d 679 (D.C. Cir. 2013)...........................................40

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)...........................................28

*Thole v. U.S. Bank N.A.*,
590 U.S. 538 (2020)...........................................25

*VHV Jewelers, LLC v. Wolf*,
17 F.4th 109 (11th Cir. 2021) ...........................................20

*Wilgar Land Co. v. Dir., Off. of Workers' Comp. Programs,
U.S. Dep't of Lab.*,
85 F.4th 828 (6th Cir. 2023) ...........................................35

**Statutes**

5 U.S.C.
§ 706(2)(A) ...........................................20
§ 706(2)(C)...........................................20
§ 706(2)(D) ...........................................20

42 U.S.C.
§ 7412(c)(1) ...........................................5
§ 7412(d)(1) ...........................................5
§ 7607(b)(1) ...........................................41

**Regulations**

40 C.F.R.

    § 61.01............................................................................................5

    § 61.200.......................................................................................5, 29

    § 61.202..........................................................................................30

    § 61.204.....................................................................................6, 7, 30

    § 61.205.....................................................................................6, 7, 30

    § 61.206..................................................................................3, 6, 8, 30

    § 61.206(a) ......................................................................................30

    § 61.206(b).............................................................................1, 18, 30, 36

    § 61.206(b)(6) ..................................................................................17

    § 61.206(c) ............................................................................1, 6, 36, 45

    § 61.206(d)..................................................................................36, 39

    § 61.207..........................................................................................52

    § 61.207(a) ......................................................................................18

54 Fed. Reg. 51,654 (Dec. 15, 1989)..........................................5, 6, 7, 42

57 Fed. Reg. 23,305 (June 3, 1992) ................................ 4, 5, 6, 7, 8, 31, 32, 33, 42

85 Fed. Reg. 66,550 (Oct. 20, 2020).................................................9, 10

86 Fed. Reg. 35,795 (July 7, 2021) .....................................................10

89 Fed. Reg. 81,910 (Oct. 9, 2024).................................................11, 16

89 Fed. Reg. 104,535 (Dec. 23, 2024) ...........................................4, 18, 19

**Other Authorities**

EPA, *EPA Facts About Radium*,
    https://semspub.epa.gov/work/11/176334.pdf
    (last visited Sept. 12, 2025) .............................................................13

*Revised TFI Request for Approval of Additional Uses of*
    *Phosphogypsum Pursuant to 40 C.F.R. § 61.206* (Apr. 7, 2020),
    https://www.regulations.gov/document/EPA-HQ-OAR-2020-0442-
    0005.........................................................................................9

T.R. Horton *et al.*, EPA 520/5-88-021, *A Long-Term Study of Radon and Airborne*
*Particulates at Phosphogypsum Stacks in Central Florida* (Oct. 1988) ...............52

## JURISDICTIONAL STATEMENT

In its April 15, 2025 order, the Court carried with the case the question of whether petitioner Center for Biological Diversity has standing to challenge the EPA decision at issue. Doc. 16-2 at 3.[1] Intervenor-Respondent Mosaic Fertilizer, LLC ("Mosaic") believes that petitioner lacks standing and that this Court accordingly lacks jurisdiction, as discussed *infra*. To the extent petitioner has standing, however, Mosaic agrees with petitioner's jurisdictional statement. Petitioner's Opening Brief ("Br.") at 1.

---

[1] Citations to "Doc." refer to filings on the Court's docket for this case.

**INTRODUCTION**

Phosphogypsum is a byproduct of phosphate fertilizer manufacturing that contains low concentrations of radium, a radioactive element that decays into radon gas. Over 30 years ago, the Environmental Protection Agency (EPA) promulgated a rule requiring most phosphogypsum to be stored in mine cuts or in highly engineered "stacks"—features that can cover hundreds of acres and can reach several hundred feet in height. But in a revised rule in 1992, EPA allowed for alternative uses, creating a process for applications to use phosphogypsum for "any other purpose" that is "at least as protective of public health … as disposal of phosphogypsum in a stack or a mine." 40 C.F.R § 61.206(b), (c).

In 2022, intervenor-respondent Mosaic Fertilizer, LLC (Mosaic) sought EPA approval for a small pilot project to evaluate using phosphogypsum from a Mosaic stack as road base. As Mosaic's request explained, the test road would be constructed entirely on Mosaic's own property and would not be publicly accessible. Mosaic would work with experienced scientists and engineers at the University of Florida to test and monitor the road during and after construction.

After an exhaustive analysis spanning nearly three years, EPA found that the pilot project was at least as protective of public health as storing phosphogypsum in stacks. It accordingly approved Mosaic's request, with conditions that limited the approval to the scope of the application.

Petitioner's opening brief and member declarations make clear that its real concern is that the pilot will serve as a gateway to broader beneficial use of phosphogypsum in road base. It has not articulated any real issue with the limited pilot project. Nor could it. Mosaic is simply excavating phosphogypsum stored in a stack *on its property*, moving the phosphogypsum less than a mile *on its property* and then incorporating that material into road base *on its property*. Petitioner's nearest member lives five miles away. There won't be any *more* phosphogypsum generated as a result of the pilot, and it won't be *closer* to any of petitioner's members. And after construction, the whole project is only expected to last for 18 months. Petitioner accordingly lacks standing to bring this challenge.

On the merits, petitioner's arguments fall flat. EPA's 1992 rule allows individual applications to use phosphogypsum for "*any* other purpose." Yet petitioner apparently hopes that the rule silently and forever excludes road construction projects because the rule's preamble stated that EPA was declining to categorically authorize use of phosphogypsum for roads. That is as wrong as it sounds. Petitioner offers a hodgepodge of additional arguments challenging EPA's assessment of risks from Mosaic's pilot project, but EPA carefully addressed and rejected each of those arguments in finding the risks negligible to non-existent, and certainly not more than the risk associated with storing phosphogypsum in a stack. Petitioner's disagreement with EPA does not render EPA's decision arbitrary and

capricious. Petitioner also wrongly contends that EPA has increased the permissible risk threshold for uses of phosphogypsum, but even if that were true (and it is not), the risk presented by the pilot is *orders of magnitude less* than even the threshold petitioner proposes.

Petitioner fears that the pilot might be a success, might demonstrate that phosphogypsum may safely be used, and might convince EPA to more broadly authorize use of phosphogypsum for other roads or other beneficial uses—as many European countries have done. In effect, petitioner now seeks what EPA rejected in its 1992 rule—a blanket prohibition, regardless of the facts or science, on *ever* using phosphogypsum in roads. But under EPA's long-established regulatory process for "other purpose" approvals, EPA must review each proposed use case-by-case, based on the merits of the request before it. If and when there is a new request concerning roads built for public use, EPA will have to address the safety of phosphogypsum for that purpose. But that is not what this case is about. It is about a limited pilot program for research purposes conducted solely on Mosaic's private land.

## STATEMENT OF THE ISSUES

1. Whether the "other purposes" for which EPA regulations allow phosphogypsum to be used, 40 C.F.R. § 61.206, may include road construction projects.

2.      Whether EPA applied a reasonable risk threshold in assessing risks presented by Mosaic's pilot road project.

3.      Whether EPA's decision to approve Mosaic's pilot road project was reasonable and reasonably explained.

**STATEMENT OF THE CASE**

**A.      EPA's Regulations Governing Storage and Use of Phosphogypsum**

Phosphoric acid, an essential feedstock in agricultural fertilizers, is produced by treating mined phosphate ore with sulfuric acid.  App.182;[2] 89 Fed. Reg. 104,535 (Dec. 23, 2024).  The remaining byproduct is largely calcium sulfate, a common building material often called gypsum, and referred to as phosphogypsum or "PG" when created through phosphoric acid production.  App.182.

Phosphate ores contain certain naturally occurring radionuclides—"atom[s] which spontaneously undergo[] radioactive decay."  57 Fed. Reg. 23,305, 23,305-06 (June 3, 1992).  Specifically, phosphate rock contains uranium along with other radionuclides into which uranium decays, including radium-226, which in turn decays into radon gas.  App.183, 187.  When phosphate rock is processed with sulfuric acid to produce phosphoric acid, radium-226 accompanies the PG

---

[2] Citations to App.[###] refer to the continuous pagination applied to the ten documents in Petitioner's Appendix.

byproduct. App.187; 57 Fed. Reg. at 23,306; *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1293-94 (11th Cir. 2019).

Because radium and radon can present risks to human health at certain exposure levels, EPA has regulated them under the Clean Air Act. Section 112 of the Act directs EPA to identify "categories" and "subcategories" of "hazardous air pollutant[]" sources and to promulgate regulations setting emissions standards for each category and subcategory. 42 U.S.C. § 7412(c)(1), (d)(1). EPA's adopted regulations are known as National Emissions Standards for Hazardous Air Pollutants or NESHAPs. *See* 40 C.F.R. § 61.01 *et seq.*

*1989 Rule.* In 1989, EPA issued a NESHAP requiring PG to be disposed of only in stacks or mines, and prohibiting its use for any purpose. 54 Fed. Reg. 51,654, 51,675 (Dec. 15, 1989) (codified as amended at 40 C.F.R. § 61.200 *et seq.*). Prior to the NESHAP, PG was commonly used for agricultural applications and limited road and parking lot construction, and other potential uses were the subject of extensive research. App.196, 202-04. In Europe, Japan, and Australia, PG is widely used for manufacturing building materials, including concrete, cement blocks, and drywall. App.196, 200, 203-04.

