Case No. 25-10515

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and

LEE ZELDIN, in his official capacity as Administrator
of the United States Environmental Protection Agency,

*Respondents*.

MOSAIC FERTILIZER, LLC*,*

*Intervenor-Respondent.*

## PETITIONER'S REPLY BRIEF

Ragan Whitlock
Ryan Maher
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

*Counsel for Petitioner*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Petitioner Center for Biological Diversity certifies that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Further, the following is a complete list of interested persons pursuant to Eleventh Circuit Rule 26.1-2(a) that have an interest in the outcome of this appeal:

Arnold & Porter Kaye Scholer LLP (Attorneys for Intervenor-Respondent)

Center for Biological Diversity (Petitioner)

Ferenc, Samuel I. (Attorney for Intervenor-Respondent)

Gustafson, Adam (Counsel for Respondents)

Luna, Mario Alfonso (Counsel for Respondents)

Maher, Ryan (Attorney for Petitioner)

McLean, Megan (Counsel for Respondents)

Mosaic Fertilizer, LLC (Intervenor-Respondent)

Preheim, Elissa J. (Attorney for Intervenor-Respondent)

Stander, Robert N. (Counsel for Respondents)

The Mosaic Company, MOS (Parent company of Intervenor-Respondent)

Theodore, Elisabeth S. (Attorney for Intervenor-Respondent)

United States Environmental Protection Agency (Respondent)

Whitlock, Ragan (Attorney for Petitioner)

Zeldin, Lee; Administrator, Environmental Protection Agency (Respondent)

*/s/ Ragan Whitlock*
Ragan Whitlock

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT......................................................................................C-1

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES.................................................................................. iii

ACRONYMS AND ABBREVIATIONS............................................................... vii

INTRODUCTION ...................................................................................................1

ARGUMENT ...........................................................................................................2

I.      The Center has standing to bring this case on behalf of its members. ...........................................................................................................2

    A.     The Center's members have standing....................................................3

       1.     Risks to the Center's members are reasonably anticipated and were not properly considered. .........................................5

       2.     The assessment was premised on deficient data, rendering the risks uncertain.....................................................7

       3.     EPA did not ensure the Road Project was safe in the long term.......................................................................................7

       4.     Vacatur or remand with explicit instructions to complete a lawful risk assessment would redress the Center's injuries. .................8

II.     EPA cannot rely on the "other purposes" provision to approve a road project. ...................................................................................................8

    A.     Approving road use as an other purpose deprives the public of fair notice and contravenes the judicial review requirements of the Clean Air Act. ..............................................................................10

    B.     The plain language of Subpart R supports the Center's interpretation. ......................................................................................13

III.    EPA unlawfully lowered the safety threshold. ..........................................16

    A.     EPA's assessment relies on the incorrect standard................................16

B.     EPA set the risk threshold at 9 in 100,000 and cannot claim deference for a weaker standard. .........................................................18

C.     EPA's application of an arbitrary threshold is a serious error that undermines this and all future assessments. ...................................20

IV.     EPA's approval unlawfully departs from the required analysis. ................21

A.     EPA accepted deficient testing data in violation of the other purposes provision. ...................................................................................21

B.     EPA fails to estimate maximum individual risk. ...................................24

V.     Remedy.........................................................................................................26

CERTIFICATE OF COMPLIANCE ...................................................................29

# TABLE OF AUTHORITIES

## Cases

*Advanced Energy United, Inc. v. FERC,*
　82 F.4th 1095 (D.C. Cir. 2023) ..................................................................9, 15

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
　988 F.2d 146 (D.C. Cir. 1993) ........................................................................26

*Am. Lung Ass'n v. EPA,*
　134 F.3d 388 (D.C. Cir. 1998) ........................................................................21

*Animal Legal Def. Fund v. U.S. Dep't of Agric.,*
　789 F.3d 1206 (11th Cir. 2015) ......................................................................20

*Appalachian Power Co. v. EPA,*
　251 F.3d 1026 (D.C. Cir. 2001) ......................................................................20

*Bidi Vapor LLC v. United States FDA,*
　47 F.4th 1191 (11th Cir. 2022) .......................................................................24

*Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs,*
　781 F.3d 1271 (11th Cir. 2015) ............................................................... 26, 27

*Blanco v. Samuel,*
　91 F.4th 1061 (11th Cir. 2024) ..................................................................9, 19

*Burlington Truck Lines v. United States,*
　371 U.S. 156 (1962) .......................................................................................13

*Catawba County v. EPA,*
　571 F.3d 20 (D.C. Cir. 2009) .........................................................................23

*Christopher v. SmithKline Beecham Corp.,*
　567 U.S. 142 (2012) .......................................................................................12

*City of Idaho Falls v. FERC,*
　629 F.3d 222 (D.C. Cir. 2011) .......................................................................23

*Collins v. Experian Info. Solutions, Inc.,*
　775 F.3d 1330 (11th Cir. 2015) ......................................................................15

*Ctr. For A Sustainable Coast v. U.S. Army Corps of Eng'rs*,
  100 F.4th 1349 (11th Cir. 2024) ...................................................8

*Dominion Transmission, Inc. v. Summers*,
  723 F.3d 238 (D.C. Cir. 2013) ...................................................27

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................... 14, 26

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...................................................6

*Ft. Stewart Schools v. FLRA*,
  495 U.S. 641 (1990) ...................................................21

*Global Green, Inc. v. SEC,*
  631 Fed. Appx. 868 (11th Cir. 2015) ...................................................11, 12