*1992 Rule.* In response to petitions for reconsideration of the NESHAP, EPA amended the relevant regulations, known as Subpart R, in 1992. 57 Fed. Reg. 23,305 (June 3, 1992) ("1992 Rule"). Among other things, the petitions had

argued that EPA's categorical ban on PG use was not reasonable, foreclosed uses that could be made sufficiently safe, and was harmful to farmers who had been using PG for agricultural purposes before the NESHAP. *Id.* at 23,307.

In the 1992 Rule, EPA agreed. It promulgated regulations categorically authorizing PG use for "agricultural" and "research and development" purposes, provided certain conditions and requirements are met. *Id.* at 23,318-19; 40 C.F.R. §§ 61.204, 61.205. EPA also provided for distribution and use of PG for "other purposes" with prior agency approval. *Id.* at 23,319; 40 C.F.R. § 61.206. Under the "other purposes" provision, EPA may grant a request to use PG for "any other purpose" if EPA "determines that the proposed distribution and/or use is at least as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R § 61.206(c).

The 1992 Rule included estimates of radiologic risk levels for PG uses, focusing on lifetime risks of fatal cancers resulting from human exposure to radiation. The rule first stated that the "estimated maximum individual lifetime risk of fatal cancer from radon emissions from phosphogypsum stacks is $9 \times 10^{-5}$," or 9 in 100,000. 57 Fed. Reg. at 23,306; *see* 54 Fed. Reg. at 51,675 (same in 1989 rule). That rate was lower than "$1 \times 10^{-4}$," or 1 in 10,000, the "presumptively safe level" for radiological risk that EPA had identified in 1989. 57 Fed. Reg. at 23,306, 23,309, 23,311; *see* 54 Fed. Reg. at 51,677. EPA noted, however, that its

earlier NESHAPs had found that "in some instances," "emissions corresponding to estimated maximum individual lifetime risks as high as $3 \times 10^{-4}$ were acceptable." 57 Fed. Reg. at 23,311; *see* 54 Fed. Reg. at 51,677 (stating that the maximum individual lifetime risk of $3 \times 10^{-4}$ "is essentially equivalent to the presumptively safe level" of $1 \times 10^{-4}$). Applying that reasoning, the 1992 Rule concluded:

> In the case of phosphogypsum, considering all of the information available on potential exposures and the associated risks, as well as the uncertainties inherent in deriving risk estimates, EPA has concluded that certain uses of phosphogypsum may be considered acceptable so long as those uses are restricted to limit the estimated lifetime risk to any individual to no more than 3 in 10 thousand.

57 Fed. Reg. at 23,311-12.

In determining whether to categorically authorize various uses of PG, the 1992 Rule considered 12 numbered scenarios for evaluating the risks of different activities. *Id.* at 23,308. Scenarios 1 through 7 and 12 addressed agricultural uses and research and development, and found the proposed uses had individual risks below the maximum permissible level. *Id.* at 23,308-11. Based in part on those findings, EPA added a provision to the Code of Federal Regulations categorically authorizing those uses. *See id.* at 23,312-13; 40 C.F.R. §§ 61.204, 61.205.

Scenarios 8 through 11 examined uses for road construction, estimating the hazard from use of PG to construct roads. 57 Fed. Reg. at 23,310. For each of those scenarios, EPA examined various "exposure pathways"—the mechanisms by

7

which individuals could be exposed to radiation—for populations including construction workers building a road, drivers using the road, and residents of houses built on land that was formerly a PG road. *Id.* In the regulatory preamble, EPA found that "[t]he largest increases in the maximum individual lifetime risks" of PG use in roads were for "people living in a house constructed on land where roads built using phosphogypsum once existed." *Id.* Factoring in the risk hypothetically posed to those individuals, the maximum individual lifetime risk EPA identified "[f]or the road construction scenarios analyzed" was "greater than the outer bound of the presumptively safe level" of "1 X $10^{-4}$." *Id.* at 23,312. EPA thus determined that each of its road construction scenarios "present[ed] an unacceptable level of risk to public health." *Id.* EPA then declined to categorically authorize PG use in road construction in the manner it had for agriculture and research. *Id.* As discussed below, however, it did not state that it was prohibiting case-by-case applications for use in road construction.

*2005 Workbook.* In 2005, EPA issued guidance to assist with applications under 40 C.F.R. § 61.206 to use PG for "other purposes." App.291. In the guidance, which EPA called a "workbook," EPA stated that "other purposes" petitions it had received since the 1992 Rule typically proposed small-scale studies to validate new proposed uses. App.302. EPA identified use of PG in "road base

8

material" as an example of a "possible 'other use[]'" under the 1992 Rule. App.302.

*2020 TFI Approval.* In October 2020, EPA granted conditional approval to an "other purposes" request from The Fertilizer Institute ("TFI"), a fertilizer industry trade association, for use of PG in government road construction projects. 85 Fed. Reg. 66,550, 66,551 (Oct. 20, 2020). As TFI's application explained, scientific understanding of PG's risks had progressed substantially since 1992, and numerous developed countries now use PG for beneficial purposes such as road construction, landfill cover, and in construction materials, rather than relegating it to engineered stacks that are unsightly and expensive to maintain. *Revised TFI Request for Approval of Additional Uses of Phosphogypsum Pursuant to 40 C.F.R. § 61.206*, at 9 (Apr. 7, 2020), https://www.regulations.gov/document/EPA-HQ-OAR-2020-0442-0005.[3]

In the course of conditionally approving the proposal, EPA discussed the 1992 Rule's analysis of scenarios for PG use in roads. EPA noted that "the risks" of road construction with PG "were found to be acceptable from most of the exposure scenarios analyzed," but "the potential risks to residents of dwellings constructed on an abandoned road were calculated to be unacceptably high." 85

---

[3] This regulatory document is listed as Index No. 4.11 in respondent's Certified Index to the Administrative Record, Doc. 17 at 9.

Fed. Reg. 66,550, 66,551 (Oct. 20, 2020). "EPA therefore did not approve road construction as a categorical use of [PG]" in 1992, but did establish "a process to request approval of other uses," under which TFI submitted its request. *Id.* EPA reiterated in an approval letter that the 1992 Rule "did not necessarily foreclose any or all use of PG in road construction." App.91. Rather, EPA "simply declined, at that time, to categorically authorize – as for agricultural or research and development uses – use of PG in road construction." App.91.

The Center for Biological Diversity (*i.e.*, the petitioner here) challenged the 2020 approval in the U.S. Court of Appeals for the District of Columbia Circuit. *See Ctr. for Biological Diversity v. EPA*, No. 20-1506 (D.C. Cir. filed Dec. 18, 2020). In 2021, EPA resolved the litigation by withdrawing the 2020 approval on procedural grounds, finding "[u]pon further evaluation" that TFI's application had not included all of the information "specified as constituting a proper request under [40 C.F.R.] § 61.206(b)." 86 Fed. Reg. 35,795 (July 7, 2021). EPA stated that the decision was "without prejudice to a subsequent or further proper request under § 61.206 for approval of the use of phosphogypsum for other purposes that contains the information required by § 61.206(b)." *Id.*

### B. EPA's Approval of Mosaic's Pilot Project

Mosaic is a fertilizer manufacturer engaged in phosphate mining and phosphoric acid production at a number of locations, including Central Florida. In

March 2022, Mosaic submitted a request to EPA for "other purposes" approval of a small-scale pilot project in which Mosaic, joined by researchers from the University of Florida, would construct four short sections of asphalt "test road," using varying mixtures of PG as the road base, on Mosaic's private property in Mulberry, Florida, adjacent to an existing PG stack. 89 Fed. Reg. 81,910, 81,911 (Oct. 9, 2024); App.57. The purpose of the pilot is "to demonstrate the range of PG road construction designs that meet the Florida Standard Specifications for Road and Bridge Construction." App.12.

Mosaic noted that the status quo has resulted in storage of 1.7 billion tons of PG in stacks across the country, a number that grows at the rate of 46 million tons per year and consumes vast quantities of land. App.17. At least 21 other countries, meanwhile, safely use PG rather than storing it in unsightly stacks. App.17-18. Permitting the safe use of PG could have significant environmental benefits, including reducing manufacturing waste and greenhouse gas emissions, decreasing the need to excavate new material for use in construction, and potentially reducing the existence or size of PG stacks. App.17-18.

*EPA Assessment.* On October 1, 2024, EPA published a detailed technical review of Mosaic's proposal. App.51. After closely examining Mosaic's risk analysis for the project, which adapted generic risk assessment scenarios for road use of PG from the approved 2020 TFI request, EPA concluded that the pilot

11

project "poses no greater radiological risk than maintaining the phosphogypsum in a stack."  App.55.  Specifically, the review concluded that the risk for Mosaic's pilot is "orders of magnitude" lower (that is, more protective than) the $3\text{x}10^{-4}$ acceptable maximum lifetime risk from proposed uses of PG identified in the 1992 Rule.  App.55-56, 67, 71.