*Golden Living Ctr. Mt. View v. Sec'y of HHS*,
  832 Fed. Appx. 967 (6th Cir. 2020) ...................................................12

*IAL Aircraft Holding, Inc. v. FAA*,
  206 F.3d 1042 (11th Cir. 2000) ...................................................23

*Kelley v. Selin*,
  42 F.3d 1501 (6th Cir. 1995) ...................................................4

*King v. Burwell*,
  576 U.S. 473 (2015) ...................................................15

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ...................................................19

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................... 17, 25

*NRDC v. EPA*,
  489 F.3d 1250 (D.C. Cir. 2007) ...................................................26

*Nuclear Energy Inst., v. EPA*,
   373 F.3d 1251 (D.C. Cir. 2004) ................................................................3

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ...................................................................... 14, 26

*PPG Indus., Inc. v. United States*,
   52 F.3d 363 (D.C. Cir. 1995) ...............................................................27

*Rafferty v. Denny's, Inc.*,
   13 F.4th 1166 (11th Cir. 2021) .............................................................18

*Riverbend Farms, Inc. v. Madigan*,
   958 F.2d 1479 (9th Cir.1992) ...............................................................21

*Salmeron-Salmeron v. Spivey*,
   926 F.3d 1283 (11th Cir. 2019) ............................................................20

*Sierra Club v. Flowers*,
   526 F.3d 1353 (11th Cir. 2008) ............................................................26

*Sierra Club v. Johnson*,
   436 F.3d 1269 (11th Cir. 2006) ........................................................3, 6

*Sierra Club v. Martin*,
   168 F.3d 1 (11th Cir. 1999) .................................................................16

*Sierra Club v. Und States Army Corps of Eng'rs*,
   464 F. Supp. 2d 1171 (11th Cir. 2006) .................................................18

*St. Luke's Hosp. v. Sebelius*,
   611 F.3d 900 (D.C. Cir. 2010) .............................................................23

*United States Steel Corp. v. U.S. EPA*,
   595 F.2d 207 (5th Cir. 1979) ...............................................................20

*Watkins v. City of Montgomery*,
   775 F.3d 1280 (11th Cir. 2014).............................................................19

*Wright v. FEMA*,
   913 F.2d 1566 (11th Cir. 1990) .............................................................9

**Statutes**

42 U.S.C. § 7607(b)(1)..................................................................9, 12

**Rules**

54 Fed. Reg. 51,654 (Dec. 15, 1989) ................................. 5, 7, 8, 16, 17, 18, 19, 24

55 Fed. Reg. 13,480 (Apr. 10, 1990) ..........................................10, 11, 13

57 Fed. Reg. 23,305 (June 3, 1992) .... 3, 5, 6, 7, 9, 10, 11, 13, 15, 16, 17, 19, 24, 26

**Regulations**

40 C.F.R. § 61.204 ........................................................... 15, 17

40 C.F.R. § 61.205 ........................................................... 15, 17

40 C.F.R. § 61.206 ...............................................................17

40 C.F.R. § 61.206(b)...........................................................14

40 C.F.R. § 61.206(b)(6) .......................................................21

40 C.F.R. § 61.206(b)(8) .....................................................5, 24

40 C.F.R. § 61.206(c) ....................................................... 7, 16, 18, 19

40 C.F.R. § 61.207 ...............................................................23

40 C.F.R. § 61.207(a)(1) .......................................................22

40 C.F.R. § 61.208(8)...........................................................25

**Other Authorities**

*Certain*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/certain (last visited Oct. 2, 2025)..................................16

*Other*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/other (last visited Oct. 2, 2025) ..................................14

# ACRONYMS AND ABBREVIATIONS

APA ............................................................... Administrative Procedure Act

EPA.................................................................Environmental Protection Agency

MIR ...............................................................Maximum Individual Risk

NESHAP ......................... National Emission Standard for Hazardous Air Pollutants

# INTRODUCTION

For the first time since the Environmental Protection Agency (EPA) required that phosphogypsum be stored in stacks to minimize health risks, the fertilizer industry has been authorized to remove it for construction of a "pilot" road project at Mosaic's New Wales Facility (Road Project).

EPA previously reviewed this use and appropriately rejected it, finding it presented "an unacceptable level of risk to public health." This was not a passing reference. The current regulations were issued after the fertilizer industry petitioned EPA to reconsider its requirement that phosphogypsum be placed in stacks. The industry sought to use phosphogypsum in agriculture, road construction, and research. EPA reconsidered, authorized two of the requested uses and denied the third—unequivocally.

In addition, the regulations are explicit: any use of phosphogypsum for other purposes must be at least as protective as placement in a stack, which has been repeatedly defined as presenting a fatal cancer risk to the public of 9 in 100,000. However, the Road Project was evaluated with an acceptable risk threshold of 3 in 10,000 fatal cancer risk (or 30 in 100,000), a threshold established for "certain uses" in agriculture or research—regulations that contain no mandate to ensure the use is as protective as placement in stacks. These distinct thresholds, found in distinct regulations, cannot be reconciled.

EPA further ignored the long-standing definition of maximum individual risk (MIR) to include a "70-year lifetime" and accepted patently deficient radium-226 testing. EPA claimed in its brief that Mosaic Fertilizer, LLC (Mosaic) must submit new testing results prior to construction. This was quickly contradicted by Mosaic's filing, submitted only twelve minutes later, admitting it started construction the week of August 25th.

Mosaic's brief was the first time EPA's Office of Radiation and Indoor Air was made aware that construction had started, undermining EPA's claim and violating an explicit assurance made to the Center during this litigation.[1] EPA clearly has no post-approval mechanisms to ensure this project protects the public. Individually or combined, these are not actions indicating a proposed use is now safe enough to protect the public.