In evaluating Mosaic's analysis, EPA noted that Mosaic developed its assessments "by adjusting the risk determined in the TFI risk assessments to account for the shorter duration of exposure and smaller size of the pilot study."  App.67.  Mosaic did not reduce other relevant parameters from the TFI assessments, however, instead employing a "conservative" approach to risk.  App.67, 69-70.  For example, TFI had proposed to use PG in road *surface* as well as road base, which increased the risk because the PG would be on the surface rather than covered by other materials.  Although Mosaic's proposal would use PG only in the road base, it conservatively carried forward the radiological exposures from the TFI request.  Mosaic's risk assessments, EPA concluded, accordingly "*overestimate*[*d*] *the actual risks* associated with the pilot program to some degree."  App.69 (emphasis added).

Mosaic's proposal likewise relied on radium concentration figures that EPA applied in reviewing the TFI proposal, even though samples from the Mosaic stack providing the PG for the pilot project actually have significantly lower

concentrations.  For that reason too, EPA found, Mosaic's "risk assessments …

*likely overestimate*[*d*] *the actual risks* associated with th[e] pilot project."  App.69-70 (emphasis added).  Additionally, although the sample data Mosaic provided was more than 12 months old and EPA's 2005 Workbook guidance had requested samples from within the past year, EPA explained that the guidance was nonbinding and exceeded the requirements of the "other purposes" regulations.  App.64.[4]  Further, because Mosaic's assessments assumed radium concentrations of "roughly double the average rate" from its samples, EPA determined that conclusions from the risk assessment "will remain valid even if the [radium-226] activity in the [PG used for the test road] turns out to be higher."  App.64.  Moreover, once the project was approved, Mosaic would be required to test the concentrations in the actual PG being used to confirm that it was not any higher than the assumed concentration.  App.64.

Mosaic's analysis also examined exposure risk across the different population categories that the TFI request had considered.  For truck drivers transporting PG to the road site, the total estimated risk was $2.1 \times 10^{-7}$, "*three orders of magnitude below* the acceptable risk threshold of $3 \times 10^{-4}$."  App.70-71 (emphasis added).  That figure was substantially lower than the corresponding risk

---

[4] Radium-226 decays slowly; its half life is 1,600 years.  EPA, *EPA Facts About Radium* 1, https://semspub.epa.gov/work/11/176334.pdf (last visited Sept. 12, 2025).  That means there is no material change to radium values year over year.

in the TFI application because Mosaic's road is shorter and narrower than the roads at issue in TFI's request, and Mosaic's proposal assumed exposure during a short, one-month construction period rather than the five-year construction window in TFI's request. App.70. For workers building the Mosaic road, the risk calculated was $2\text{x}10^{-6}$, *two orders of magnitude below* the maximum safe level. App.71.

Mosaic further explained that exposure to Mosaic workers using the road once built would be negligible. App.71. EPA agreed, applying road use risk models from the supporting materials for the 1992 Rule and the 2020 TFI proposal and concluding that Mosaic workers would have an exposure risk of approximately $1 \text{ x } 10^{-6}$ or less, *more than one order of magnitude lower* than the risk found in those previous assessments of risk for road users. App.72.

Considering impact on the nearby population, Mosaic reported that the nearest resident is 2.4 miles from the road project site, though just 0.55 miles from an existing PG stack. App.72. Again applying modeling from prior assessments, EPA calculated that the lifetime risk for someone living only 100 meters from a road containing PG is $6.6 \text{ x } 10^{-7}$, and that risk from Mosaic's proposed test road to the individuals living closest to Mosaic's facility "*would be several orders of magnitude less*." App.72-73 (emphasis added). Further, because the closest resident is already living just half a mile from an existing PG stack, and because dose decreases "exponentially" with distance, EPA concluded that using some of

14

the same PG to build a test road located five times further away is "at least as protective" as maintaining the PG in the stack. App.73. EPA further noted that its assessment for the 1992 Rule found that radionuclides would take almost 10,000 years to present a risk via groundwater contamination for residents 100 meters from a PG road, meaning that any risk from the Mosaic road for nearby residents through that pathway was "negligible." App.72.

EPA lastly considered the so-called "reclaimer" scenario, under which a person resides on land that was formerly a road containing PG. App.73-74. EPA noted that the 1992 Rule had found potential lifetime risks greater than the 3 x $10^{-4}$ safety threshold for reclaimer scenarios, but agreed with Mosaic that "the location of the pilot project changes the consideration" of those scenarios and makes the risk negligible in this case. App.73. Because the test road is located proximate to an existing stack on Mosaic's "privately-owned industrial site," which consists of land that has been "mined for phosphate ore and reclaimed," "removing the proposed quantity of [PG] from the stack and using it in the proposed pilot project on the same site would not significantly change site characteristics or create additional risk to a future trespasser, reclaimer, or other member of the public." App.73-74; *see* App.75.

*Notice of Pending Approval, Responses to Comments, and Final Approval.* On October 9, 2024, EPA published a Notice of Pending Approval for the Mosaic

pilot and requested comment. 89 Fed. Reg. 81,910 (Oct. 9, 2024). EPA received 91 comments, to which it responded on December 11, 2024. App.85; *see* App.88. A majority of the comments expressed general opposition to PG use for public roads, which EPA correctly deemed outside the scope of Mosaic's pilot proposal because any use beyond the pilot would require a separate application, risk assessment, and approval. App.88-90.

Several comments argued that EPA prohibited PG use in roads in the 1992 Rule and that the approval unlawfully reversed that position. App.90. EPA rejected that characterization of the Subpart R regulations or the 1992 Rule. App.90. Quoting the Administrator's 2020 letter approving the TFI request, EPA explained that, although the 1992 Rule declined to "categorically" authorize PG use in road construction because some road construction scenarios were deemed in a regulatory preamble to "'present[] an unacceptable level of risk to public health,'" "[t]hat determination largely was based on a concern about the risks to people living in a house constructed on land where roads built using PG once existed," and "EPA did not necessarily foreclose any or all use of PG in road construction." App.90-91.

Other comments argued that EPA applied a risk threshold that was too lenient and that EPA should allow only other uses of PG with less than a $9 \times 10^{-5}$ risk threshold, the figure EPA calculated for the risk from PG stacks in its since

revised 1989 rule. App.91-92. EPA responded that its approach was consistent with its previous actions related to radionuclide NESHAPs, and that its $3 \times 10^{-4}$ threshold for estimated maximum individual risk for other uses of PG had been consistent since the 1992 Rule. App.91-92. Moreover, EPA explained that the issue is immaterial here because the maximum risks posed by the pilot were orders of magnitude lower than both the standard EPA applied and the one the commenters sought. The "risks posed by the proposed pilot project are less than 1% of [the] decision threshold" of $3 \times 10^{-4}$ set in the 1992 Rule. App.92. Indeed, they are less than $1 \times 10^{-6}$ overall—well below a proposed $9 \times 10^{-5}$ risk threshold. App.55-56, 92.

One commenter (petitioner here) argued that Mosaic's radium concentration sampling data was outdated and invalid. App.94. EPA responded that the relevant "other purposes" regulation, 40 C.F.R. § 61.206(b)(6), does not set specific requirements for radium analysis for purpose of an application, and that for multiple reasons, EPA had deemed Mosaic's sampling data adequate for purposes of reviewing the pilot. App.95.

First, the risk assessment scenarios EPA examined assumed radium concentration levels approximately double the average in Mosaic's data, such that EPA's conclusions remain valid even if the concentration in the PG actually used for the pilot is substantially higher than anticipated. App.94. Second, Mosaic's

17

data reported radium concentrations consistent with existing data from other central Florida locations, corroborating its validity.  App.94.  Third, the "other purposes" regulation requires Mosaic to perform sampling on the actual PG used for the project before construction, and EPA expressly conditioned its approval of the pilot on Mosaic fulfilling that requirement, mitigating any concerns about the data that was used for the application.  App.94-95; *see* 40 C.F.R. § 61.207(a) (requiring sampling before removing PG from a stack for an "other purpose," not before submitting an application).

On December 20, 2024, EPA sent Mosaic a letter granting final approval to Mosaic's request.  App.112-14.  EPA imposed a number of detailed conditions on the approval, including that Mosaic must perform sampling on the PG it will use for the project prior to its removal from the stack and then submit that data to EPA before beginning construction.  App.113.  Mosaic must also conduct environmental sampling for a minimum of 18 months after construction and submit the data gathered to EPA within 60 days.  App.113.