## ARGUMENT

### I. The Center has standing to bring this case on behalf of its members.

The Center meets the three elements of associational standing. EPA and Mosaic err in claiming that the Center does not have a member who has suffered a

---

[1] Counsel for EPA explicitly stated via emails pertaining to this litigation that Mosaic is required provide notice at least 30 days prior to beginning construction, and that the Center would, in turn, be notified in exchange for its non-opposition to an extended briefing schedule. No such notice was provided to the Center. These emails are on file with the Center.

redressable injury. The Center also plainly meets the second and third requirements of associational standing, neither of which have been challenged.

### A.     The Center's members have standing.

The Center's members have demonstrated an injury in fact that is (a) concrete and particularized and (b) actual or imminent; a causal link between their injury and the conduct they complain of; and that their injury will likely be redressed with a favorable decision by the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

The Center's members are injured by the release of a hazardous air pollutant from roads, a use EPA independently reviewed and rejected due to potential adverse health effects to the public. 57 Fed. Reg. 23305, 23312 (June 3, 1992) ("1992 Rule").

For example, one member lives less than five miles from the project site. Lexner Decl., ¶ 3. This member alleges actual and imminent harm to his physical health, recreational use of his property, and property value. Lexner Decl., ¶¶ 8–10. These injuries are caused by the improperly analyzed cancer risks and increased risk of groundwater contamination. *See Sierra Club v. Johnson*, 436 F.3d 1269, 1279 (11th Cir. 2006) (a member had an injury "as a result of concerns about pollution" and uncertainty "about whether pollution [was] being emitted in illegal quantities."); *Nuclear Energy Inst., v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004) (a

member's concerns of buried waste contaminating groundwater supply and causing adverse health effects were sufficient to support standing); *Kelley v. Selin*, 42 F.3d 1501, 1510 (6th Cir. 1995) (finding an injury from the storage of spent nuclear fuels with the potential to "interrupt enjoyment" of "lakefront property and to diminish its value.").

Although living next to a phosphogypsum stack has conferred past and present injuries to the Center's members distinct from the Road Project, Lexner Decl., ¶¶ 4–7, they stem from a work practice and associated risk standard established to mitigate risks to the public from phosphogypsum.

EPA has not held this Road Project to the same standard and is thus causing new and greater injury. This is the first project moving forward under an elevated 3 in 10,000 risk threshold, which subjects the Center's members a *tripled* "acceptable" cancer risk.

EPA claims that, even if it applied the correct risk threshold, this project would likely protect the public. EPA Br. at 53–54. However, given the significant flaws in application, this argument fails for several reasons: (1) EPA did not consider Center members' reasonably anticipated risks; (2) EPA's risk assessment was premised on deficient data; and (3) EPA did not ensure the Road Project would be safe in the long-term. EPA cannot rely on the results of an unlawful analysis to claim residents near the Road Project lack standing to challenge the

methodology—particularly when that methodology departs from all previous assessments and violates the applicable regulation.

Vacatur or narrowly tailored remand would redress these injuries.

### 1. Risks to the Center's members are reasonably anticipated and were not properly considered.

EPA and Mosaic argue that the Center's members live too far away to incur risk, and that any risk they do incur is likely from the stacks themselves. Both arguments are unavailing and contradicted by EPA's previous findings.

First, the risk posed by phosphogypsum in stacks is borne by residents within a 80-kilometer (49.7-mile) radius of the stack. 1992 Rule at 23306. Yet Mosaic's application declined to analyze impacts to nearby residents because "the closest residence is over 3 miles from the test road location." App'x Doc. 3 at 8; 40 C.F.R. § 61.206(b)(8) (mandating that the applicant provide "an estimate of the maximum individual risk). EPA attempted to brush this under the rug, "scaling" down and assessing 26- and 30-year timeframes, instead of 70 years. Appx' Doc. 4 at 19. This flatly fails as an analysis of the "maximum individual risk" to nearby residents, which EPA repeatedly defined in rulemaking as "the additional cancer risk imposed on a person due to exposure to a pollutant for a 70-year lifetime." 54 Fed. Reg. 51654 (Dec. 15, 1989) ("1989 Rule") at 51660; 1992 Rule at 23305.

EPA further disregarded its mandate by claiming "any risk" would be caused primarily by the volume of phosphogypsum remaining in the stack," a finding

made without citation to any comparative analysis, regulation, rulemaking, or guidance. App'x Doc. 4 at 20.

EPA cherry-picks an out-of-circuit decision where the court found the alleged harm did not exceed regulatory requirements, but the court also acknowledged that the analysis is "context specific" requiring courts to draw on "experience and common sense." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 917 (D.C. Cir. 2015). There, the court found isolated statistics showing higher rates of poultry illness in certain establishments ambiguous and inconclusive. *Id*. Here, where EPA unlawfully used a standard that allows for a higher risk of radiation-caused cancer, there is clear evidence of a new and greater injury to Center members. These are personal, concrete injuries from realistic danger—a tripled fatal cancer risk. *Sierra Club v. Johnson*, 436 F.3d at 1279.

Further, EPA's argument fundamentally misrepresents why phosphogypsum is stacked in the first place: EPA determined that stacking minimized the risk to the public. 1989 Rule; 1992 Rule at 23306. It cannot logically follow that removing phosphogypsum from a stack and using it in road construction—a use EPA previously reviewed and denied—could be used interchangeably without presenting an additional risk. Even less logical is the presumption that this use can confer an elevated risk of cancer without injury.