On December 23, 2024, EPA published its final approval of the Mosaic pilot.  89 Fed. Reg. 104,535 (Dec. 23, 2024).  EPA found that Mosaic's request satisfied the requirements of the "other purposes" regulation, 40 C.F.R. § 61.206(b); that Mosaic's risk assessment was acceptable as a technical matter; and that the project was at least as protective of public health as maintaining the

PG in a stack.  89 Fed. Reg. at 104,535-36.  EPA also summarized its responses to comments, and reiterated that its approval "applies only to the proposed pilot project and not any broader use," which "would require a separate application, risk assessment, and approval."  *Id.* at 104,536.

### C.    Procedural History

Petitioner filed this petition for review on February 19, 2025.  Doc. 1.  It did not seek preliminary relief or move to expedite the petition in any way.  On February 27, the Court directed the parties to submit briefs addressing whether the Court has jurisdiction over the petition and whether petitioner has standing.  Doc. 2.  The parties did so on March 13, agreeing that venue is proper in this Court and that petitioner's standing could not be determined because petitioner had not yet filed supporting evidence, although EPA argued that it was unlikely petitioner's forthcoming evidence would suffice.  Doc. 9; Doc. 10.  On March 20, Mosaic moved to intervene in support of EPA.  Doc. 14.  On April 15, the Court issued an order finding that venue was proper and carrying the standing issue with the case. Doc. 16-2.  The Court granted Mosaic's motion to intervene on April 28.  Doc. 19.

Mosaic began construction of the test road at issue here during the week of August 25, 2025.

**STANDARD OF REVIEW**

Under the Administrative Procedure Act ("APA"), courts apply an "exceedingly deferential" standard of review for agency actions that "limits [the court's] role to ensuring that the agency came to a rational conclusion." *VHV Jewelers, LLC v. Wolf*, 17 F.4th 109, 114 (11th Cir. 2021) (cleaned up). Courts may set aside an EPA action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; exceeds EPA's authority; or does not observe procedures required by law. *Ala. Env't Council v. EPA*, 711 F.3d 1277, 1285 (11th Cir. 2013) (quoting 5 U.S.C. § 706(2)(A), (C), & (D)). To satisfy the arbitrary-and-capricious standard, an agency action must simply be "reasonable and reasonably explained." *Gray Television, Inc. v. FCC*, 130 F.4th 1201, 1212 (11th Cir. 2025) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court "cannot substitute [its] own judgment for that of the agency," *Sierra Club v. Johnson*, 436 F.3d 1269, 1273 (11th Cir. 2006), and an agency decision of "'less than ideal clarity' will be upheld 'if the agency's path may reasonably be discerned.'" *Sierra Club v. Johnson*, 541 F.3d 1257, 1264 (11th Cir. 2008) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)).

## SUMMARY OF THE ARGUMENT

The Court should deny the petition for review. First, petitioner lacks standing. The two member declarations it has submitted fail to demonstrate past harm or imminent future harm stemming from the pilot project. The members, who live far from the project site—the closest is five miles away—assert that they are at risk of air pollution or groundwater contamination as a consequence of the storage of PG at Mosaic's facility. But the pilot project will not increase the amount of PG stored at Mosaic's facility or move that PG any closer to either member. And so petitioner offers no evidence or reason to believe that any risk would be *increased* by transferring PG from a stack on Mosaic's property to a road on the same property. That action—not use or storage of PG at Mosaic's facility in general—is the only EPA decision at issue here. Having failed to demonstrate actual or imminent injury to any member, petitioner lacks standing.

On the merits, EPA's decision to approve the pilot was reasonable and reasonably explained and fully consistent with the applicable regulatory regime. Petitioner's objections to the approval mischaracterize or ignore key elements of Mosaic's proposal and EPA's assessment, misread relevant regulatory history, and misstate or misapply basic principles of administrative law. While it did not categorically approve the use of PG in road construction, EPA's 1992 rule expressly and appropriately established a process through which individual

21

applicants could demonstrate that PG could safely be used for "any other purpose," a broad phrase that includes road base. EPA faithfully applied that rule here.

Petitioner's next argument, that EPA implied an improperly low risk threshold, is incorrect and irrelevant: EPA applied the same risk threshold that it applied in its 1992 rule, and in any event the risks presented by the pilot project are orders of magnitude lower than even the stricter risk threshold petitioner supports.

Finally, EPA conducted a reasonable and thorough review of Mosaic's application, concluding that it satisfied all regulatory requirements and that it presented no meaningful risk to the public. Petitioner offers a medley of objections, but EPA carefully and fully addressed them, and petitioner's dislike of and disagreement with EPA's scientific judgment does not render the agency's decision arbitrary.

If the Court does find any deficiencies in the approval, the equities strongly support remanding to the agency without vacating the approval.

## ARGUMENT

### I. Petitioner Lacks Standing to Challenge the Pilot Project Approval

At the outset, petitioner lacks standing to challenge EPA's approval of Mosaic's pilot project. The petition should be denied on that basis alone.

As the Supreme Court recently reiterated, "citizens … do not have standing to sue simply because others are allowed to engage in certain activities—at least

22

without the plaintiffs demonstrating how they would be injured by the government's alleged under-regulation of others." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 392-93 (2024). "To establish standing," a plaintiff or petitioner "must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380.

Petitioner here fails to demonstrate an injury in fact, much less one that is fairly traceable to the challenged EPA decision. To satisfy the injury-in-fact requirement, petitioner must show "an injury that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) (en banc). Petitioner does not claim that it has suffered any organizational injury, and instead "seek[s] to establish associational standing based on the injuries of [its] members." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1248 (11th Cir. 2020). "To establish associational standing, an organization must prove that its members 'would otherwise have standing to sue in their own right.'" *Id.* at 1249 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

Petitioner attempts to make that showing through declarations from two of its members, one of whom lives approximately 50 miles from Mosaic's New

Wales facility, and one of whom lives 5 miles from the facility. Declaration of Elise Pautler Bennett (Bennett Decl.), Doc. 24-3, ¶ 15; Declaration of Michael Lexner (Lexner Decl.), Doc. 24-2, ¶ 3. These declarations fail to demonstrate that the members are or will be injured by the pilot approval.

Both declarations focus substantially on historical events relating to PG stacks generally, with no connection to the Mosaic pilot. *See* Lexner Decl. ¶¶ 4-7 (alleging prior issues with PG stacks at Mosaic); Bennett Decl. ¶¶ 10, 12 (discussing a discharge from a PG stack at Piney Point in Florida, a facility that is not owned by Mosaic). The declarants also claim injury from ongoing activities at Mosaic's facility, including mining operations and potential expansion. *See* Lexner Decl. ¶¶ 9, 11; Bennett Decl. ¶¶ 11, 12. But the only EPA action petitioner challenges is the approval of the pilot project. The declarants do not and cannot claim to have already suffered harm from the pilot approval.

Nor do the declarants adequately allege imminent harm. The standard for demonstrating injury in fact based on "risk of harm" is "high." *Muransky*, 979 F.3d at 927-28. "Allegations of *possible* future injury" do not clear the bar. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Petitioner's members must "demonstrate that future injury is '*certainly impending*,' or at the very least, that there is a '*substantial risk*' that the harm will occur" from the pilot project. *Cambridge Christian Sch., Inc. v. Fla. High Sch.*

*Athletic Ass'n, Inc.*, 115 F.4th 1266, 1282 (11th Cir. 2024) (quoting *Clapper*, 568 U.S. at 414 & n.5); *see Thole v. U.S. Bank N.A.*, 590 U.S. 538, 546 (2020); *see also Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) ("The binding precedent in this circuit is clear that for an injury to suffice for prospective relief, it must be imminent.").

The declarants fail to demonstrate any imminent harm and fail to demonstrate that approval of the small-scale pilot project within Mosaic's private industrial facility could, let alone will, cause more harm to them than the status quo of large-scale PG stacks. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 916 (D.C. Cir. 2015) (holding that plaintiffs "fail to plausibly allege that the regulations substantially increase the risk of" harm because they "do not allege that the[] results are *worse* than" than the existing regulations).

Mr. Lexner asserts that he is concerned about groundwater contamination or air pollution from the New Wales facility, but his concerns on their face stem from the existence of the stacks, not the approval of the pilot project. Lexner Decl. ¶¶ 4-5, 7, 9. EPA found that "any risk to the nearest resident from phosphogypsum would be caused primarily by the volume of phosphogypsum remaining on the stack," not the pilot project. App.73.

Mr. Lexner does not offer any evidence or argument to dispute this or any basis to believe that transferring a small amount of PG on one portion of Mosaic's

property to another portion of Mosaic's property would increase any risk of groundwater contamination or air pollution at his home 5 miles away. Petitioners challenging agency actions "must prove each element of standing" through "specific facts supported by affidavit or other evidence." *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201-02 (11th Cir. 2018). "[A]n affidavit stating only that the affiant 'believes' a certain fact exists" is not cognizable proof. *Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002). Mr. Lexner's bare assertion, citing no evidence, that he "believe[s]" that the pilot project "will lead to additional radioactive particular matter exposure, groundwater contamination, or sinkholes at the stack" is not remotely sufficient to "demonstrate" imminent injury. Lexner Decl. ¶¶ 8.