6

**2. The assessment was premised on deficient data, rendering the risks uncertain.**

As described fully below, *infra* at 21–24, EPA accepted five-year-old radium-226 testing results presented without any description of the sampling procedures. EPA used these results, which are explicitly deficient under Subpart R and EPA guidance, as the basis for its calculation of risk.

Given that a stack only miles from the Road Project has reported radium-226 concentrations as high as 81 pCi/g, more than double the "conservative estimate" of 35 pCi/g, this error significantly undermines EPA's risk determination for the public, including the Center's members.

**3. EPA did not ensure the Road Project was safe in the long term.**

EPA must ensure any proposed use is "at least as protective of public health, in both the short term *and the long* term, as disposal of phosphogypsum in a stack or mine." 40 C.F.R. § 61.206(c) (emphasis added). EPA has failed to satisfy this mandate.

First, as noted above and *infra* at 16–21, EPA departed from the long-standing definition of "maximum individual risk" as the "additional cancer risk imposed on a person due to exposure to a pollutant for a 70-year lifetime." 1989 Rule at 51660; 1992 Rule at 23305. Second, despite recognizing that heavy metals and radionuclides can leach from phosphogypsum and migrate to nearby surface

and groundwaters, App'x Doc. 9 at 2–8, all groundwater monitoring for this project will cease a mere eighteen months after construction. App'x Doc. 4 at 21. This cannot be seen as a "long-term" evaluation of the safety of this project in light of the 1,600-year half-life for radium-226 and the permanent nature of the road. 1989 rule at 51654.

### 4. Vacatur or remand with explicit instructions to complete a lawful risk assessment would redress the Center's injuries.

EPA's approval of the Road Project directly injures the Center's members. Causation and redressability "typically follow" such injury. *Ctr. For A Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1353 (11th Cir. 2024).

As outlined below, *infra* at 8–15, should the Court find EPA is prohibited from evaluating road projects under the "other purposes" provision, but that it did so unlawfully in this instance—remand with instruction to meet the requirements of Subpart R. This should result in meaningful mitigation measures, would also redress these injuries. These measures should include increased groundwater and air quality monitoring requirements to ensure the public, including the Center's members, are protected from additional, personal injury.

## II. EPA cannot rely on the "other purposes" provision to approve a road project.

EPA unequivocally rejected road construction projects in the 1992 Rule. EPA cannot revise the 1992 Rule through the Notice of Approval. A new rulemaking to

amend Subpart R or to promulgate a new NESHAP for radon emissions from roads is required.

First, EPA clearly evinced its intent to exclude road projects as a purpose for which phosphogypsum can be used under the 1992 Rule, and Courts must not defer to an agency's interpretation where "an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *See* Opening Br. at 24–26; *Advanced Energy United, Inc. v. FERC*, 82 F.4th 1095, 1114 (D.C. Cir. 2023); *Wright v. FEMA*, 913 F.2d 1566, 1571 (11th Cir. 1990); *Blanco v. Samuel*, 91 F.4th 1061, 1076 (11th Cir. 2024).

EPA's bait-and-switch interpretation cannot stand because it violates the fair notice doctrine by presenting an unfair surprise. It is entirely unreasonable to suppose that the Center and other injured members of the public had fair notice that Subpart R would not, in fact, protect them from radon emissions from roads when the 1992 Rule was issued, and that they should have challenged the 1992 Rule in the D.C. Circuit.

Thus, EPA's attempt to shoehorn a road project approval under the "other purposes" provision contravenes the judicial review requirements of the Clean Air Act, which provide that petitions for review of EPA's amendment or promulgation of a NESHAP belong in the D.C. Circuit. 42 U.S.C. § 7607(b)(1). This will result

in a flood of litigation around the country, burdening litigants and circuit courts, especially the Eleventh Circuit where phosphogypsum stacks are most common. This also creates the possibility of inconsistent decisions on road project approvals and the requirements of Subpart R as these approvals are litigated one by one, instead of all at once in the D.C. Circuit, like the Clean Air Act requires.

A.   **Approving road use as an other purpose deprives the public of fair notice and contravenes the judicial review requirements of the Clean Air Act.**

EPA and Mosaic attempt to re-write the history of the 1992 rulemaking to support their erroneous interpretation of the other purposes provision. EPA and Mosaic argue that in the 1992 Rule EPA rejected road projects as a *category* of other purpose while leaving open the option of backdooring individual approvals of road projects in the future through the other purposes provision. EPA Br. at 31–34; Mosaic Br. at 31–38.

EPA did not articulate in the 1990 Proposed Rule, 55 Fed. Reg. 13480, 13481 (Apr. 10, 1990) ("1990 Proposed Rule"), or the 1992 Rule that roads could qualify as an other purpose under Subpart R. Nor did EPA specify that it was only evaluating road projects as a use category, or that its conclusion that "the use of phosphogypsum in road construction presents an unacceptable level of risk to public health" meant it was rejecting road projects only categorically while leaving open the option of individual other purpose approvals. *See* Opening Br. at 24–26

(citing 1992 Rule at 23312). EPA's rejection of road projects was unequivocal. *See id.*

Subpart R's context makes clear that EPA excluded road projects without exception. EPA undertook the 1992 rulemaking in response to the fertilizer industry's petitions to reconsider its 1989 NESHAP, which required phosphogypsum placement in stacks. 1990 Proposed Rule at 13481; 1992 Rule at 23314 (discussing "Industry Petitions"). The industry sought to use phosphogypsum outside of stacks for specific uses. *Id.*

EPA then evaluated these agricultural, indoor research, and road uses. *Id.* (EPA stating it is "granting limited reconsideration" of "the specific types of proposed alternative uses of phosphogypsum"). In the 1992 Rule, EPA approved two of these three uses, agricultural and indoor research, and foreclosed the third, roads, based on its unacceptable risk to human health. 1992 Rule at 23312. EPA then left open the option for individual approval of *other* purposes, beyond the three it had specifically evaluated, on a case-by-case basis.