Likewise, Ms. Bennett states that she "believe[s]" that "construction activities at Mosaic's New Wales facility *could* contaminate Florida's landscape" or "*could*" impact drinking water, citing concerns about a "possible sinkhole beneath the stack" or a "liner tear" at the stack. Bennett Decl. ¶¶ 11-14 (emphases added). She does not explain why the pilot project increases any of these risks. And PG is already transported regularly within the Mosaic property as it is added to the stack. Like Mr. Lexner, Ms. Bennett offers nothing more than unsubstantiated speculation about the impacts of the pilot project on wildlife, drinking water, and the environment. *See* Lexner Aff. ¶¶ 8, 11; Bennett Aff. ¶¶ 11-

26

14. Nor does Ms. Bennett offer any evidence that *she* would be impacted by anything happening at the New Wales facility, 50 miles from her house. Her hypothetical concerns and conclusory allegations do not demonstrate standing. *See Cent. & S. W. Servs., Inc. v. U.S. E.P.A*., 220 F.3d 683, 700 (5th Cir. 2000) (environmental group could not establish standing through "pure[] conjectur[e]" that pollutants "could leach from the landfill and contaminate [the] town's water supply").

Both declarants also assert that they are injured because the EPA has purportedly altered the permissible risk threshold for phosphogypsum, from a cancer risk of no more than 9 in 100,000 to no more than 3 in 10,000. Bennett Decl. ¶ 9; Lexner Decl. ¶ 10. But even if EPA had done that (it has not, *infra* at 42-43), that would not present any risk to either declarant. EPA concluded that the *actual* risk of the pilot project to the "nearest members of the public" is "significantly less than $1 \times 10^{-6}$," i.e., significantly less than 1 in 1,000,000 and less than the risk threshold declarants say is permissible. App.56. And both declarants live much further away than the "nearest members of the public." The nearest resident is 2.4 miles away from the road project, App.72, while petitioner's members live 5 miles or 50 miles away.

At most, the declarations and petitioner's similarly wanting allegations in its brief (at 21-23) describe "belie[fs]" about injury to the environment, not to the

declarants.  "The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Nor can petitioner demonstrate cognizable injury to any recreational and aesthetic interests; none of petitioner's members can "plan to make use of the specific site[]," within Mosaic's private industrial facility, where the test road is being built.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

At bottom, petitioner cannot manufacture standing to block the pilot solely based on two affiants' unsubstantiated speculation that the outcomes might be unfavorable in some nonspecific way.  *See Cent. & S. W. Servs., Inc.*, 220 F.3d at 698-700.  Such beliefs do not establish a "material risk of harm" sufficient to prevent the pilot from proceeding.  *Nicklaw v. Citimortgage, Inc.*, 839 F.3d 998, 1003 (11th Cir. 2016).

Moreover, the declarations lay bare that petitioner's ultimate concern is not with any harm from the pilot, but rather from hypothetical future projects.  *See, e.g.*, Lexner Decl. ¶ 8 (warning of future deregulation); *id.* ¶ 11 (urging "Court intervention" to "protect the public" from "the door to nationwide use this step will open").  Predictions about future agency action cannot be the sole basis for standing to challenge a current action.  Petitioner fails to show that any member

28

faces any injury in fact from the pilot approval, so it lacks standing to challenge

EPA's decision.

## II.     EPA Lawfully and Reasonably Applied its Regulations in Approving the Pilot Project

Petitioner's principal argument is that EPA violated its "other purpose"

regulations in approving Mosaic's pilot project because those regulations silently

exclude road construction as a qualifying "other purpose."  They do not.  EPA's

"Subpart R" regulations on the use of PG, found at 40 C.F.R. § 61.200 *et seq.*,

categorically authorize the use of PG for agricultural and research purposes, and

allow individual requests for approval of the use of PG for "any other purpose."

EPA and Mosaic followed those rules.

Petitioner's reliance on language in the 1992 regulatory preamble is

factually and legally baseless.  It is factually baseless because the regulatory

preamble merely explained why EPA was declining to categorically authorize road

projects; the preamble does not purport to modify or interpret the "any other

purpose" language in the rule or to categorically exclude road construction.  And

petitioner's argument is legally baseless because a rulemaking preamble is not the

equivalent of a promulgated regulation, and petitioner's argument that a preamble

binds future agency action is wrong as a matter of law.  In other words, assuming

counterfactually that the preamble did suggest that road construction could not be

approved even on a case-by-case basis, that still would not mean that the agency acted unlawfully or violated its own regulations.

### A. EPA's Regulations Allow Use of Phosphogypsum in Road Construction as a Permissible "Other Purpose"

The key EPA provisions relating to use and storage of PG appear in "Subpart R" of EPA's regulations, at 40 C.F.R. § 61.202, § 61.204, § 61.205, and § 61.206. As EPA has explained, these regulations categorically authorize use of PG for certain purposes, and establish a process for approving "other uses" on a case-by-case basis. App.91. Section 61.202 begins by generally requiring phosphogypsum to be stored in "stacks," except as provided elsewhere in Subpart R. Section 61.204 then authorizes phosphogypsum to be removed from a stack and used for "outdoor agricultural purposes." Section 61.205 authorizes phosphogypsum to be removed from a stack and used for "indoor research and development." Section 61.206, in turn, states that PG may be removed from a stack and used for "any other purpose" beyond agricultural and research purposes, so long as the applicant secures "prior EPA approval." 40 C.F.R. § 61.206(a), (b).

EPA followed its rules when it approved Mosaic's pilot. On its face, road construction is an "other purpose"—it is not an outdoor agricultural purpose or an indoor research and development purpose. And petitioner identifies no text in the Code of Federal Regulations stating that road construction projects cannot qualify as a permissible "other purpose." To the contrary, the word "any" in EPA's

30

regulation forecloses that result.  As the Supreme Court has emphasized, "any" is a term of great "breadth."  *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88 (2018).  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (citation omitted).

**B.     EPA's 1992 Regulatory Preamble Did Not Impliedly Exempt Road Construction from the Scope of the "Other Purpose" Regulation**

Petitioner's contrary argument rests on a single passage in a 1992 regulatory preamble preceding the promulgation of the Subpart R regulations:

> *For the road construction scenarios analyzed*, the use of phosphogypsum always resulted in a MIR greater than the outer bound of the presumptively safe level of approximately $1 \times 10^{-4}$.  Therefore, EPA has determined that the use of phosphogypsum in road construction presents an unacceptable level of risk to public health.

57 Fed. Reg. at 23,312 (emphasis added).  Petitioner insists that, as a consequence of this language, EPA "unconditionally rejected all road construction as an other purpose."  Br. 26, 32-33.

But that is not what the regulatory preamble did, and even if it were, a regulatory preamble cannot trump an unambiguous rule authorizing EPA to approve the use of PG in road construction.

1.     In the leadup to issuance of the 1992 rule, EPA considered a host of potential uses of phosphogypsum, including uses in road construction.  In

31

particular, it analyzed hypothetical "road construction scenarios," each of which assumed that PG road surfaces would be crumbled and removed and that 50 years after construction, houses would be built on the former road base and occupied continuously by "reclaimers" for 70 years. 57 Fed. Reg. at 23,312; *see id.* at 23,308 (noting 70-year estimated exposure period for risk calculation); *see* App.240 (summarizing underlying risk estimate findings for one year of exposure). Based on those assumptions, EPA concluded that the hypothetical road construction scenarios presented an unacceptable risk level and declined to categorically authorize them in the way that it categorically authorized use of PG for agricultural and research purposes.

But nothing in that decision reflected a decision to categorically *ban* road construction as a permissible "other purpose" in situations that did not present the same risks as the hypothetical scenarios. In the section of the regulatory preamble entitled "Description of Final Rule," EPA stated that "[t]he use of phosphogypsum in agriculture will be permitted," "[t]he use of phosphogypsum in research and development will also be permitted," and "[o]ther uses of phosphogypsum will be prohibited without prior EPA approval." 57 Fed. Reg. at 23,316. There is no suggestion anywhere that road construction is an exception, and as petitioner concedes, no language to that effect appears in the actual promulgated rule itself. Although petitioner focuses on EPA's statement that it had "determined that the

use of phosphogypsum in road construction presents an unacceptable level of risk to public health," Br. 26 (citing 57 Fed. Reg. at 23,312). petitioner ignores the sentence immediately preceding that statement, which explains that the analysis concerned the "road construction scenarios analyzed."  57 Fed. Reg. at 23,312. The reference to "unacceptable level[s] of risk" applies to particular construction scenarios; it does not purport to interpret or cabin EPA's separate provision authorizing applications to use PG for "other purposes," each of which must be evaluated on an individual basis.

Mosaic's pilot project demonstrates precisely why EPA's conclusions in the 1992 regulatory preamble could not possibly have been intended to permanently ban the use of PG in road construction, no matter the circumstances.  None of the assumptions that drove EPA's conclusion in 1992 reasonably apply to the Mosaic pilot.  The construction site for Mosaic's test road is within Mosaic's privately owned industrial facility, which includes chemical manufacturing and PG stacking. EPA explained that the site is already under existing and extensive state and federal regulatory oversight, making any reclaimer risk categorically different than a risk of reclaimer for roads built on public property.  App.73-75.  As EPA's risk assessment noted, any redevelopment of Mosaic's facility would require comprehensive consideration of any radiological and other risks, with or without the pilot road, and the pilot would not increase levels of PG.  App.73.  It would

have been wholly *un*reasonable for EPA to evaluate Mosaic's pilot proposal using risk analyses that assume the site would be converted to residential housing in the next 50 years and occupied for the next 70.