Given this context and history, it is entirely unreasonable to suppose that the Center and other injured members of the public had "fair notice" that Subpart R would not, in fact, protect them from radon emissions from roads when the 1992 Rule was issued. *See Global Green Inc. v. SEC,* 631 Fed. Appx. 868, 870 (11th Cir. 2015) (explaining that the fair notice doctrine is applied "where the agency's

interpretation was 'so far from a reasonable person's understanding of the regulations'" that the agency's interpretation was not discernable) (citations omitted).

EPA thus violates the fair notice doctrine, because to now allow road projects as an other purpose when previously rejecting them has given rise to an "unfair surprise." *Golden Living Ctr. Mt. View v. Sec'y of HHS*, 832 Fed. Appx. 967, 973-74 (6th Cir. 2020) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012)); *Global Green*, 631 Fed. Appx. at 870.

The consequence of this unfair surprise, if EPA is allowed to revise Subpart R without a rulemaking, is the contravention of the Clean Air Act's judicial review requirements, which provide that EPA's decisions on NESHAP belong in the D.C. Circuit. 42 U.S.C. § 7607(b)(1). This will result in burdensome litigation over individual road projects in circuit courts across the country, but especially in the Eleventh Circuit where phosphogypsum stacks are most common. Congress provided for centralized review of EPA actions involving NESHAP in the D.C. Circuit, which is why the case at bar is the only case *ever* where a challenge to EPA's decision on a NESHAP is being heard outside of the D.C. Circuit.

**B.** **The plain language of Subpart R supports the Center's interpretation.**

EPA and Mosaic argue that the language of Subpart R does not explicitly preclude EPA from approving road projects as an "other purpose." EPA Br. at 29–31; Intervenor Br. at 29–31. This is incorrect.

As an initial matter, EPA did not raise its arguments pertaining to the word "any" in the other purposes provision until the agency's response brief. The Court may not accept this impermissible *post hoc* rationalization of EPA's counsel. *Burlington Truck Lines v. United States*, 371 U.S. 156, 168–89 (1962) ("a review court . . . must judge the priority of [agency] action solely by the grounds invoked by the agency." (citation omitted)).

Regardless, the plain language of Subpart R does not allow for road projects as an other purpose, explicitly or implicitly. On the contrary, the plain language and its context supports the exclusion of road projects as an other purpose for which phosphogypsum can be used.

As discussed above, *supra* at 11, the 1992 Rule was the product of the fertilizer industry's requests to reconsider the 1989 Rule to add other purposes for using phosphogypsum. 1990 Proposed Rule at 13481. EPA evaluated the specific purposes advanced by industry in the rulemaking—agricultural uses, indoor research, and road projects. *Id*. EPA responded by approving two purposes, agricultural use and indoor research, rejecting road use, and leaving open the

option for individual approval of *other* purposes, beyond these three, on a case-by-case basis. 1992 Rule at 23312.

Thus, EPA and Mosaic ignore the plain use of the term "other" in the "other purpose" provision to advance their erroneous interpretation. "Other," when considered using common sense, the context of the other purposes provision, and the rulemaking, refers to purposes other than those EPA already evaluated, approved (in the case of the agricultural and indoor research uses), and rejected (road projects).[2] EPA and Mosaic disregard that the other purposes provision could not be used to approve agricultural or indoor research uses, because "other purposes" refers to purposes other than those EPA specifically evaluated in the 1992 Rule.

To support their interpretation, EPA and Mosaic attempt to insupportably limit the tools of regulatory interpretation available to the Court to simply focus on one word: "any" in "any other purpose." EPA Br. at 29–31; Mosaic Br. at 29–31; *see* 40 C.F.R. § 61.206(b).  The Court is not bound to disregard important interpretative tools, like regulatory context and history, and certainly not other words in the provision, like "other," to put on horse blinders just because an

---

[2] Merriam-Webster Dictionary defines "other," among other things, as "being the one or ones distinct from that or those first mentioned or implied." *Other*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/other (last visited Oct. 2, 2025).

agency asserts one interpretation and deems that it is compelled by the plain language.[3]

Rather, courts take a contextual approach to assessing competing interpretations. *See King v. Burwell*, 576 U.S. 473, 486 (2015) ("[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So . . . we must read the words in their context."); *see also Collins v. Experian Info. Solutions, Inc.*, 775 F.3d 1330, 1334 (11th Cir. 2015). The context and history of a rulemaking itself inform the meaning of a regulation's plain language, in addition to the plain language term "other."

The word "any" in the regulation does not override either the word "other" in the regulation, or the bearing of the regulation's context and rulemaking history. Countervailing tools of regulatory interpretation contradict the breadth that the word "any" can convey. *Advanced Energy United,* 82 F.4th at 1114.

In sum, the other purposes provision allows EPA to approve use of phosphogypsum for purposes *other* than those it already evaluated in the 1992 Rule. In the rulemaking, EPA evaluated agricultural use and indoor research and

---

[3] EPA guidance that indicates road projects could be other purposes also has no bearing on the interpretation of the other purposes provision. EPA cannot modify the requirements of the 1992 Rule through guidance, just like it cannot do so through the Notice of Approval. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also* 1992 Rule at 23316 (EPA acknowledging that revising a NESHAP requires a rulemaking).

set forth specific requirements for these purposes. 40 C.F.R. §§ 61.204, 61.205.