EPA, moreover, has long held the view that the "other purpose" regulations cover the use of PG in road construction. EPA's 2005 workbook guidance for companies considering seeking approval for "other purposes," for example, listed "[r]oad base material" as one of several possible other uses of PG that "have been explored over the years." *See* App.302. EPA adopted the same position in its 2020 decision approving The Fertilizer Institute's application for permission to use PG in road construction. *See* App.90-91. Its conclusion that the 1992 regulatory preamble was not intended to categorically exclude road construction was in no way newly minted for purposes of approving Mosaic's project.

2. In any event, petitioner's arguments about the 1992 regulatory preamble are ultimately immaterial. Even if EPA were wrong about the 1992 preamble and petitioner were right, that still would not render EPA's approval of Mosaic's pilot unlawful or arbitrary. The "other purposes" provision is an actual rule, codified in the Code of Federal Regulations, and it unambiguously does not exclude road construction. The sentence on which petitioner relies does not appear in the Code of Federal Regulations. And it is hornbook law that agency statements that "appear in the preamble [of a rulemaking] and the Federal Register but do not

appear in the Code of Federal Regulations do not enjoy the force of law." *Blanco v. Samuel*, 91 F.4th 1061, 1076 (11th Cir. 2024). This Court noted in *Blanco* that it was "unaware of any authority suggesting that the language an agency uses in a preamble should be awarded the same weight as if the agency chose to formally use the language in the regulation itself." *Id.* And regulatory enactments that lack the force of law bind neither regulated parties nor the agency. *See Wilgar Land Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 85 F.4th 828, 837-38 (6th Cir. 2023). As a result, even if petitioner were characterizing the 1992 preamble language correctly, EPA would not have been bound by it when applying the text of the enacted Subpart R regulations to Mosaic's pilot.

Petitioner's reference to *Kisor* deference (Br. 17) is a red herring. That doctrine addresses whether courts should "defer[] to an agency's reading of its own genuinely ambiguous regulation." *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (citing *Auer v. Robbins*, 519 U.S. 542, 461 (2021); *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019)). To the extent the Court concludes that the regulatory preamble renders the "other purposes" language ambiguous, *Kisor* would require the Court to defer to EPA.

Here, however, EPA does not require deference to an "interpretation" of the "other purposes" regulation because its text is plain: EPA may approve requests for "distribution and/or use of phosphogypsum for any other purpose" beyond

agriculture and research if the regulation's procedural and safety requirements are met.  40 C.F.R. § 61.206(b), (c), (d).  Road construction indisputably constitutes an "other purpose." It is petitioner that tries to inject ambiguity and reinterpret the regulation by claiming—incorrectly—that a sentence in a non-binding regulatory preamble can amend the plain text of the regulation.

None of the authority petitioner cites is to the contrary.  *Advanced Energy United, Inc. v. FERC*, 82 F.4th 1095 (D.C. Cir. 2023), reviewed a complex set of Federal Energy Regulatory Commission (FERC) orders permitting creation of a new energy transmission service across several Southeastern states known as "SEEM."  *See id.* at 1099-1100.  One element of the dispute was whether SEEM constituted a "loose pool" entity; per a FERC regulation, Order No. 888, one factor informing whether an entity is a loose pool is whether it contains any  "discounted … transmission arrangements."  *Id.* at 1113-14.  The D.C. Circuit concluded that the definition of "loose pool" was ambiguous; that FERC's interpretation of the phrase "loose pool" was inconsistent with its interpretation of that phrase in a prior order that had the force of law; and that FERC had not adequately explained the apparent conflict between the prior order and the challenged orders.  *Id.* at 1104, 1115.

Nothing in that analysis sheds light on the dispute here.  The language that *Advanced Energy United* relied on appeared in a FERC order that had the force of

law; the case stands merely for the uncontroversial proposition that an agency's statements in a regulation or order inform the regulation or order's meaning. But that principle does little work here for the reasons already explained: the text of the "other purposes" Subpart R regulation is plain, and nothing in the regulation conflicts with EPA's present interpretation or its approval of the Mosaic pilot.

*IAL Aircraft Holding, Inc. v. FAA*, 206 F.3d 1042 (11th Cir. 2000), a ruling this Court later vacated as moot, *see* 216 F.3d 1304 (11th Cir. 2000), is equally off-point. There, the Court declined to defer to an agency's novel *litigation* position about a regulation's meaning—not an interpretation applied in a regulatory action. 206 F.3d at 1046. The principle that agency litigation positions do not merit deference is irrelevant here, because EPA is not seeking deference to a litigation position. EPA's interpretation was clearly articulated in the pilot project approval; it is not a "post hoc rationalizatio[n]" for "past agency action." *Kisor*, 588 U.S. at 579.

Petitioner lastly cites *City of Idaho Falls v. FERC*, 629 F.3d 222 (D.C. Cir. 2011), which determined that FERC was obligated to conduct a new notice-and-comment rulemaking before changing its method of calculating certain fees. *See id.* at 228. FERC had previously adopted by regulation a joint calculation methodology for land values used by the U.S. Forest Service (USFS) and the Bureau of Land Management (BLM) that included annual inflation adjustments;

when those agencies later changed their joint methodology, FERC argued that under its regulation, which required FERC to "update" its fees to reflect changes in USFS's land values, its methodology had to change automatically to the new USFS-BLM framework. *See id.* at 225-26.

The D.C. Circuit disagreed, finding that FERC's regulation adopting the initial USFS-BLM methodology was premised on its substantive reasonableness, not merely the fact that other agencies used it. *See id.* at 228-29. The D.C. Circuit accordingly held that FERC was required to undergo rulemaking to *change* the calculation methodology embodied in a promulgated rule. But EPA here is not seeking to change any of the language in the promulgated "other purposes" rule. Nor is EPA "improperly divorc[ing] the regulation's text" from the underlying rulemaking process. *Id.* at 230. EPA's application of the plain text of the "other purposes" regulation does not undermine EPA's consideration of public input during the 1992 Subpart R rulemaking, unlike FERC's attempt to evade notice-and-comment in *City of Idaho Falls*.

### C. Petitioner's Procedural Challenges to the Pilot Approval Fail

EPA's approval of the Mosaic pilot did not constitute a revision of the Subpart R regulations, nor an impermissible or "surprise" interpretation of the term "other purpose" that breaks from the regulation's plain text. Petitioner's claims

38

that it lacked fair notice of EPA's position and that the pilot approval misinterprets or amends the regulations fail for multiple reasons.

### 1. EPA has not changed its position.

EPA has not "reversed" its approach to road construction adopted in the Subpart R regulations in 1992. *Contra* Br. 26. For the reasons just explained, EPA did not interpret the Subpart R regulations to prohibit all use of PG in roads in 1992, nor has it ever evinced that position.

### 2. EPA has not amended the Subpart R regulations.

Petitioner's claim (at 30-32) that EPA's approval of the Mosaic pilot somehow amended the Subpart R regulations is groundless. Agencies must follow the same process to revise rulemakings as to promulgate them, *see Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015), but that principle has no application here. None. EPA applied the regulation it adopted in 1992; it has not "retroactively change[d] the rules at will." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 122 (D.C. Cir. 2008); *see* Br. 33 (citing *NetworkIP*, 548 F.3d at 122). Indeed, if EPA were to re-promulgate the 1992 rule to make clear that "any other purpose" means what it says and includes road construction, it would not need to change a single word in 40 C.F.R. § 61.206(d).

### 3. The fair notice doctrine is inapplicable.

Petitioner's appeal to the "fair notice" doctrine is equally meritless. Br. 28-30. As petitioner concedes (at 29), that doctrine derives from the constitutional

principle that "[a]n enforcement action may violate due process if the defendant does 'not have fair notice of the agency's interpretation' of a law or statute, even if that interpretation is reasonable." *SEC v. Ibrahim Almagarby*, 92 F.4th 1306, 1319 (11th Cir. 2024) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1331 (D.C. Cir. 1995)). That principle "applies to administrative actions," but "in only a 'very limited' set of cases" involving enforcement against regulated parties. *Id.* (quoting *Suburban Air Freight, Inc. v. TSA*, 716 F.3d 679, 684 (D.C. Cir. 2013)). In those situations, "due process requires 'fair notice of what was forbidden.'" *Id.* (quoting (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012)).

The due process clause does not entitle petitioner to notice of EPA's regulatory interpretation of a regulation of Mosaic. EPA is not enforcing any regulation against petitioner. Petitioner is not being punished in any way or deprived of any of the interests protected by the due process clause. Petitioner's theory seems to be that anyone who claims to be collaterally affected by a regulation of *somebody else* is entitled to some unspecified degree of "notice" of how that regulation will apply. That is not the law.