EPA rejected road projects unequivocally. 1992 Rule at 23312. EPA can approve

other purposes beyond these three through the other purposes provision, but it

cannot now backdoor road project approvals into place through the provision.

**III.    EPA unlawfully lowered the safety threshold.**

   **A.    EPA's assessment relies on the incorrect standard.**

EPA must assess whether any distribution of phosphogypsum for "other

purposes" "is at least as protective of public health, in both the short term and the

long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. §

61.206(c). This is an explicit standard that EPA is required to assess under its own

regulations. 1989 Rule at 51675; 1992 Rule at 23306. However, EPA continually

conflates "certain" assessments for agricultural and research uses of

phosphogypsum as "essentially equivalent" to its defined "placement in a stack"

standard. EPA Br. at 52. EPA is required to "scrupulously follow" its own

regulations and thus cannot lower the risk threshold by diluting this standard.

*Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999).

EPA selectively references disconnected sections lacking references to

disposal in a stack. Specifically, "[c]ertain uses" is an operative phrase that EPA

continues to ignore, as it indicates that only for the assessments of agricultural and

scientific uses of phosphogypsum may EPA consider the threshold of 3 in 10,000.[4] These "certain uses" received individual regulations at the same time EPA independently evaluated and denied road use.

The discrete approvals of "certain uses" do not give EPA explicit latitude to incorporate a contradictory risk threshold in its assessment of whether an "other use" of phosphogypsum is as protective as placement in the stack. EPA Br. at 50. And while the "certain use" regulations codify specific work practice requirements, the "other purposes" provision does not, and instead requires assessment based solely on whether an alternative distribution of phosphogypsum meets the disposal in a stack standard. *Compare* 40 C.F.R. §§ 61.204–61.205 *with* § 61.206.

Moreover, EPA inaccurately claims that its interpretation has "remained consistent over time," which the record clearly contradicts. EPA defined the risk from placement in a stack as 9 in 100,000 in 1989 and reiterated it in 1992. 1989 Rule at 51675; 1992 Rule at 23306. EPA has not reviewed the risk posed by placement of phosphogypsum in stacks through rulemaking since the 1992 Rule. EPA has only published a "guidance document" that states, without citation, that risk "was estimated to be less than three in ten thousand." This statement contradicts explicit findings issued across multiple rulemakings and represents an

---

[4] See *Certain*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/certain (last visited Oct. 2, 2025) (defined as "fixed, settled").

unexplained departure from EPA's prior positions. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983).

EPA argues that it "makes sense" to redefine the regulatory standard in its assessment of the Road Project, EPA Br. at 50, but doing so directly contravenes its own regulations and prior guidance. A "decision issued without adherence to its own regulations must be overturned as arbitrary and capricious." *Sierra Club v. United States Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1183 (11th Cir. 2006).

### B.  EPA set the risk threshold at 9 in 100,000 and cannot claim deference for a weaker standard.

EPA's argument that it did not define the risk from placement of phosphogypsum in stacks as 9 in 100,000 is unsupported by the text of the 1989 and 1992 Rules, and therefore its new threshold is not entitled to deference. EPA Br. at 52. Once again, the standard EPA is required to assess is whether a distribution "is at least as protective of public health, in both the short term and the long term, as disposal of phosphogypsum in a stack or a mine." 40 C.F.R. § 61.206(c). EPA recognizes this regulation is not ambiguous. EPA Br. at 30. Although the regulation does not specify the exact numerical threshold, Mosaic Br. at 43, it is apparent that the threshold is 9 in 100,000 after "carefully consider[ing] the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021).

First, EPA specifically stated in 1989 that "the maximum individual risk to any individual is 9 x $10^{-5}$"—i.e., 9 in 100,000—when phosphogypsum is placed in a stack. 1989 Rule at 51675. Second, in the same rulemaking, EPA reprinted the 9 in 100,000 threshold in a table labeled "disposal of phosphogypsum in stacks," which is the exact phrase adopted in § 61.206(c). Finally, EPA reiterated in 1992 that "[t]he estimated maximum individual lifetime risk of fatal cancer from radon emissions from phosphogypsum stacks is 9 x $10^{-5}$" or 9 in 100,000. The text of the 1989 and 1992 Rules offer clear evidence of EPA's contemporaneous intent to equate disposal in stacks with a risk threshold of 9 in 100,000. *Blanco*, 91 F.4th at 1076; *see also Watkins v. City of Montgomery*, 775 F.3d 1280, 1284 (11th Cir. 2014). Clearly, "there is only one reasonable construction" of Section 61.206(c), and it is inappropriate to "defer[] to any other reading, no matter how much the agency insists it would make more sense." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019).

Even though EPA concedes that it found that the individual risk from phosphogypsum stacks was 9 in 100,000, it contends that a separate conclusion that the "baseline risk from phosphogypsum was acceptable" may be used to define the standard set forth in § 61.206(c). EPA Br. at 53. However, concluding an *acceptable* risk is not the same as finding the *risk presented* by disposal in the stack. If EPA were allowed to now arbitrarily lower the risk threshold based on this

new justification, it would "permit the agency, under the guides of interpreting a regulation, to create de facto a new regulation." *Kisor*, 588 U.S. at 575.