In any event, petitioner had fair notice of EPA's position. Even if the Court concludes that the phrase "any other purpose" is unclear, EPA has made clear since at least 2005 that that phrase encompasses road construction. *Supra* at p.34.

### 4. The pilot approval is not nationally applicable.

EPA's approval of Mosaic's pilot also does not contravene the Clean Air Act's judicial review provisions. *Contra* Br. 34-37. If EPA sought to revise Subpart R, proposing new text for the Code of Federal Regulations, that would be a "nationally applicable" action that the Clean Air Act makes exclusively reviewable in the U.S. Court of Appeals for the D.C. Circuit. 42 U.S.C. § 7607(b)(1). But nothing in the pilot approval is nationally applicable.

Indeed, petitioner argued at length in response to the Court's jurisdictional questions that the pilot approval is not nationally applicable and that venue is proper in this Court, Doc. 10 at 4-11, and the Court agreed and so held, Doc. 16-2 at 2-3. Petitioner's reversal for its merits brief should be disregarded, as should its claim that rejecting its newfound position would "result in a deluge of litigation around each individual approval in different circuit courts." Br. 35-36. To date, EPA has approved no other PG road construction pilots, let alone full-scale projects. If that were to occur, petitioner then can try to challenge perceived inadequacies in the decisions in the appropriate regional circuit, if it can demonstrate standing. 42 U.S.C. § 7607(b)(1). Nothing about that scenario is cause to accept petitioner's recharacterizing of EPA's straightforward application of the "other purposes" regulation to Mosaic's pilot as an amendment to Subpart R.

41

**III. EPA Reasonably Applied the Proper Safety Threshold to Mosaic's Pilot**

EPA properly applied the safety threshold of $3 \times 10^{-4}$ it has used since at least 1992. *See* 57 Fed. Reg. at 23,311 (1992 Rule); 54 Fed. Reg. at 51,677 (1989 PG NESHAP rule). Petitioner nevertheless protests (at 38-39) that the "other purposes" regulation prohibits EPA from approving any project with a risk greater than $9 \times 10^{-5}$, the maximum individual lifetime risk EPA calculated for PG stacks in 1989, by virtue of the requirement that an approved use must be at least as protective of public health as storing PG in stacks. 57 Fed. Reg. at 23,306; *see* 54 Fed. Reg. at 51,675.

That claim is both meritless and irrelevant here. First, petitioner's challenge to the risk threshold EPA must apply to "other purposes" applications is an issue of law that arises from the 1992 Rule, not from approval of Mosaic's application. Indeed, the section of petitioner's brief raising this issue barely mentions the pilot approval at all. *See* Br. 38-44. In any event, the 1992 Rule made clear that a risk threshold of $3 \times 10^{-4}$ would apply and that level is "presumptively safe." 57 Fed. Reg. at 23,311-12. Indeed, as EPA explained, that is precisely the risk threshold that EPA applied in 1992 to categorically approve PG for agricultural and research uses—an approval that petitioner takes no issue with. App.91. Petitioner argues that EPA's prior conclusion that agricultural and research uses with risks of up to "3 in 10 thousand" are "acceptable" took into account "quantity restrictions" and

other features of use for those purposes.  Br. 42-43.  But this is a non-sequitur.  A

3 x $10^{-4}$ risk presented by PG in agriculture or research is the same risk to health as

a 3 x $10^{-4}$ risk presented by use of PG for a road or some other purpose.

In any event, this issue is purely academic: the risk thresholds Mosaic and

EPA calculated for the pilot project are orders of magnitude smaller than even the

stricter threshold petitioner advocates.  The risk for truck drivers moving PG to the

test road site was 2.1 x $10^{-7}$; for construction workers, 2 x $10^{-6}$; for workers at the

Mosaic site not involved in the pilot, 1 x $10^{-6}$; and for nearby residents, "several

orders of magnitude less" than the 6.6 x $10^{-7}$ risk for someone living 100 meters

from the road.  App.70-73.  As a result, the Court need not reach the question of

the proper maximum threshold.  To the extent the Court reaches the issue and

determines that EPA erred, that would be paradigmatically harmless error.  *See,*

*e.g.*, *Salmeron-Salmeron v. Spivey*, 926 F.3d 1283, 1287 (11th Cir. 2019)

(discussing administrative law harmless error standard).

## IV.   EPA's Assessment of Mosaic's Pilot Project Was Reasonable and Reasonably Explained

Petitioner finally argues on several unsupported, conclusory grounds that

EPA acted unreasonably in reviewing Mosaic's pilot.  Each of these arguments

fails because EPA acted reasonably and sufficiently explained the reasoning

underlying its decisionmaking.  Petitioner's challenges amount to simple dislike

for EPA's policy decisions, not grounds for invalidating the approval as unlawful.

**A.      EPA Considered the Appropriate Exposure Pathways and Populations in Evaluating the Pilot**

Petitioner first makes a series of claims challenging aspects of EPA's risk assessment for the pilot.  Each of these arguments ignores key elements of the pilot and Mosaic's proposal, misconstrues excerpts from EPA's PG guidance, baselessly rejects EPA's reasoned analysis, or all of the above.

*Time of Exposure and Populations Impacted*.  First, petitioner argues that "EPA fail[ed] to analyze dose for more than one year at any point in the risk analysis," which is supposedly insufficient because "the actual exposure will likely occur over a much longer duration."  Br. 46.  But the test road will only take "a few weeks to a month" to construct, which is accurately reflected in EPA's assessment of risks to workers involved in transporting PG to the site and building the road.  App.14-15, App.37, App.70-71.

Petitioner then claims that "Mosaic declined to evaluate the risk for nearest residents [sic]" and "EPA unlawfully accepted this truncated analysis."  Br. 46.  That is again wrong.  EPA conducted an analysis for that population, applying modeling accepted from prior assessments to determine that the lifetime risk for a hypothetical person living 100 meters from a road containing PG is $6.6 \times 10^{-7}$, and that the risk from Mosaic's test road to the closest residents, 2.4 miles away, "would be several orders of magnitude less."  App.73.

*Comparative Risk*.  Petitioner next appears to claim (at 46-47) that EPA failed to properly assess whether the pilot is "at least as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. § 61.206(c).  But EPA's assessment expressly discussed the risk posed by the existing PG stacks at Mosaic's site, and the fact that the closest resident to the facility already lives just 0.55 miles from the closest stack.  App.72-73.  It was wholly reasonable for EPA to conclude that inclusion of PG in a test road located five times further away, covered by asphalt, is "at least as protective" as maintaining the PG in the stack.  App.73.

*Reclaimer Scenario*.  Petitioner then faults EPA and Mosaic for supposedly declining to consider the reclaimer scenario, wherein a person resides for decades on land that was formerly a road containing PG.  Br. 47-49.  This argument again simply ignores detailed discussion in EPA's assessment, which expressly stated: "[b]ecause the future reclaimer scenario could potentially still present lifetime risks above the Agency's defined threshold of 3 x $10^{-4}$, EPA concludes that it cannot be dismissed out of hand."  App.73.

Conducting the relevant analysis, EPA reasonably explained why the reclaimer scenario presents less concern for the Mosaic pilot than in past assessments for PG roads.  Because the test road is located proximate to an existing stack on Mosaic's "privately-owned industrial site," which consists of land that has

45

been "mined for phosphate ore and reclaimed," "[r]emoving the proposed quantity of [PG] from the stack and using it in the proposed pilot project on the same site would not significantly change site characteristics or create additional risk to a future trespasser, reclaimer, or other member of the public." App.73-74; *see* App.75.

Petitioner responds (at 48) that EPA's explanations are insufficient because radium-226 has a 1,600-year half-life, creating risk even after Mosaic's facility ceases operation. But EPA reasonably explained that any redevelopment of Mosaic's facility for residential use would require comprehensive consideration of any radiological and other risks, with or without the pilot road. App.73. The key point underlying EPA's analysis is that the pilot project will not actually increase the amount of PG present at the New Wales site. Petitioner has no response to this point.

Petitioner then claims (at 48) that a 1998 EPA comment response (which petitioner incorrectly dates to the 1992 rulemaking) bars EPA from "cabin[ing] its assessment on its own speculation regarding the likelihood of the property around the stack leaving Mosaic's ownership." That misreads EPA's response and ignores its context. The comment at issue, submitted on 1998 proposed amendments to the Subpart R regulations, argued that EPA was *over*estimating risk to PG researchers because its analysis assumed all of its tested exposure scenarios would occur and

46

did not reduce the anticipated risk based on each scenario's "probability of occurrence."  App.156.  In response, EPA explained that NESHAPs "are based on the exposure to the maximally exposed individual … regardless of the likelihood of that individual's becoming exposed."  App.156.