**C. EPA's application of an arbitrary threshold is a serious error that undermines this and all future assessments.**

This Road Project marks EPA's first approval of an "other use" of phosphogypsum, not only injuring Center's members in assessing the Road Project, but also setting precedent that will guide future approvals. As such, the application of an improper risk threshold is not "irrelevant" or a "purely academic" exercise. EPA Br. at 49; Mosaic Br. at 43. Indeed, Mosaic suggests that EPA can approve "full-scale projects" under the "other purposes" provision. Mosaic Br. at 41. "[T]herefore, this Court cannot excuse the EPA's reliance upon a methodology that generates apparently arbitrary results," especially as it pertains to all future approvals. *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1035 (D.C. Cir. 2001).

A mistake is only "harmless when it 'is one that clearly had no bearing on the *procedure used* or the substance of decision reached.'" *Salmeron-Salmeron v. Spivey*, 926 F.3d 1283, 1287 (11th Cir. 2019) (quoting *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1224 n.13 (11th Cir. 2015) (emphasis added). And in this case, where the EPA's "error plainly affected the procedure used" the Court "cannot assume that there was no prejudice to petitioners." *United States Steel Corp. v. U.S. EPA*, 595 F.2d 207, 215 (5th Cir. 1979). EPA's threshold not only formed the basis of what risk is "acceptable" to the Center's members, but

20

this application will fundamentally alter the standard for which it assesses the short-term and long-term risks for any project moving forward.

Given the immediate and far-reaching consequences, EPA's arbitrary decision to use a 3 in 10,000 threshold—despite its own regulations mandating a more protective threshold—cannot possibly be a harmless error. *See Riverbend Farms, Inc. v. Madigan,* 958 F.2d 1479, 1487 (9th Cir.1992) ("harmless error . . . must therefore focus on the process as well as the result.").

## IV. EPA's approval unlawfully departs from the required analysis.

### A. EPA accepted deficient testing data in violation of the other purposes provision.

EPA advances two arguments to support accepting five-year-old radium-226 testing results, presented without any description of the sampling procedures. First, EPA argues that this project's approval is "conditioned" on Mosaic providing additional data "prior to construction." EPA Br. at 45–46. EPA claims, without citation, that it could require a revised application if the actual results—which were never received by the relevant EPA office—depart significantly from those in the original request. *Id*. at 47. Second, EPA argues that the "other purposes" provision does not explicitly prescribe sampling requirements, only requiring applicants to provide "[t]he average concentration of [radium] in the phosphogypsum to be used" for purposes of the request. EPA Br. at 47; 40 C.F.R. § 61.206(b)(6). Both of these arguments are meritless and fail to satisfy EPA's "heaviest of obligations" to

21

explain its reasoning. *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 392 (D.C. Cir. 1998). Moreover, EPA "must abide by its own regulations." *See Ft. Stewart Schools v. FLRA*, 495 U.S. 641, 654 (1990).

As was made clear by Mosaic's admission that construction of this project started more than a month ago, a critically important fact that EPA's Office of Air and Radiation was completely unaware of, EPA cannot in good-faith claim it has control to make changes or rescind its approval.

Simply put: EPA maintained a procedure for testing that conforms to the regulation, changed it at Mosaic's request, and reserved no options to intervene should the radium-226 concentrations present greater risks. EPA's argument that it has provided a "reasoned explanation for its acceptance of data that did not completely conform to the non-binding 2005 EPA guidance," is not only incorrect, but was conditioned on the fallacy that EPA retained any authority following its Notice of Approval. The primary issue is not that EPA disavowed the guidance relied upon throughout other portions of this approval process, but that the EPA staff who would review the pre-construction testing were unaware that construction had already started until Mosaic informed it, the Center, and this Court contemporaneously. Any insinuation that EPA maintains control to ensure testing is completed was refuted the moment Mosaic's brief was filed.

Moreover, the regulations lay out detailed sampling requirements, including taking a minimum of 30 samples, at regularly spaced intervals, at least once during the calendar year. *See* 40 C.F.R. § 61.207(a)(1). Mosaic failed to meet any of these requirements.

It is absurd to assume that, because sampling requirements are housed in a section within the same chapter titled "Radium-226 sampling and measurement procedures," 40 C.F.R. § 61.207, as opposed to being reiterated in each preceding section, that no requirements exist. Following EPA's logic, Mosaic could have simply stated "Radium-226 concentrations at the New Wales facility are 1 pCi/g," and EPA would be powerless to reject this assertion because the provision "does not set any sampling requirements." EPA Br. at 48. A plain reading would dictate that the regulation outlining procedures for determining average radium-226 concentrations would inform the requirement that an applicant must provide the "average radium-226 concentration." EPA's interpretation is "plainly erroneous" and "inconsistent with the regulation." *IAL Aircraft Holding, Inc. v. FAA*, 206 F.3d 1042, 1046 (11th Cir. 2000); *City of Idaho Falls v. FERC*, 629 F.3d 222, 230 (D.C. Cir. 2011) (citing *St. Luke's Hosp. v. Sebelius*, 611 F.3d 900, 904–05 (D.C. Cir. 2010). EPA's inconsistent treatment is also "the hallmark of arbitrary agency action." *Catawba County v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009).

Despite EPA's attempt to convince this Court that it took a conservative approach to testing by assuming radium levels of 35 pCi/g, EPA Br. at 45–6, phosphogypsum in a stack just miles away from the Road Project has shown values as high as 81 pCi/g. App'x Doc. 9 at 2–7. These deficiencies are, therefore, far from harmless. In addition to precedent-setting for future projects as a "pilot project" destined to be the "intermediate step to full scale implementation" of road use,[5] EPA accepted the "dose factor" of its risk assessment at face value and without any scientific support. This mistake fatally undermines EPA's conclusion. *Bidi Vapor LLC v. United States FDA*, 47 F.4th 1191, 1205 (11th Cir. 2022) (finding that an agency decision is only harmless when its mistake "clearly had no bearing on the procedure used or the substance of the decision reached.").