As the context makes clear, that concept is irrelevant here.  A resident of a hypothetical redeveloped Mosaic facility hundreds of years from now would not be "the maximally exposed individual" in the way that EPA used that phrase in 1998.  App.156.  Nothing in EPA's statement precludes (or has anything to do with) EPA's finding here that reclaimer scenarios for the Mosaic test road site would properly be considered as part of a broader analysis of risks from general redevelopment of Mosaic's facility, and that a reclaimer scenario would not be impacted by the *pilot project*.  Nor did EPA "arbitrarily assume that a project's location is justification to ignore long-term risks of removing [PG] from the stack for use in road construction" as petitioner claims (at 49).  EPA reasonably explained why its analysis was consistent with the evidence before it and why the reclaimer scenario presented no limitations for the pilot project in the specific context of a project that would be fully confined to land already containing PG and that would not increase the amount of PG on that land.  App.73-75.

*Approach to Road Use Compared to Stack Storage*.  Nor did EPA adopt a "new position that phosphogypsum paved into a road near a stack presents no

47

difference from keeping the phosphogypsum in the stack." Br. 50. EPA evaluated relevant features of the pilot project, including that the test road is located proximate to an existing stack on Mosaic's "privately-owned industrial site," and reasonably concluded that removing PG from the stack and using it for the adjacent test road "would not significantly change site characteristics or create additional risk." App.73-74. As noted, EPA made clear that its conclusions were tailored to the pilot project and that future projects would undergo separate analysis. App.74. EPA's reasoning and explanation easily satisfied its obligations under the APA to "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Gray Television*, 130 F.4th at 1212 (quoting *Prometheus Radio*, 592 U.S. at 423).

*Purpose of the Pilot*. Petitioner claims EPA's assessment of the pilot "contradicts the described purpose and objectives of a pilot project." Br. 50. Citing statements in EPA's 2005 workbook guidance that "[a] small-scale study is the intermediate step between laboratory testing and full-scale implementation of the alternative use" and "should simulate alternative use conditions as much as possible," petitioner asserts that EPA's assessment precluded Mosaic's pilot from serving that purpose because EPA "purposefully dismisse[d] risk pathways that previously justified a prohibition of [road construction] use merely due to the unique characteristics of the site." *Id.* (citing App.303).

That objection fails on two levels.  First, EPA did not "dismiss" any risk pathways in evaluating the pilot due to the project's "unique characteristics;" it *considered* each pathway in the context of those characteristics and determined that the risk values for each were acceptable.  App.73-74.  Second, the "purpose and objective[]" of the pilot as proposed is "to demonstrate the range of PG road construction designs that meet the Florida Standard Specifications for Road and Bridge Construction."  App.12.  A test road built on Mosaic's private industrial property is well suited (in fact, ideally suited) for that purpose.  As EPA noted, any future PG road projects "outside the Mosaic property" will be considered on their own facts.  App.74.

Again citing the 2005 workbook, Petitioner claims that the pilot cannot be an "'intermediate step' to full-scale implementation of road use" because "all environmental monitoring of this site will cease within eighteen months of construction."  Br. 50-51.  That is misleading.  Mosaic's facility is subject to ongoing environmental monitoring requirements independent of the pilot, with which it "will need to remain in compliance" throughout and after the project.  App.74.  And the eighteen-month period discussed in EPA's assessment is a "minimum" that Mosaic proposed for groundwater monitoring, which EPA agreed "may increase the understanding" of PG components' mobility in groundwater, at least over the time period studied.  App.74-75.  Petitioner's assertion that Mosaic's

49

monitoring program somehow undermines the pilot's purpose is unavailing—especially because the 2005 workbook's discussion of small-scale projects serving as "intermediate steps" was not a threshold requirement or binding obligation, but merely a description of how PG other-purposes proposals could be presented to EPA for the most efficient review. App.303.

In sum, EPA's assessment of Mosaic's pilot satisfied all relevant requirements of the Clean Air Act, APA, and EPA's implementing regulations. Petitioner's superficial and conclusory objections to EPA's reasoned analysis offer no basis to overturn the agency's reasoned decisionmaking.

## B. EPA Reasonably Accepted Mosaic's Radium Sampling Data

Petitioner lastly challenges EPA's acceptance of the radium concentration values for samples of Mosaic's PG that Mosaic included with its proposal, which were approximately three years old when submitted. Br. 51-53; *see* App.74; App.12. Petitioner raises interrelated objections to the sample data and EPA's assessment, which fail for similar reasons.

Petitioner primarily claims EPA acted arbitrarily when it determined that a statement in the 2005 workbook—that radium sampling for other-purposes applications should be less than 12 months old—did not bind EPA or Mosaic because it is inconsistent with the relevant Subpart R regulation. Br. 51-52; App.64. But EPA's determination was plainly correct as a matter of law; guidance

documents are by definition non-binding and cannot impose requirements on the agency or regulated parties. *See Lewis v. City of Union City*, 934 F.3d 1169, 1182 (11th Cir. 2019) (guidance is "not binding"); *Nat'l Mining Ass'n v. Sec'y of Lab.*, 589 F.3d 1368, 1371 (11th Cir. 2009) (a guidance document "leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case" (quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983)); *see also Gelber v. Akal Sec., Inc.*, 14 F.4th 1279, 1292 n.8 (11th Cir. 2021) (Branch, J., dissenting) (discussing effect of guidance and explaining "[u]nlike regulations, interpretations are not binding and do not have the force of law" (quoting *Freeman v. Nat'l Broad. Co.*, 80 F.3d 78, 83 (2d Cir. 1996)). Indeed, the workbook guidance itself expressly states that it "does not replace or change the final rule." App.295.

Moreover, EPA reasonably explained why Mosaic's sampling results were adequate and reasonable for evaluating the pilot. EPA assessed Mosaic's proposal using risk scenarios that assumed a radium concentration of *double* the average of Mosaic's samples, meaning the risk assessment remains valid even if the actual radium content of Mosaic's PG is 100 percent greater than the 2019 samples. App.64. Petitioner argues that the assumption is insufficient and inaccurate because an EPA study from 1988, over 30 years ago, reported a radium concentration approximately five times as high as Mosaic's samples in another

Florida company's PG stack.  Br. 53 (citing App.188).  But petitioner ignores that the high value from the 1988 study was a dramatic outlier.  App.188 (citing T.R. Horton *et al.*, EPA 520/5-88-021, *A Long-Term Study of Radon and Airborne Particulates at Phosphogypsum Stacks in Central Florida* (Oct. 1988)).  The radium concentration EPA assumed in its risk assessment was therefore eminently reasonable.  Indeed, it would have been arbitrary and *un*reasonable if EPA rejected Mosaic's submission based on a single outlier finding from a different company's thirty-year-old sample.

Closing the door on petitioner's baseless objection is that EPA's acceptance of Mosaic's samples was preliminary; EPA accurately explained that Subpart R rules require Mosaic to prepare and submit "detailed analyses" of radium concentration when removing PG from its stack, and must submit that data to EPA before beginning construction on the test road.  App.70 (citing 40 C.F.R. § 61.207); *see* App.112-13.  Petitioner simply ignores this robust pre-construction safeguard, which renders petitioner's objection to the samples in Mosaic's *application* essentially academic.

## V.  Remand Without Vacatur is the Proper Remedy for Any Error

EPA's approval of Mosaic's pilot was reasonable and reasonably explained, so the Court should deny the petition for review.  *Gray Television*, 130 F.4th at 1212.  If the Court finds that EPA erred, however, the appropriate remedy is

remand without vacatur.  "[W]here it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate."  *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).  To make that determination, courts consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

None of the errors petitioner alleges here rise to a level of seriousness that would require vacatur.  As EPA's assessment summarized:

> The current proposed pilot project takes place on an existing industrial facility. It is of small scale and occurs at a significant distance from members of the public and is under environmental regulatory oversight at the facility. Mosaic committed in its request to conduct environmental sampling and study of both radiological and non-radiological parameters as part of the pilot project.

App.75.  The overall impact of a test project with those features is de minimis, confined to Mosaic's existing industrial site, and presents risks orders of magnitude below even the most stringent thresholds.  Even if EPA erred on one of the grounds that petitioner identifies, there is no credible balance of the equities that results in Mosaic tearing up the test road before at least conducting the

"environmental sampling program" that EPA found "may increase the understanding of the mobility of both radiological and non-radiological components of phosphogypsum." App.75.

Plainly, petitioner's actual concern in this action is not the pilot itself, but that the pilot will be successful and that other PG road project proposals will follow. If that happens, petitioner will have every opportunity to try to challenge it.

## CONCLUSION

This Court should deny the Petition for Review.

Dated: September 12, 2025

Respectfully submitted,

/s/ Elisabeth S. Theodore
Elissa J. Preheim
Elisabeth S. Theodore
Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
elisabeth.theodore@arnoldporter.com

*Counsel for Mosaic Fertilizer, LLC*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing brief was filed electronically on September 12, 2025 and will therefore be served electronically upon all counsel.

/s/ Elisabeth S. Theodore
Elisabeth S. Theodore

*Counsel for Mosaic Fertilizer, LLC*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) and Eleventh Circuit Rule 32-4 because it contains 12,495 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), according to the word count feature of Microsoft Word. This document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), and Eleventh Circuit Rule 32-3, because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore

*Counsel for Mosaic Fertilizer, LLC*