**B.     EPA fails to estimate maximum individual risk.**

EPA has also failed to provide an estimate of the "maximum individual risk" posed by this project. 40 C.F.R. § 61.206(b)(8). EPA disregarded its long-standing definition of MIR by reducing the length of exposure it analyzed and failing to incorporate any monitoring mechanisms to ensure the Road Project is at least as protective in the long term as placement in stacks.

---

[5] While Mosaic takes issue with the Center mentioning that this project is a steppingstone to more projects, that is explicitly the intention of a "pilot." The fact that Mosaic went to detail to convince this Court that road use is a valuable way to reduce stress on their failing stack systems underscores the ultimate goal. *See* Mosaic Br. at 3, 9.

First, Mosaic failed to provide, and EPA has explicitly failed to determine, the MIR posed by the Road Project as required by § 61.206(b)(8). EPA previously defined MIR as "the additional cancer risk imposed on a person due to exposure to a pollutant for a *70-year lifetime*." 1989 Rule at 51660; 1992 Rule at 23305 (emphasis added). EPA has not analyzed a single risk over the course of a 70-year lifetime. At most, despite Mosaic's failure to analyze any risk to nearby residents, EPA "scaled" down previous lifetime estimates of 26 and 30 years to the Road Project. App'x Doc. 4 at 19. This flatly fails as an analysis of the "maximum individual risk" to nearby residents, which is defined as a lifetime exposure of 70-year.

Further, EPA and Mosaic ignore the explicit mandate that the project's risk be no greater, both in the short *and long term*, as placement in stack systems. 40 C.F.R. § 61.206(c).

For example, EPA touts that its approval "adds a groundwater monitoring requirement." EPA Br. at 13, App'x Doc. 4 at 21–22. Yet all groundwater monitoring for this project will cease eighteen months after construction despite the well-established risks phosphogypsum poses to groundwater. App'x Doc. 9 at 2–8 (noting that surface and groundwater resources may be negatively impacted by the arsenic, lead, cadmium, chromium, fluoride, zinc, antimony, and copper present in phosphogypsum). EPA recognizes this short period of monitoring "may not

necessarily be sufficient to support conclusions about longer term use in a full-scale project." App'x Doc 4 at 21–22. Disregarding the absurdity that a "pilot project" will not support conclusions for full-scale projects, EPA's admission cements the failure to properly ensure this project is at least as protective as placement in stacks over the long term. EPA has thus "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

## V. Remedy

Vacatur of EPA's approval is both the ordinary remedy and necessary in this case. *Sierra Club v. Flowers*, 526 F.3d 1353, 1369 (11th Cir. 2008) (reiterating "vacatur of unlawful agency action is the ordinary APA remedy."); *see also Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993)). The burden is on EPA to show why equity requires anything less than vacatur of its unlawful agency actions. *NRDC v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring) (vacatur places "the burden where it should be—on the losing agency.").

Further, because EPA cannot interpret "other purposes" to include road projects and must engage in a new rulemaking to reverse the 1992 Rule, vacatur is the only appropriate remedy. EPA must follow the same process to revise a rule as it used to promulgate it, i.e., a rulemaking for NESHAP. *Perez*, 575 U.S. at 101

26

(citing *Fox*, 556 U.S. at 515); *see also* 1992 Rule at 23316 (EPA stating "[t]he procedures to be utilized to modify or revise a NESHAP under the old section 112 are the same as the procedures used to promulgate the NESHAP in the first place."). Because EPA cannot rectify this fatal flaw in the Notice of Approval without a new rulemaking, vacatur is the necessary remedy.

However, should the Court find that EPA is permitted to review road projects pursuant to the "other purposes" provision, but has acted unlawfully when reviewing and approving the Road Project, the Center respectfully requests that this approval be remanded for a review consistent with the regulations, which could result in meaningful mitigation measures, among other equitable remedies the Court deems just. "When we determine that an agency made an error of law, our inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 245 (D.C. Cir. 2013) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)); *see, e.g., Black Warrior Riverkeeper*, 781 F.3d at 1291-92 (remanding to the District Court with specific instructions to remand to the agency for reevaluation of the agency action consistent with the Court's opinion and the applicable statutory and regulatory requirements).

On remand, EPA should require testing consistent with the regulatory requirements, should review the application under a risk threshold of 9 in 100,000

fatal cancers to the public, should properly evaluate all risks regulatorily mandated when considering this use, and should require groundwater monitoring that extends a meaningful time.

In addition to thoughtfully evaluating risks to the public and mitigating long-term health impacts, this narrowly tailored remedy would ensure that any future applications are reviewed lawfully. Mosaic and EPA would be unable to cement unlawful practices for reviewing future applications simply by situating a "pilot" project on already contaminated land.

Respectfully submitted,

*/s/ Ragan Whitlock*
Ragan Whitlock
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 426-3653
Email: rwhitlock@biologicaldiversity.org

Ryan Maher
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street, NW, Suite 1300
Washington, DC 20005
Tel: (781) 325-6303
Email: rmaher@biologicaldiversity.org

*Counsel for Petitioner Center for Biological Diversity*

DATED: October 3, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,479 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14.

*/s/ Ragan Whitlock*
Ragan Whitlock